ORIGINAL

1  Wilmer J. Harris, SBN 150407
   wharris@sshhzlaw.com
2  **SCHONBRUN SEPLOW**
   **HARRIS HOFFMAN & ZELDES LLP**
3  715 Fremont Ave., Suite A
   South Pasadena, CA. 91030
4  Telephone No.: (626) 441-4129
   Facsimile No.: (626) 283-5770
5



FILED
CLERK, U.S. DISTRICT COURT

JUL - 9 2020

CENTRAL DISTRICT OF CALIFORNIA
BY                              DEPUTY

6

7  [Additional Counsel on following page]

8  Attorneys for Plaintiff Randy Jacobs

9            UNITED STATES DISTRICT COURT

10      FOR THE CENTRAL DISTRICT OF CALIFORNIA

11
   UNITED STATES OF AMERICA          CASE NO: ED CV20-01373-JGB-SHK
12 ex rel. RANDY JACOBS,
13       and                        **FILED UNDER SEAL PURSUANT**
   STATE OF CALIFORNIA ex rel.      **TO 31 U.S.C. § 3730(b)(2)**
14 RANDY JACOBS
15                                  **COMPLAINT**
16       Relator,
                                    1. VIOLATION OF FEDERAL
17       v.                            FALSE CLAIMS ACT 31 U.S.C.
                                       § 3729 (a) (1) (A);
18
   ADVANCED DERMATOLOGY &           2. VIOLATION OF FEDERAL
19 SKIN CANCER SPECIALISTS, P.C.,      FALSE CLAIMS ACT 31 U.S.C.
   DR. JESSE MITCHELL, and DR.         § 3729 (a) (1) (B);
20 ROUPEN YAGHSEZIAN
         Defendants.                3. VIOLATION OF FEDERAL
21                                     FALSE CLAIMS ACT 31 U.S.C.
22                                     § 3729 (a) (1) (G);

23              4. VIOLATION OF CALIFORNIA
      PAID                             FALSE CLAIMS ACT CAL.
24                                     GOVT. CODE §§ 12651 et seq.
      JUL - 9 2020
25
   Clerk, US District Court
26     COURT 4612                   **DEMAND FOR JURY TRIAL**

27

28

                              COMPLAINT

ORIGINAL

1   Wilmer J. Harris, SBN 150407
    wharris@sshhzlaw.com
2   **SCHONBRUN SEPLOW**
    **HARRIS HOFFMAN & ZELDES LLP**
3   715 Fremont Ave., Suite A
    South Pasadena, CA. 91030
4   Telephone No.: (626) 441-4129
5   Facsimile No.: (626) 283-5770

FILED
CLERK, U.S. DISTRICT COURT

JUL - 9 2020

CENTRAL DISTRICT OF CALIFORNIA
BY _____ DEPUTY

6

7   [Additional Counsel on following page]

8   Attorneys for Plaintiff Randy Jacobs

9              UNITED STATES DISTRICT COURT

10        FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

12  UNITED STATES OF AMERICA        CASE NO. CV20-01373 JGB-SHKx
    ex rel. RANDY JACOBS,
13         and                      **FILED UNDER SEAL PURSUANT**
    STATE OF CALIFORNIA ex rel.     **TO 31 U.S.C. § 3730(b)(2)**
14  RANDY JACOBS
15                                  **COMPLAINT**
           Relator,
16                                    1. VIOLATION OF FEDERAL
17         v.                            FALSE CLAIMS ACT 31 U.S.C.
18                                       § 3729 (a) (1) (A);
    ADVANCED DERMATOLOGY &
19  SKIN CANCER SPECIALISTS, P.C.,    2. VIOLATION OF FEDERAL
    DR. JESSE MITCHELL, and DR.         FALSE CLAIMS ACT 31 U.S.C.
20  ROUPEN YAGHSEZIAN                    § 3729 (a) (1) (B);
           Defendants.
21                                    3. VIOLATION OF FEDERAL
22                                       FALSE CLAIMS ACT 31 U.S.C.
                                         § 3729 (a) (1) (G);
23  
                                      4. VIOLATION OF CALIFORNIA
24  PAID                                 FALSE CLAIMS ACT CAL.
                                         GOVT. CODE §§ 12651 *et seq.*
25  JUL - 9 2020

    Clerk, US District Court
26  COURT 4612
                                     **DEMAND FOR JURY TRIAL**
27

28

─────────────────────────────────────────
COMPLAINT

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Mike Bothwell (Georgia Bar No. 069920)
Mike@whistleblowerlaw.com
**BOTHWELL LAW GROUP, P.C.**
304 Macy Drive
Roswell, GA 30076
Telephone No.: (770) 643-1606
Facsimile No.: (770) 643-1442

Attorneys for Plaintiff Randy Jacobs

COMPLAINT

## COMPLAINT

The United States of America and the State of California, by and through Relator Randy Jacobs ("Relator"), bring this action under 31 U.S.C. § 3729 *et seq.* (False Claims Act "FCA") and the California False Claims Act, Cal. Govt. Code § 12651 *et seq.* to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and Relator, and the California False Claims Act on behalf of the State of California and Relator, and would show the following:

### JURISDICTION AND VENUE

1.      This action arises under the FCA, 31 U.S.C. § 3729, *et seq.* and the California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

2.      This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants live in this jurisdiction, do or transact business in this jurisdiction, and portions of the violations of the FCA described herein were carried out in this district.

3.      This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

4.      Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a).

5.      Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over the subject matter of the claim brought pursuant to the California False Claims Act on the ground that the claim is so related to the claims within this Court's original jurisdiction that they form the same case or controversy under Article III of the United States Constitution.

### THE PARTIES

6.      Dr. Randy Jacobs is a board-certified clinical dermatologist with special expertise in skin cancer prevention, skin cancer treatment, acne care, complexion care, and care for all people with dry and sensitive skin conditions. He received a medical degree upon graduating from the University of Southern

1  California School of Medicine, after which he completed a six (6) year medical
2  residency at the Loma Lide University Medical Center.  His six-year residency
3  included two internship years, one in Internal Medicine and one in Pediatrics, plus,
4  four years of post-graduate education in Dermatology.  Relator has practiced
5  dermatology for approximately thirty-four (34) years and has bee in private practice
6  since 1992.

7      7.    Advanced Dermatology & Skin Cancer Specialists, P.C. ("Advanced
8  Dermatology") has offices in Temecula, Hemet, San Bernardino, Riverside,
9  Corona, Menifee, Sun City, Moreno Valley, Victorville, La Quinta, and Palm
10  Springs, California with their principal business office at 31720 South Temecula
11  Parkway, Suite 200, Temecula, California 92592.

12      8.    Dr. Jesse Mitchell is a Dermatologist at Advanced Dermatology and
13  also listed as the owner of Advanced Dermatology.

14      9.    Dr. Roupen Yaghsezian is a pathologist for Roupen Yaghsezian, M.D.,
15  Inc. who reads slides for Advanced Dermatology & Skin Cancer Specialists, P.C.

16      10.    Roupen Yaghsezian, M.D., Inc. is the entity that received payments
17  from Advanced Dermatology & Skin Cancer Specialists, P.C.

18                    **HEALTHCARE PROGRAMS AND LAWS**
19  **A.  Medicare and Medicaid Programs**

20      11.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*,
21  establishes the Health Insurance for the Aged and Disabled Program, popularly
22  known as the Medicare program.  The Secretary of the United States Department
23  of Health and Human Services ("HHS") administers the Medicare Program through
24  the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

25      12.    The Medicare program consists of several parts.  Medicare Part A
26  provides basic insurance for the costs of hospitalization and post-hospitalization
27  care. 42 U.S.C. § 1395c-1395i-2 (1992).  Medicare Part B is a federally subsidized,
28  voluntary insurance program that covers certain non-hospital medical services and

products including the treatments at issue in this complaint. 42 U.S.C. § 1395(k), 1395(i), 1395(s). Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b) (1994).

13.     In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states expressly state that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid. 42 C.F.R. § 455, *et seq.*

14.     Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over-utilization of services; (4) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

15.     Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, establishes Medicaid, a federally assisted grant program for the States. Medicaid enables the States to provide medical assistance and related services to needy individuals. CMS administers Medicaid on the federal level. Within broad federal rules, however, each state decides who is eligible for Medicaid, the services

covered, payment levels for services and administrative and operational procedures. Medicaid authorizes grants to states for medical assistance to children and blind, aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care.  42 U.S.C. § 1396; 42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v.  The Medicaid Program is jointly funded by the federal government and participating states.

16.    In California, the Medicaid Program is called "Medi-Cal" and is administered by the California Department of Health Care Services ("DHCS") and CDPH. The CMS Medicare regulations at 42 C.F.R. § 409 *et seq.* apply to beneficiaries of both Medicare and Medi-Cal ("dual eligibles")

17.    At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program.  Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act.  By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid.  In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

18.    As a condition of participation in the Medicare and Medicaid programs, providers are required to enter into "Provider Agreements" with the government. 42 U.S.C. § 1395cc. At all times relevant herein, the Medicare Provider Agreement, Form CMS-1561 (07/01), contain the following certification: "In order to receive payment under title XVIII of the Social Security Act, [provider name] as the provider of services, agrees to conform to the provisions of 1866 of the Social Security Act and applicable provisions in 42 CFR." The provider must

1   also certify that it can be subject to criminal penalties if it "knowingly and willfully
2   falsifies" a material fact, or makes any "false, fictitious or fraudulent statement or
3   representation."

4       19.    Advanced Dermatology, as "Provider," executed a Medi-Cal
5   Telecommunications Provider and Biller Application/Agreement (Form 6153) with
6   DHCS. Form 6153 required the provider to certify under penalty of perjury that (1)
7   "all claims for services submitted electronically have been personally provided to
8   the patient;" (2) "[t]he services were medically indicated and necessary to the health
9   of the patient;" and (3) "all information submitted electronically is accurate and
10  complete." By signing Form 6153, the Provider (1) "understands that payment of
11  [Medi-Cal] claims will be from federal and/or state funds, and that any falsification
12  or concealment of a material fact may be prosecuted under federal and/or state
13  laws"; (2) "agrees to retain personal responsibility for the development,
14  transcription, data entry, and transmittal of all claim information for payment"; and
15  (3) "assume[s] personal responsibility for verification of submitted claims with
16  source documents."

17      20.    The Medi-Cal Provider Agreement (Form DHCS 9098 (6/10)),
18  similarly required the provider to agree to "comply with all federal laws governing
19  and regulating Medicaid providers," and that "it may be subject to temporary
20  suspension" if it is under investigation for fraud or abuse of the Medi-Cal program
21  "or other health care programs operated, or financed in whole or in part, by the
22  Federal Government."

23      21.    As a final condition of participation and payment, Medicare providers
24  must execute a Medicare Electronic Data Interchange ("EDI") Enrollment Form in
25  order to submit claims electronically.  The EDI Form requires providers to agree to
26  "be responsible for all Medicare claims submitted to CMS by itself, its employees,
27  or its agents," and to "submit claims that are accurate, complete and truthful." By
28  executing the EDI Enrollment Form, a provider acknowledges that "all claims will

be paid from Federal funds, that the submission of such claims is a claim for payment under the Medicare program, and that anyone who misrepresents or falsifies or causes to be misrepresented or falsified any record or other information relating to that claim as required by this Agreement may, upon conviction be subject to a fine and/or imprisonment under applicable Federal law."

22.    At all times relevant to this Complaint, Defendants were participating as Medicare/Medicaid providers.

23.    At all times relevant to this Complaint, Medicare/Medicaid constituted and continues to constitute a significant source of revenue for Defendants.

24.    Defendants submitted or caused to be submitted false claims for payment to Medicare/Medicaid for services and supplies.

**B.    General Rules for Billing Physician Services**

25.    Under Medicare rules, physician services are reimbursed through a payment system called the Resource Based Relative Value Scale ("RBRVS").  In the RBRVS system, payments for medical services and procedures are determined by the resource costs needed to provide them.  Payments are calculated by multiplying a standardized measure of the amount of resources the service or procedure is expected to require by a region-specific payment rate (conversion factor).

26.    RBRVS payments are based on the Healthcare Common Procedure Coding System ("HCPCS").  HCPCS is a standardized coding system designed to ensure that Medicare, Medicaid and other federal and state-funded health care programs pay for services rendered to patients by physicians and other healthcare professionals in accordance with payment schedules tied to the level of professional effort required to render classes or types of medical care.  To ensure uniform descriptions of medical care rendered and consistent compensation for similar work, Government-funded health care programs tie levels of reimbursement to these standardized codes.

27.    The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association.   Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Surgery," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

28.    Physicians typically submit claims to Medicare and Medicaid for professional services on Form CMS-1500.  The claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient...."

29.    Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395(a)(l)(A).

30.    The medical necessity requirement applies not only to the fact of treatment, but also to the level of treatment provided to the patient. Medicare will not pay for more expensive services if only less expensive services were medically necessary.   For physician services, "medical necessity of a service is the overarching criterion" for determining which CPT code is appropriate.   See Medicare Claims Processing Manual, Chapter 12 § 30.6.1(A).

31.    Although CPT codes are used by Medicare to determine the appropriate levels of reimbursement for specific medical procedures and services, those codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered.  In part to establish that care was appropriately rendered and medically necessary, patient medical records must also document the reason for the patient encounter and relevant history, physician examination findings and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the

provider. The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented. If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible. The documentation must support the CPT codes reported on the health insurance forms. See CMS's 2010 Evaluation and Management Services Guide, at 4.

### C. Other Federal Health Care Programs

32. The Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPUS, and the Federal Employee Health Benefit Program.

33. TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

34. TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer. The program is administered by the Department of Defense and funded by the federal government.

35. CHAMPUS, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

36. The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

### D. The Federal Anti-Kickback Statute

37. The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977. The Anti-Kickback Statute arose out of Congressional concern that payoffs

to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even handful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult to detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

38.    The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute ascribes liability to both sides of an impermissible kickback relationship.

39.    Essentially, if just one purpose of the payment was to induce future referrals, the Medicare statute has been violated.  This is true even if the doctor performs some medical service for the money.  It is not even required that it be the primary purpose—just one purpose of the payment.  In other words, a defendant can have 99 lawful reasons to enter a relationship, but if one other reason is to expect referrals, it is illegal.  It is irrelevant if the funds would have been spent anyway or that Medicare funds were not used to make the illegal payment.

40.    Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § 1320a-7b(g). It is not just the claims tied to the referring physician, but all claims that in any way relate to the referred patient. This would include medicine, scans and x-rays, and a host of other related charges.

41.    The act of referring a patient to a hospital or other provider is not a covered item or service.  Therefore, any payments made to an employee in order to compensate that employee for making referrals are not covered by the employee safe harbor.  This is true even if the majority of an employee's compensation is for the provision of covered services.  As to that portion of the payments that is made

1    to induce referrals and to compensate for an employee's act of referring, the Anti-
2    Kickback Statute is violated.

3        42.    Compliance with the Anti-Kickback Statute is a precondition to
4    participation as a health care provider under the Medicare and Medicaid programs.

5        43.    Either pursuant to provider agreements, claim forms, or other
6    appropriate manner, physicians who participate in a federal health care program
7    generally must certify that they have complied with the applicable federal rules and
8    regulations, including the Anti-Kickback Statute.

9        44.    Violation of the Anti-Kickback Statute subjects the violator to
10   exclusion from participation in federal health care programs, civil monetary
11   penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-
12   7(b)(7), 1320a-7a(a)(7). Any party convicted under the Anti-Kickback Statute must
13   be excluded (i.e., not allowed to bill for services rendered) from federal health care
14   programs for a term of at least five years. 42 U.S.C. § 1320a-7(a)(l). Even without
15   a conviction, if the Secretary of HHS finds administratively that a provider has
16   violated the statute, the Secretary may exclude that provider from the federal health
17   care programs for a discretionary period (in which event the Secretary must direct
18   the relevant State agencies to exclude that provider from the State health program),
19   and may consider imposing administrative sanctions of $50,000 per kickback
20   violation. 42 U.S.C. § 1320a-7(b).

21       45.    The Patient Protection and Affordable Care Act, Pub. L. No. 111-148,
22   § 6402(f)(2), 124 Stat. 119, 759 (March 23, 2010), clarified that "a person need not
23   have actual knowledge of" or "specific intent to commit a violation" of the Anti-
24   Kickback Statute.

25       46.    The enactment of these various provisions and amendments
26   demonstrates Congress' commitment to the fundamental principle that federal
27   health care programs will not tolerate the payment of kickbacks.  Thus, compliance
28   with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to

1   receive or retain reimbursement payments from Medicare, Medicaid and other
2   federal health care programs.

3       47.    The Anti-Kickback Statute (AKS) specifies that "a claim that items or
4   services resulting from a violation of this section constitutes a false or fraudulent
5   claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b (2013).  Accordingly,
6   receiving kickbacks disqualifies all remuneration from Government Payors.

7   **FACTUAL ALLEGATIONS**
8   **A.  MOHS SURGERY**

9       48.    Mohs micrographic surgery (aka "Mohs surgery") is a specialized
10   technique for the removal of skin cancer, and is reserved for particular types of skin
11   cancers, including skin cancers that have recurred following  previous treatment,
12   cancers that are at high risk of recurrence, cancers located in specific areas of the
13   body, large tumors, and neurotropic lesions. It is most commonly used to remove
14   basal cell carcinoma ("BCC") and, much less frequently, squamous cell carcinoma
15   ("SCC").

16       49.    BCC and SCC are both types of non-melanoma skin cancer
17   ("NMSC").  NMSCs most frequently occur on the head and neck.

18       50.    The surgical procedure has also been used to remove melanoma and
19   other malignancies of the skin and mucous membranes.  Mohs surgery is a tissue-
20   sparing procedure, with the objective of fully removing the cancer with as little loss
21   of skin as possible.  Thus, it may allow a more cosmetically aesthetic or functional
22   post-surgical result, in specific areas, than other treatment modalities.

23       51.    Historically, Mohs surgery is often performed by dermatologists
24   because of their expertise in skin cancer pathophysiology, cutaneous
25   histopathology, and dermatologic surgery, including their ability to repair defects.
26   ("Defect" means the surgical wound created by the removal of the specimen.)

27       52.    Training programs in Mohs surgery are available throughout the U.S.
28   via a one (1) or two (2)-year post-residency fellowship.  In 2003, the Accreditation

1  Council for Graduate Medical Education approved procedural dermatology
2  fellowships in which Mohs surgery is often the fellowships' centerpiece.

3      53.    Mohs surgery is usually performed in a medical office properly
4  equipped for the procedure. (It need not be performed in a specialized outpatient
5  surgical facility.) The procedure may take several hours, depending on the extent
6  of the cancer. If facial reconstruction is needed (e.g., a flap) after the Mohs surgery,
7  a lot of additional time is needed.

8      54.    Mohs surgery is a meticulous technique that provides complete
9  microscopic margin control through the taking of horizontal frozen histological
10 sections of the surgical margins of the excised tumor, for the most complete
11 microscopic examination possible. It requires a physician trained in Mohs surgery
12 and pathology to accurately excise and map tumor extensions.

13     55.    The surgery is performed in stages (or "levels") in which the physician
14 removes a single layer of tissue, and performs additional stages, if necessary for
15 each stage, to clear the area of cancer. (A " stage" or "level", in Mohs surgery, is
16 an individual excision in which tissue is removed from the patient, oriented,
17 processed, and microscopically reviewed.)

18     56.    After each stage of Mohs surgery, the physician examines the excised
19 skin with a microscope for the presence of cancer, acting in a dual role as surgeon
20 and pathologist. Only if cancer remains present should the physician proceed to the
21 next stage of removing additional tissue.

22     57.    The goal of Mohs surgery is excision of cutaneous and mucosal
23 malignancies with maximal cure rates and tissue sparing.

24     58.    Mohs surgery is not the only way of treating skin cancer and other
25 cutaneous tumors, which may be treated successfully by standard fusiform excision,
26 cryotherapy, radiation therapy, curettage and electrodessication, intralesional
27 interferon, topical and intralesional 5-fluorouracil, and ablative laser treatment.
28 These alternative methods can provide excellent results.

59.     Mohs surgery is indicated in situations where other treatment modalities have failed.  The Mohs technique is used for recurrent tumors or those at high risk for recurrence, those with clinically indistinct margins, and for those tumors that are anatomically located where tissue conservation is important.  Such locations include the eyelids, ears, nose, lips, and fingers.

60.     Because Mohs surgery is not the exclusive way to treat skin cancer, under Medicare regulations, Mohs surgery is deemed medically reasonable and necessary only if performed based on certain current, accepted diagnoses, and indications.   Medicare separately reimburses for each stage of Mohs surgery performed in removing cancer.  Hence, the more stages of Mohs surgery that are performed, the higher the reimbursement from Medicare.

61.     Although Mohs surgery is not a high-risk form of surgery, it is not without its significant risks.  Caution must be taken to ensure that the vital dyes are pure and sterile, to minimize the risk of placing infected material into the surgical site.  Mohs surgery frequently may involve the nasal, buccal, conjunctiva, and anogenital mucosa. Proper stabilization, exposure, and instrumentation are essential when working on nasal or oral mucosa to ensure access and hemostasis, and thereby prevent uncontrollable bleeding and aspiration of blood.  Further, muscle is commonly encountered during Mohs surgery.  Facial muscle lies just below the dermis, often separated by a thin band of connective tissue and little or no fat. Conservation of function is important for muscle groups. To minimize unnecessary muscle damage, the Mohs surgeon must attempt to split muscles and take only superficial portions for evaluation.

62.     Similarly, nerve tissue is commonly encountered during Mohs surgery. Sacrifice of motor nerves can be debilitating, disfiguring, and distressing. Care must be taken to protect named nerves-although these may have to be removed if there is tumor involvement.

63.     As with other forms of surgery, anesthesia poses its own set of risks.

1   Mohs surgery may require several hours to complete; injecting a mixture of short-
2   and long-acting local anesthetics, such as lidocaine and bupivacaine, imparts more
3   prolonged anesthesia and enhances patient comfort.     To further reduce
4   intraoperative pain, some surgeons apply lidocaine jelly for EMLA topical
5   anesthetic on the wound between stages.  Cutaneous and mucosal Mohs surgery is
6   usually performed under local anesthesia, using a combination of direct infiltration
7   and regional nerve blocks.  Lingual, laryngotracheal, esophageal, and anogenital
8   surgery may require conscious sedation or general anesthesia.

9       64.    Mohs surgery may also leave a scar.  In many cases, however, there is
10   little or no scarring.

11      65.    To bill and receive reimbursement from federal healthcare programs
12   for Mohs-surgical services, the surgeon must perform both the excision and the
13   histologic evaluation.  In such cases, the surgeon would file a claim using Mohs-
14   specific Current Procedural Terminology (CPT) codes:  CPT 17311-17315.  The
15   surgical pathology codes 8830-88309, 88331-88332, and 88342 are part of the
16   Mohs surgery and are bundled into 17311-17315.  The surgeon should not append
17   Modifier 59 to these pathology codes unless they pertain to a separate
18   biopsy/excision that does not involve the Mohs surgery.

19      66.    If either the excision or the histologic evaluation is delegated to
20   another physician who reports the services separately, the Mohs-specific CPT codes
21   should not be reported.   Where the surgeon performs an excision using Mohs
22   surgical techniques but does not personally perform the histologic evaluation, the
23   surgeon must bill for the excision using standard excision codes for any medically
24   necessary services (e.g., CPT 11600 – 11646).

25      67.    Noridian Healthcare Solutions, LLC ("Noridian") has contracted with
26   the Medicare program to administer and pay Medicare Part A and Medicare Part B
27   claims in California.  Pursuant to this role, Noridian has promulgated certain Local
28   Coverage Determinations ("LCD") specifying the conditions necessary to receive

1   reimbursement for Mohs surgeries.   *See* Noridian Healthcare Solutions, Local
2   Coverage Determination (LCD):  Mohs Micrographic Surgery (L3502) (effective
3   date Oct. 1, 2015).  This LCD makes clear that "if either of these responsibilities is
4   delegated to another physician who reports the services separately, [the Mohs-
5   specific codes] should not be reported."   *Id.*; *see also* Noridian Healthcare
6   Solutions, Local Coverage Article: Billing and Coding: MOHS Micrographic
7   Surgery (A56514) (effective date January 1, 2018) ("If a surgeon performs an
8   excision using MOHS surgical techniques but does not personally provide the
9   histologic evaluation of the specimen(s), the CPT® codes for MMS shall not be
10   used. Instead standard excision codes should be chosen for such medically
11   necessary services (e.g., 11600 – 11646).").

12        68.    CMS has also promulgated a certain "MLN Matters® Special Edition
13   Article" alerting stakeholders to the impermissibility of billing for Mohs surgeries
14   when the interpretation is performed by someone other than the Mohs surgeon. *See*
15   Ctrs. For Medicare & Medicaid Servs., Guidance to Reduce Mohs Surgery
16   Reimbursement Issues (June 27, 2013) ("You many not bill Medicare for these
17   procedures if preparation or interpretation of pathology slides is performed by a
18   physician other than the Mohs surgeon.").

19   **B.   MOHS SURGERY OBLIGATION FOR ACCURACY**

20        69.    At all relevant times herein, Dr. Jesse Mitchell has been a participating
21   physician in the Medicare Part B Program.

22        70.    The vast majority of Dr. Mitchell's patients are over the age of 65 and
23   are Medicare beneficiaries.

24        71.    Medicare local medical review policy requires-among other things-
25   that a physician who claims payment for performing Mohs surgery document in the
26   patient's medical record the necessity of the surgery, include in the medical record
27   a pathologic description of the slides, and retain all slides.

28        72.    Dr. Mitchell electronically submitted claims (completed "HCFA

1   1500s") to the Medicare Part B Program.

2   73.   Dr. Mitchell agreed in his electronic enrollment form application with

3   Medicare, among other things, that he would be responsible for all Medicare claims

4   submitted to HCFA/CMS relating to Dr. Mitchell services, whether submitted

5   personally by Dr. Mitchell, or by his employees or agents, and that he would submit

6   claims that were accurate, truthful and complete, and based on medical services that

7   were reasonable and necessary.

8   74.   However, they were not accurate, truthful, complete, reasonable or

9   necessary-- as set forth herein.

10   **C.   CPT CODES**

11   75.   Effective January 1, 2007, the CPT book specifies as follows for the

12   primary CPT codes involved with Mohs surgery, which Dr. Mitchell utilized for

13   billing Medicare:

14   17311   Mohs micrographic technique, including removal of all gross
15              tumor, surgical excision of tissue specimens, mapping, color
16              coding of specimens, microscopic examination of specimens by
17              the surgeon, and histopathologic preparation including routine
18              stain(s) (e.g., hematoxylin and eosin, toluidine blue), head,
19              neck, hands, feet, genitalia, or any location with surgery directly
20              involving muscle, cartilage, bone, tendon, major nerves, or
21              vessels; first stage, up to 5 tissue blocks.

22   17312   Mohs micrographic technique, including removal of all gross
23              tumor, surgical excision of tissue specimens, mapping, color
24              coding of specimens, microscopic examination of specimens by
25              the surgeon, and histopathologic preparation including routine
26              stain(s) (e.g., hematoxylin and eosin, toluidine blue), head,
27              neck, hands, feet, genitalia, or any location with surgery directly
28              involving muscle, cartilage, bone, tendon, major nerves, or

vessels; each additional stage after the first stage, up to 5 tissue blocks (list separately in addition to code for primary procedure).

17313    Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; first stage, up to 5 tissue blocks.

17314    Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), of the trunk, arms, or legs; each additional stage after the first stage, up to 5 tissue blocks (list separately in addition to code for primary procedure).

17315    Mohs micrographic technique, including removal of all gross tumor, surgical excision of tissue specimens, mapping, color coding of specimens, microscopic examination of specimens by the surgeon, and histopathologic preparation including routine stain(s) (e.g., hematoxylin and eosin, toluidine blue), each additional block after the first 5 tissue blocks, any stage (list separately in addition to code for primary procedure).

76.    CPT Codes 17311-17315 are used for Mohs surgery when tumor selection criteria are met and the Mohs surgeon acts as surgeon and pathologist. If Mohs surgery is performed on the same day as the E/M services, a -25 modifier is to be used with the appropriate E/M code. If an unrelated major surgical procedure

1  was performed in addition to the Mohs surgery, a - 57 would be attached to the E/M

2  code instead of the -25.

3      77.   As suggested above, the following surgical and laboratory procedures

4  are bundled into the 17311-17315 codes: clinical evaluation of tumor margins,

5  outlining of tumor margins with skin-marking pens, reference-mark placement,

6  local anesthesia of the tumor area, "debulking" of the tumor, surgical excision of

7  the first stage (layer, or level), division of the specimen into smaller sections (if

8  done), chroma-coding of all sections, mapping, embedding, cutting, and staining of

9  the histopathology slides, complete microscopic slide evaluation, and transfer of

10  the histologic findings to the Mohs map.

11      78.   If the margins of the first stage are clear of cancer, and if the defect

12  will be allowed to heal by secondary intention, hemostasis, bandaging, and post-

13  operative instructions are also bundled with codes 17311-17315.

14      79.   The excision of the first layer of tissue may be totally embedded

15  ("TE") and processed as a single specimen ("Texl") or may be of a size or

16  complexity requiring division into multiple smaller sections.

17      80.   Dividing the specimen into five or fewer sections is bundled within

18  code 17311-17315.  No matter how many cuts are put on a slide or how many slides

19  are made, these are all bundled into code 17311-17315.

20      81.   When the specimen removed in the first stage, or any subsequent stage,

21  is so large and/or complex that it requires division into more than five sections, for

22  each additional stage, depending on the body area, 17312-17315 may be applied.

23  H & E staining and/or toluidine blue staining are also bundled within code 17311-

24  17315, as noted above.

25      82.   If more than one separate tumor is appropriately treated using Mohs

26  excision on the same date of service, each tumor is billed separately using Mohs

27  codes 17311 through 17315.  If the stage one specimen is not clear of cancer, one

28  or more additional stages will need to be excise until clear margins are obtained.

1  These additional stages are coded as 17312 for the additional stage for the head,

2  neck, hands, feet, genitalia, or any area involving muscle, bone, nerves, vessels, or

3  cartilage; 17313 for the first stage for the trunk, arms or legs; 17314 for each

4  additional stage after stage one for the trunk, arms, or legs; and, 17315 each

5  additional block after the first five tissue blocks, any stage.

6  **D. FRAUDULENTLY BILLING FOR MOHS**

7  83.   Advanced Dermatology has engaged in a scheme to defraud federal

8  healthcare programs wherein its surgeons bill for Mohs surgeries using the Mohs-

9  specific CPT codes despite the Mohs surgeon failing to perform the histologic

10  evaluation of the specimen.

11  84.   Specifically, Dr. Jesse Mitchell of Advanced Dermatology performs

12  the excision portion of the Mohs micrographic surgical procedure but does not also

13  perform the histologic evaluation.   Instead, Advanced Dermatology sends the

14  frozen section to Dr. Roupen Yaghsezian of Roupen Yaghsezian, M.D., Inc. to have

15  the slides interpreted. Dr. Yaghsezian is a quasi-retired dermapathologist who has

16  agreed to perform the interpretive services as part of a side arrangement. Relator

17  understands that Dr. Yaghsezian often seeks out these types of arrangements,

18  having previously contacted Relator to perform interpretative services (which

19  Relator declined).

20  85.   Relator first became aware of this arrangement after speaking with Dr.

21  Fred Shahan, a dermatologist practicing in San Diego, California.

22  86.   Dr. Shahan informed Relator in 2017 that he had learned from a Mohs

23  technician who assisted Dr. Mitchell in performing the Mohs procedure that Dr.

24  Mitchell sent all Mohs slides to Dr. Yaghsezian.

25  87.   Relator confirmed these happening upon speaking with former

26  Advanced Dermatology employee, Mr. Cyrus Pratt.   Mr. Pratt served as a

27  Physician's Assistant ("PA") for Dr. Mitchell for approximately two years.  Mr.

28  Pratt confirmed that Dr. Mitchell would perform the excision, but he would never

interpret the slides.  Instead, Dr. Yaghsezian would perform all interpretations.  On days when Dr. Mitchell performed Mohs surgeries, Dr. Yaghsezian would visit the office location and perform said services.  In fact, Dr. Mitchell would not even perform or supervise the closure of the surgical site, leaving Mr. Pratt or other PAs to perform that task.

88.    Mr. Pratt also learned and conveyed to Relator that Advanced Dermatology pays Dr. Yaghsezian under the table for providing these interpretive services.  Dr. Yaghsezian is not employed by Advanced Dermatology.  Moreover, Advanced Dermatology and Dr. Yaghsezian have not executed a written agreement setting forth the exact services to be performed.

89.    Wanting to confirm Dr. Yaghsezian's role in the fraudulent scheme, Relator called Dr. Yaghsezian in 2020.  Dr. Yaghsezian confirmed that he performs the histologic evaluation portion of the Mohs procedure for the Advanced Dermatology physicians.

90.    According to Mr. Pratt, Advanced Dermatology performs approximately 35 Mohs surgeries per office location (of which there are ten) per month.

91.    In 2017, Dr. Mitchell submitted claims for the following Mohs-specific CPT codes:  17311, 17312, 17313, and 17314.

92.    In 2017, Dr. Mitchell submitted claims for CPT code 17311 no fewer than 85 times for no fewer than 70 Medicare beneficiaries.  For that year, the Average Medicare Payment for CPT Code 17311 was $336.97.  In 2017, for MAC Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility price for CPT 17311 was $700.26 and the Facility Price was $396.28.

93.    In 2017, Dr. Mitchell submitted claims for CPT code 17312 no fewer than 77 times for no fewer than 44 Medicare beneficiaries.  For that year, the Average Medicare Payment for CPT Code 17312 was $307.69.  In 2017, for MAC Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility

1   price for CPT 17312 was $412.87 and the Facility Price was $210.73.

2      94.   In 2017, Dr. Mitchell submitted claims for CPT code 17313 no fewer
3   than 63 times for no fewer than 47 Medicare beneficiaries.  For that year, the
4   Average Medicare Payment for CPT Code 17313 was $296.96.  In 2017, for MAC
5   Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility
6   price for CPT 17313 was $655.52 and the facility price was $355.41.

7      95.   In 2017, Dr. Mitchell submitted claims for CPT code 17314 no fewer
8   than 43 times for no fewer than 29 Medicare beneficiaries.  For that year, the
9   Average Medicare Payment for CPT Code 17314 was $295.55.  In 2017, for MAC
10  Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility
11  price for CPT 17314 was $396.57 and the facility price was $195.59.

12     96.   By submitting claims to Medicare for Mohs-specific services without
13  performing  the  histologic  evaluation  portion,  Advanced  Dermatology  has
14  submitted false claims for payment. The amounts received include reimbursement
15  for services Advanced Dermatology did not perform, thereby allowing Advanced
16  Dermatology to recoup amounts greater than if they had submitted claims with
17  general excision codes.

18  **E.   AKS VIOLATIONS**

19     97.   The claims for Mohs-specific services are made further false because
20  they are the product of kickbacks actionable under the Federal Anti-Kickback
21  Statute, 42 U.S.C. § 1320a-7b(b).

22     98.   The Anti-Kickback Statute prohibits anyone from knowingly and
23  willfully  offering,  providing,  soliciting,  or  receiving  remuneration  to  induce
24  referrals for items or services payable under federal healthcare programs.

25     99.   Here, Advanced Dermatology knowingly and willfully paid Dr.
26  Yaghsezian to perform interpretive services so that Advanced Dermatology could
27  bill  using  the  Mohs-specific  CPT  codes  (which  command  higher  rates  of
28  reimbursement) as opposed to general excision CPT codes.

100.   Advanced Dermatology in fact billed Medicare for these services, as detailed above.

101.   But for the payments to Advanced Dermatology paid to Dr. Yaghsezian, the interpretive services would not have been furnished by Dr. Yaghsezian.

102.   While the Anti-Kickback Statute affords stakeholders certain safe harbors that may immunize these sorts of arrangements from liability, the requirements of potentially applicable safe harbors have not been met here. Specifically, two safe harbors might have shielded the arrangement from liability: (1) The employee safe harbor; and (2) the personal services and management contracts safe harbor.

103.   The employee safe harbor immunizes payments made from an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment is made in whole or in part by a federal healthcare program.   42 C.F.R. §1001.952(i).   Here, Dr. Yaghsezian is not a W2 employee of Advanced Dermatology, and payments are made to Dr. Yaghsezian's medical corporation, Roupen Yaghsezian, M.D., Inc.   Accordingly, the employee safe harbor does not protect the payments.

104.   The personal services and management contracts safe harbor immunize payments made by a principal to an agent as compensation for the services of the agent as long as seven standards are met.   42 C.F.R. §1001.952(d). These include, inter alia, that the agency agreement be set out in writing and signed by the parties, and that the agency agreement covers and specifies all the services the agent provides to the principal for the term of the agreement.   Here, Advanced Dermatology and Dr. Yaghsezian have not memorialized their arrangement in an executed, written agreement specifying the services Dr. Yaghsezian provides. Instead, Advanced Dermatology pays Dr. Yaghsezian according to an unwritten,

"under the table" arrangement.    Accordingly, the personal services and management contract does not protect the payments.

## F.  MEDICALLY UNNECESSARY PROCEDURES

105.   Dr. Mitchell, directly and through Advanced Dermatology, has been conducting medically unnecessary Mohs surgeries since Advanced Dermatology was created.

106.   Under the standard of care, Mohs surgery is normally performed only after a preliminary biopsy is done, is sent off to a lab, and is proven to be skin cancer (most frequently BCC; much less often, squamous cell  carcinoma).

107.   If the clinician suspects a BCC, a skin biopsy should be performed. Either a shave or punch biopsy is appropriate based upon specific considerations.

108.   The existence of a biopsy-proven or suspect BCC (or other NMSC) does not necessarily mean that Mohs surgery is the proper treatment modality. Mohs surgery, which is more elaborate and expensive than other treatment modalities, is a specialized surgical procedure mostly used for the removal of high-risk skin cancers and/or those in functionally or cosmetically sensitive areas.

109.   The relatively simple, less expensive alternative to Mohs surgery, of electrodessication and curettage ("ED&C"), is the most common treatment method used by dermatologists for low-risk, primary, non-infiltrative BCCs < 1.5 cm in diameter.  Furthermore, excisional surgery of selected BCCs can offer excellent results when appropriate margins are used.

110.   Indeed, a procedure may not be needed at all. Given the slow growth of most BCCs, it is acceptable to monitor a lesion with low clinical suspicion when a biopsy is not an ideal choice because of location or patient preference.  In this case, the lesion should be monitored every 3 to 6 months. Any change in the lesion should prompt a biopsy. In general, skin biopsies are quick and well tolerated procedures and should be performed when warranted by clinical suspicion.

111.   In a Mohs surgery practice, each time the surgeon removes a

1  stage/level, the histology technician makes a frozen-section slide of the margins for
2  the physician.

3      112. The physician uses that frozen-section slide to determine whether there
4  is malignancy, and to determine whether any additional stages need to be
5  performed.

6      113. However, it is the number of stages of Mohs surgery that is particularly
7  "over the top."

8      114. Each stage (or "level") is a layer of specimen. One normally only
9  proceeds to take off an additional stage/level if the testing shows that there is cancer
10  in the prior level.

11      115. But Dr. Mitchell is routinely billing Medicare for two or more stages
12  (i.e., levels) of Mohs surgery for the vast majority of Mohs surgeries allegedly
13  performed. As noted above, Medicare separately reimburses for each stage of Mohs
14  surgery performed in removing cancer. Hence, the more stages of Mohs surgery
15  that are performed, the higher the reimbursement from Medicare.

16      116. This is far outside the norm, which generally requires one,
17  occasionally two, stages of Mohs surgery. One cannot justify performing two or
18  more stages of Mohs surgery on the overwhelming majority of cancerous lesions.

19      117. Mr. Cyrus Pratt, a former Advanced Dermatology PA, confirmed that
20  Dr. Mitchell intentionally undermeasures the first cut so that he can perform
21  subsequent cuts for additional reimbursement.

22      118. Mr. Pratt also conveyed to Relator that Dr. Mitchell would perform
23  Mohs where a less invasive or complex procedure could have removed the
24  cancerous lesion. Often, Mr. Chris Clem, Advanced Dermatology's non-physician
25  part-owner would edit order forms to ensure Mohs surgeries were being performed
26  as opposed to the less complex (and lucrative) procedure selected.

27      119. Because the additional cuts (and in some instance, the first cuts) were
28  not medically necessary or reasonable, the ensuing claims for payment are false.

### G.  PHYSICIAN ASSISTANTS BILLING AS PHYSICIANS

120.  Medicare guidelines are clear as to billing procedures regarding PAs. According to CMS guidelines, services that are provided by PAs for medical and surgical services are subject to a reimbursement rate, which is the lesser of 80 percent of the actual charge or 85 percent of the Physician's Fee Schedule amount reimbursement rate for the service being rendered.

121.  Bills submitted to Medicare for services rendered by PAs must indicate the PAs National Provider Identification (NPI) to make Medicare aware that the payment should be made at 85% of the Physician's Fee Schedule.  This mode of billing does not require the physical presence onsite of the physician as long as the service is being billed at the PAs' rates.

122.  In some circumstances the practice will be allowed to bill under the Physician Fee Schedule "incident-to" services even when the services were provided by PAs. However, this would require direct supervision from the physician.  Direct supervision means that the physician needs to be physically on site during the patient's visit, and immediately available to furnish assistance if required when the PA is providing care.

123.  Dr. Jesse Mitchell routinely allows PAs to bill under the physician fee schedule when Dr. Mitchell is not present in the office.  Dr. Jesse Mitchell performs the excision portion of the Mohs procedure, but does not otherwise supervise the many PAs employed by Advanced Dermatology. Dr. Mitchell acts more or less as the figurehead of the practice, leaving the PAs to furnish services to government healthcare program beneficiaries.  Instead of taking an active role in both the provision of and supervision of care, Dr. Mitchell spends much of the workday golfing and reading magazines.

124.  Relator learned from Mr. Pratt, former Advanced Dermatology PA, that Dr. Mitchell rarely, if ever, was even available by phone to answer his PAs questions.  The PAs, who often had no prior experience working in a dermatologic

1   clinical setting, would have to learn what to do on the job and independent of their
2   physician supervisor.

3       125.  Advanced Dermatology employs a family medicine practitioner to
4   "supervise" the PAs, but he does not have the training or qualifications to supervise
5   the dermatology procedures at issue.  Up through and including December 31, 2019,
6   California's Medical Practice Act limited the PAs scope of practice to the
7   supervising physician's medical specialty.

8       126.  Moreover, the family medicine practitioner "supervises" more PAs
9   than are permitted under California law.  The California Medical Practice Act limits
10  the number of PAs a physician may supervise to four (4).  See Bus & Prof. Code §
11  3516(b).  At any given times, the number of PAs employed by Advanced
12  Dermatology greatly exceeds that number.  Thus, many PAs performing procedures
13  on behalf of Dr. Mitchell and Advanced Dermatology are practicing unsupervised.

14      127.  To compound these illegalities, Chris Clem, the non-physician, part-
15  owner of Advanced Dermatology, dictates to the PAs and Medical Assistants what
16  they should and should not do with patients, especially as it relates to Mohs
17  surgeries.  Often, where less invasive and costly procedures had been selected to
18  remove cancerous lesions, Mr. Clem would cross out the procedure on the order
19  and replace with Mohs.

20  **H.  CLIA LICENSING LOCATION ISSUES**

21      128.  Section 353 of the Public Health Service Act, as amended by the
22  Clinical Laboratory Improvement Act of 1988 ("CLIA"), requires all laboratories
23  that perform tests on human specimens to meet the requirements established by
24  Congress.

25      129.  Every other year, a Mohs surgeon must residence, and
26  this relicensing involves documentation of the Mohs surgeon reading two test slides
27  with an independent pathologist to verify their performance.

28      130.  Upon information and belief, Advanced Dermatology's Mohs

1   surgeons have not completed the relicensing requirements.

2   131.   Additionally, Advanced Dermatology inappropriately submits claims
3   for payment without disclosing the appropriate CLIA licensing location.

4   132.   When submitting a claim for payment, each claim requires a CLIA
5   license ID.   Moreover, in California, each physical location (address) where the
6   Mohs procedure is done requires its own unique CLIA license.

7   133.   Advanced Dermatology submits claims for payment under a single
8   CLIA license ID (CLIA #05D2080392) despite providing Mohs surgeries across all
9   of its locations.

10                    **FIRST CAUSE OF ACTION**
11                    **(False or Fraudulent Claims)**
12                    **(FCA 31 U.S.C. § 3729(a)(1)(A))**
13                    **(Cal. Govt. Code § 12651 *et seq.*)**

14   134.   Relator hereby incorporates and re-alleges all other paragraphs as if
15   fully set forth herein.

16   135.   As set forth above, Defendants, by and through their agents, officers,
17   and employees, knowingly presented, or caused to be presented to the United States
18   Government and the State of California numerous false or fraudulent claims for
19   payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) and/or the
20   California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

21   136.   Due to Defendants' conduct, the United States and the State of
22   California have suffered substantial damages.

23   137.   The United States and the State of California are entitled to treble
24   damages based upon the amount of damage sustained by them in an amount that
25   will be proven at trial.

26   138.   The United States and the State of California are entitled to the largest
27   civil penalty allowed by law for each of the false claims.

28   139.   Relator is also entitled to her attorney's fees and litigation expenses.

## SECOND CAUSE OF ACTION

### (False Statements)

### (FCA 31 U.S.C. § 3729(a)(1)(B))

### (Cal. Govt. Code § 12651 *et seq.*)

140.   Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

141.   As set forth above, Defendants, by and through their agents, officers and employees, knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(B) and/or the California False Claims Act, Cal. Govt. Code § 12651 *et seq*.

142.   Due to Defendants' conduct, the United States and the State of California have suffered substantial damages.

143.   The United States and the State of California are entitled to treble damages based upon the amount of damage sustained by them in an amount that will be proven at trial.

144.   The United States and the State of California are entitled to the largest civil penalty allowed by law for each of the false claims.

145.   Relator is also entitled to her attorney's fees and litigation expenses.

## THIRD CAUSE OF ACTION

### (Failure to Repay)

### (FCA-31 U.S.C. § 3729(a)(1)(G))

### (Cal. Govt. Code § 12651 *et seq.*)

146.   Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

147.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly made, used, or caused to be made or used a false record or statement material to an obligation to pay or transmit property or money to the

1   United States Government and the State of California and knowingly concealed or

2   knowingly and improperly avoided or decreased an obligation to pay or transmit

3   property or money to the United States Government and the State of California, in

4   violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) and/or the California False Claims

5   Act, Cal. Govt. Code § 12651 *et seq.*

6   148.   Due to Defendants' conduct, the United States and the State of

7   California have suffered substantial damages.

8   149.   The United States and the State of California are entitled to treble

9   damages based upon the amount of damage sustained by them in an amount that

10  will be proven at trial.

11  150.   The United States and the State of California are entitled to the largest

12  civil penalty allowed by law for each of the false claims.

13  151.   Relator is also entitled to her attorney's fees and litigation expenses.

14  **PRAYER FOR RELIEF**

15  **WHEREFORE**, Relator prays for judgment:

16  a.   awarding the United States and the State of California damages

17  sustained by them for each of the false claims;

18  b.   awarding the United States and the State of California treble damages

19  sustained by them for each of the false claims;

20  c.   awarding the United States and the State of California the largest civil

21  penalty allowed by law for each of the false claims;

22  d.   awarding Relator 30% of the proceeds of this action and any alternate

23  remedy or the settlement of any such claim;

24  e.   awarding Relator her litigation costs and reasonable attorney's fees;

25  and

26  ///

27  ///

28  ///

f.    granting such other relief as the Court may deem just and proper.

DATED:  July 9, 2020          SCHONBRUN SEPLOW
                              HARRIS HOFFMAN & ZELDES LLP

                              BOTHWELL LAW GROUP, P.C.

                              By: _____
                              Wilmer J. Harris
                              Mike Bothwell
                              Attorneys for Relator/Plaintiff,
                              Randy Jacobs


**JURY DEMAND**

Plaintiff hereby demands a jury trial on all issues triable to a jury.

DATED:  July 9, 2020          SCHONBRUN SEPLOW
                              HARRIS HOFFMAN & ZELDES LLP

                              BOTHWELL LAW GROUP, P.C.

                              By: _____
                              Wilmer J. Harris
                              Mike Bothwell
                              Attorneys for Relator/Plaintiff,
                              Randy Jacobs