1   Wilmer J. Harris, SBN 150407
    wharris@sshhzlaw.com
2   **SCHONBRUN SEPLOW HARRIS**
    **HOFFMAN & ZELDES LLP**
3   715 Fremont Avenue, Suite A
    South Pasadena, CA 91030
4   Telephone No.: (626) 441-4129
    Facsimile No.: (626) 283-5770
5

6
7   [Additional Counsel on following page]

8   Attorneys for Relator Randy Jacobs

9                  UNITED STATES DISTRICT COURT

10
11          FOR THE CENTRAL DISTRICT OF CALIFORNIA

12
    UNITED STATES OF AMERICA          **Case No.: 5:20-cv-01373-JGB-SHK**
13  ex rel. RANDY JACOBS,
14          and                       **FIRST AMENDED COMPLAINT**
    STATE OF CALIFORNIA ex rel.
15  RANDY JACOBS
16                                        1. VIOLATION OF FEDERAL
17          Relator,                         FALSE CLAIMS ACT 31 U.S.C. §
                                             3729 (a) (1) (A);
18          v.
19                                        2. VIOLATION OF FEDERAL
    ADVANCED DERMATOLOGY &                   FALSE CLAIMS ACT 31 U.S.C. §
20                                           3729 (a) (1) (B);
    SKIN CANCER SPECIALISTS, P.C.,
21  DR. JESSE MITCHELL, DESERT            3. VIOLATION OF FEDERAL
22  DERMATOLOGY & SKIN CANCER               FALSE CLAIMS ACT 31 U.S.C. §
                                             3729 (a) (1) (G);
23  SPECIALISTS, INC., and
24  CHRISTOPHER CLEM                      4. VIOLATION OF CALIFORNIA
                                             FALSE CLAIMS ACT CAL.
25                                           GOVT. CODE §§ 12651 *et seq.*
26          Defendants.
                                          **DEMAND FOR JURY TRIAL**
27
28

---
FIRST AMENDED COMPLAINT

1  Mike Bothwell, admitted Pro Hac Vice
2  Mike@whistleblowerlaw.com
   **BOTHWELL LAW GROUP, P.C.**
3  304 Macy Drive
4  Roswell, GA 30076
   Telephone No.: (770) 643-1606
5  Facsimile No.: (770) 643-1442
6
7  Attorney for Relator Randy Jacobs
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# FIRST AMENDED COMPLAINT

The United States of America and the State of California, by and through Relator Randy Jacobs ("Relator"), bring this action under 31 U.S.C. § 3729 *et seq.* (False Claims Act "FCA") and the California False Claims Act, Cal. Govt. Code § 12651 *et seq.* to recover all damages, penalties, and other remedies established by the FCA on behalf of the United States and Relator, and the California False Claims Act on behalf of the State of California and Relator, and would show the following:

## JURISDICTION AND VENUE

1.     This action arises under the FCA, 31 U.S.C. § 3729, *et seq.* and the California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

2.     This court has personal jurisdiction over the Defendants pursuant to 31 U.S.C. § 3732(a) in that Defendants have contact with the United States of America.

3.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1345 and 31 U.S.C. § 3732(a) and (b).

4.     Venue is proper in this district under 28 U.S.C. § 1391(b) and (c) and under 31 U.S.C. § 3732(a).

5.     Pursuant to 28 U.S.C. 1367, this Court has supplemental jurisdiction over the subject matter of the claim brought pursuant to the California False Claims Act on the ground that the claim is so related to the claims within this Court's original jurisdiction that they form the same case or controversy under Article III of the United States Constitution.

## THE PARTIES

6.     Dr. Randy Jacobs is a board-certified clinical dermatologist with special expertise in skin cancer prevention, skin cancer treatment, acne care, complexion care, and care for all people with dry and sensitive skin conditions.  He received a medical degree upon graduating from the University of Southern California School of Medicine, after which he completed a six (6) year medical residency at the Loma Linda University Medical Center.  His six-year residency

included two internship years, one in Internal Medicine and one in Pediatrics, plus, four years of post-graduate education in Dermatology.  Relator has practiced dermatology for approximately thirty-four (34) years and has been in private practice since 1992.

7.    Advanced Dermatology & Skin Cancer Specialists, P.C. ("Advanced Dermatology") has offices in Temecula, Hemet, San Bernardino, Riverside, Corona, Menifee, Sun City, Moreno Valley, Victorville, La Quinta, and Palm Springs, California with their principal business office at 31720 South Temecula Parkway, Suite 200, Temecula, California 92592.  The corporation also has affiliated offices in Yuba City and Stockton, doing business as Advanced Dermatology & Skin Cancer Specialists of Northern California.

8.    Desert Dermatology & Skin Cancer Specialists, Inc. ("Desert Dermatology") is an Arizona corporation with locations in Gilbert and Glendale, Arizona. The corporate address for Desert Dermatology is 2 East Congress St., Suite 900A, Tucson, AZ, 85701. Desert Dermatology is a related entity to Advanced Dermatology with common ownership, leadership, and practices.

9.    Dr. Jesse Mitchell is a Dermatologist at Advanced Dermatology and Desert Dermatology, is listed as the owner of Advanced Dermatology, and is a director of Desert Dermatology.

10.    Mr. Christopher Clem is a non-physician who effectively runs the Advanced Dermatology and Desert Dermatology practices.  He is an agent-in-fact. Employees and vendors of Advanced Dermatology believe him to be the company's real owner and Chief Operating Officer (CEO). Mr. Clem directs both the day-to-day operations and the broader management of both Advanced Dermatology and Desert Dermatology.  He is listed with the Arizona Secretary of State as an officer of Desert Dermatology.  His address listed with the Arizona Secretary of State is 31720 South Temecula Parkway, Suite 200, Temecula, California 92592.

//

---

COMPLAINT

2

# HEALTHCARE PROGRAMS AND LAWS

## A.   Medicare and Medicaid Programs

11.    Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq*., establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program.  The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS"), a component of HHS.

12.    The Medicare program consists of several parts.  Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. § 1395c-1395i-2 (1992).  Medicare Part B is a federally subsidized, voluntary insurance program that covers certain non-hospital medical services and products including the treatments at issue in this complaint.  42 U.S.C. § 1395(k), 1395(i), 1395(s).  Reimbursement for Medicare claims is made by the United States through CMS.  CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund.  42 U.S.C. § 1395(u).  In this capacity, the carriers act on behalf of CMS.  42 C.F.R. § 421.5(b) (1994).

13.    In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states expressly state that a provider must certify that it is in compliance with all federal and state statutes and regulations in order to receive payment from Medicare and/or Medicaid.  42 C.F.R. § 455, *et seq.*

14.    Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (1) bill Medicare for only those covered services which are medically necessary; (2) not bill Medicare for any services or items which were not performed or delivered in accordance with all applicable policies, nor

submit false or inaccurate information relating to provider costs or services; (3) not engage in any act or omission that constitutes or results in over-utilization of services; (4) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (5) comply with state and federal statutes, policies and regulations applicable to Medicare; and (6) not engage in any illegal activities related to the furnishing of services to recipients.

15.    It is logistically impossible for Medicare to verify the accuracy of every claim submitted, so Medicare must rely on certifications by claimants that the claims are true and accurate:

> Because Medicare is required to pay claims submitted within just a few weeks of receipt of the claim, the Medicare program has historically paid claims quickly without verifying the accuracy of the claims before payment. Medicare accepts claims as submitted by providers as being a true representation that the claim either qualifies for reimbursement or does not qualify and automatically pays those claims represented as qualifying. Medicare must then seek reimbursement or recoupment if it later determines that the claim should not have been paid. This payment system has become known as "pay and chase," and relies on the honesty of providers and the accuracy of the claims they submit.

*Godecke ex rel. United States v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1206 (9th Cir. 2019)

16.    Title XIX of the Social Security Act, 42 U.S.C. § 1396, *et seq.*, establishes Medicaid, a federally assisted grant program for the States.  Medicaid enables the States to provide medical assistance and related services to needy individuals.  CMS administers Medicaid on the federal level.  Within broad federal rules, however, each state decides who is eligible for Medicaid, the services covered, payment levels for services and administrative and operational procedures. Medicaid authorizes grants to states for medical assistance to children and blind,

aged, and disabled individuals whose income and resources are not sufficient to meet the costs of necessary medical care. 42 U.S.C. § 1396; 42 C.F.R. § 430.0; 42 U.S.C. § 1396-1396v. The Medicaid Program is jointly funded by the federal government and participating states.

17.     In California, the Medicaid Program is called "Medi-Cal" and is administered by the California Department of Health Care Services ("DHCS") and CDPH. The CMS Medicare regulations at 42 C.F.R. § 409 *et seq*. apply to beneficiaries of both Medicare and Medi-Cal ("dual eligibles"). Arizona Health Care Cost Containment System ("AHCCCS") is Arizona's Medicaid agency that offers health care programs to serve Arizona residents. Individuals must meet certain income and other requirements to obtain services. AHCCCS

18.     At all times relevant to this Complaint, the United States provided funds to the States through the Medicaid program. Enrolled providers of medical services to Medicaid recipients are eligible for payment for covered medical services under the provisions of Title XIX of the 1965 Amendments to the Federal Social Security Act. By becoming a participating provider in Medicaid, enrolled providers agree to abide by the rules, regulations, policies and procedures governing claims for payment, and to keep and allow access to records and information as required by Medicaid. In order to receive Medicaid funds, enrolled providers, together with authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the State.

19.     As a condition of participation in the Medicare and Medicaid programs, providers are required to enter into "Provider Agreements" with the government. 42 U.S.C. § 1395cc. At all times relevant herein, the Medicare Provider Agreement, Form CMS-1561 (07/01), contain the following certification: "In order to receive payment under title XVIII of the Social Security Act, [provider name] as the provider of services, agrees to conform to the provisions of 1866 of the Social

Security Act and applicable provisions in 42 CFR." The provider must also certify that it can be subject to criminal penalties if it "knowingly and willfully falsifies" a material fact, or makes any "false, fictitious or fraudulent statement or representation."

20.     Advanced Dermatology, as "Provider," executed a Medi-Cal Telecommunications Provider and Biller Application/Agreement (Form 6153) with DHCS. Form 6153 required the provider to certify under penalty of perjury that (1) "all claims for services submitted electronically have been personally provided to the patient;" (2) "[t]he services were medically indicated and necessary to the health of the patient;" and (3) "all information submitted electronically is accurate and complete." By signing Form 6153, the Provider (1) "understands that payment of [Medi-Cal] claims will be from federal and/or state funds, and that any falsification or concealment of a material fact may be prosecuted under federal and/or state laws"; (2) "agrees to retain personal responsibility for the development, transcription, data entry, and transmittal of all claim information for payment"; and (3) "assume[s] personal responsibility for verification of submitted claims with source documents."

21.     The Medi-Cal Provider Agreement (Form DHCS 9098 (6/10)), similarly required the provider to agree to "comply with all federal laws governing and regulating Medicaid providers," and that "it may be subject to temporary suspension" if it is under investigation for fraud or abuse of the Medi-Cal program "or other health care programs operated, or financed in whole or in part, by the Federal Government."

22.     As a final condition of participation and payment, Medicare providers must execute a Medicare Electronic Data Interchange ("EDI") Enrollment Form in order to submit claims electronically.  The EDI Form requires providers to agree to "be responsible for all Medicare claims submitted to CMS by itself, its employees, or its agents," and to "submit claims that are accurate, complete and truthful." By

1  executing the EDI Enrollment Form, a provider acknowledges that "all claims will
2  be paid from Federal funds, that the submission of such claims is a claim for
3  payment under the Medicare program, and that anyone who misrepresents or
4  falsifies or causes to be misrepresented or falsified any record or other information
5  relating to that claim as required by this Agreement may, upon conviction be subject
6  to a fine and/or imprisonment under applicable Federal law."

7       23.    At all times relevant to this Complaint, Defendants were participating
8  as Medicare/Medicaid providers.

9       24.    At all times relevant to this Complaint, Medicare/Medicaid constituted
10  and continues to constitute a significant source of revenue for Defendants.

11       25.    Defendants submitted or caused to be submitted false claims for
12  payment to Medicare/Medicaid for services and supplies.

13  **B.   General Rules for Billing Physician Services**

14       26.    Under Medicare rules, physician services are reimbursed through a
15  payment system called the Resource Based Relative Value Scale ("RBRVS").  In
16  the RBRVS system, payments for medical services and procedures are determined
17  by the resource costs needed to provide them.  Payments are calculated by
18  multiplying a standardized measure of the amount of resources the service or
19  procedure is expected to require by a region-specific payment rate (conversion
20  factor).

21       27.    RBRVS payments are based on the Healthcare Common Procedure
22  Coding System ("HCPCS").  HCPCS is a standardized coding system designed to
23  ensure that Medicare, Medicaid and other federal and state-funded health care
24  programs pay for services rendered to patients by physicians and other healthcare
25  professionals in accordance with payment schedules tied to the level of professional
26  effort required to render classes or types of medical care.  To ensure uniform
27  descriptions of medical care rendered and consistent compensation for similar work,
28  Government-funded health care programs tie levels of reimbursement to these

standardized codes.

28.    The Current Procedural Terminology ("CPT") codes are a subset of the HCPCS codes (called Level I codes) and are published and updated annually by the American Medical Association.  Base CPT codes are five-digit numbers organized in numeric sequences that identify both the general area of medicine to which a procedure relates (such as "Evaluation and Management," "Surgery," or general "Medicine") and the medical services and procedures commonly performed by physicians working in that field.

29.    Physicians typically submit claims to Medicare and Medicaid for professional services on Form CMS-1500.  The claim form sets forth the diagnostic code describing the patient's presenting condition and the procedural codes.  On the claim form, the physician certifies that the services were "medically indicated and necessary to the health of the patient...."

30.    Medicare will only pay for services that are "reasonable and necessary for the diagnosis or treatment of illness or injury." 42 U.S.C. § 1395(a)(l)(A).  This standard is distinct from the "medical necessity" requirement.  Because the standard revolves around the billing process and not treatment, it encompasses more than a mere basis for the service provided.  Not only must the treatment correspond to the diagnosis, but, as addressed above and below, the codes used to bill Medicare and subsequent payment for treatment must correspond to what was actually done.  In other words, Medicare dictates what it will pay for which codes or procedures and requires that the actions and documentation directly correlate to such direction (and are also reasonable and necessary).

31.    Although CPT codes are used by Medicare to determine the appropriate levels of reimbursement for specific medical procedures and services, those codes are not intended to substitute for adequate documentation in a patient's medical record of all medical services rendered.  In part to establish that care was appropriately rendered, and was reasonable and necessary, patient medical records

must also document the reason for the patient encounter and relevant history, physician examination findings and prior diagnostic test results; assessment, clinical impression or diagnosis; plan for care; time and date; and legible identity of the provider.  The patient's progress, response to and changes in treatment, and revision of diagnosis should also be documented.  If not documented, the rationale for ordering diagnostic and other ancillary services should be easily inferred, and past and present diagnoses should be accessible.  The documentation must support the CPT codes reported on the health insurance forms.  See CMS's 2010 Evaluation and Management Services Guide, at 4.

### C.   Other Federal Health Care Programs

32.     The Federal Government administers other health care programs including, but not limited to, TRICARE, CHAMPUS, and the Federal Employee Health Benefit Program.

33.     TRICARE, administered by the United States Department of Defense, is a health care program for individuals and dependents affiliated with the armed forces.

34.     TRICARE is a government-funded program that provides medical benefits to retired members of the Uniformed Services and to spouses and children of active duty, retired, and deceased members, as well as reservists who were ordered to active duty for thirty (30) days or longer.  The program is administered by the Department of Defense and funded by the federal government.

35.     CHAMPUS, administered by the United States Department of Veterans Affairs, is a health care program for the families of veterans with 100 percent service-connected disability.

36.     The Federal Employee Health Benefit Program, administered by the United States Office of Personnel Management, provides health insurance for federal employees, retirees, and survivors.

//

_____

COMPLAINT

9

### D.   The Federal Anti-Kickback Statute

37.     The Medicare and Medicaid Fraud and Abuse Statute (Anti-Kickback Statute), 42 U.S.C. § 1320a-7b(b), was enacted under the Social Security Act in 1977.  The Anti-Kickback Statute arose out of Congressional concern that payoffs to those who can influence health care decisions will result in goods and services being provided that are medically inappropriate, unnecessary, of poor quality, or even harmful to a vulnerable patient population.  To protect the integrity of federal health care programs from these difficult-to-detect harms, Congress enacted a prohibition against the payment of kickbacks in any form, regardless of whether the particular kickback actually gives rise to overutilization or poor quality of care.

38.     The Anti-Kickback Statute prohibits any person or entity from making or accepting payment to induce or reward any person for referring, recommending, or arranging for the purchase of any item for which payment may be made under a federally-funded health care program.  42 U.S.C. § 1320a-7b(b).  The statute ascribes liability to both sides of an impermissible kickback relationship.

39.     Essentially, if just one purpose of the payment was to induce future referrals, the Medicare statute has been violated.  This is true even if the doctor performs some medical service for the money.  It is not even required that it be the primary purpose—just one purpose of the payment.  In other words, a defendant can have 99 lawful reasons to enter a relationship, but if one other reason is to expect referrals, it is illegal.  It is irrelevant if the funds would have been spent anyway or that Medicare funds were not used to make the illegal payment.

40.     Claims for reimbursement for services that result from kickbacks are rendered false under the False Claims Act.  42 U.S.C. § l320a-7b(g). It is not just the claims tied to the referring physician, but all claims that in any way relate to the referred patient. This would include medicine, scans and x-rays, and a host of other related charges.

41.     The act of referring a patient to a hospital or other provider is not a

covered item or service.  Therefore, any payments made to an employee in order to compensate that employee for making referrals are not covered by the employee safe harbor.  This is true even if the majority of an employee's compensation is for the provision of covered services.  As to that portion of the payments that is made to induce referrals and to compensate for an employee's act of referring, the Anti-Kickback Statute is violated.

42. Compliance with the Anti-Kickback Statute is a precondition to participation as a health care provider under the Medicare and Medicaid programs.

43. Either pursuant to provider agreements, claim forms, or other appropriate manner, physicians who participate in a federal health care program generally must certify that they have complied with the applicable federal rules and regulations, including the Anti-Kickback Statute.

44. Violation of the Anti-Kickback Statute subjects the violator to exclusion from participation in federal health care programs, civil monetary penalties, and imprisonment of up to five years per violation.  42 U.S.C. § 1320a-7(b)(7), 1320a-7a(a)(7).  Any party convicted under the Anti-Kickback Statute must be excluded (i.e., not allowed to bill for services rendered) from federal health care programs for a term of at least five years.  42 U.S.C. § 1320a-7(a)(l).  Even without a conviction, if the Secretary of HHS finds administratively that a provider has violated the statute, the Secretary may exclude that provider from the federal health care programs for a discretionary period (in which event the Secretary must direct the relevant State agencies to exclude that provider from the State health program), and may consider imposing administrative sanctions of $50,000 per kickback violation.  42 U.S.C. § 1320a-7(b).

45. The Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 6402(f)(2), 124 Stat. 119, 759 (March 23, 2010), clarified that "a person need not have actual knowledge of" or "specific intent to commit a violation" of the Anti-Kickback Statute.

46.     The enactment of these various provisions and amendments demonstrates Congress' commitment to the fundamental principle that federal health care programs will not tolerate the payment of kickbacks.  Thus, compliance with the Stark and Anti-Kickback Statutes is a prerequisite to a provider's right to receive or retain reimbursement payments from Medicare, Medicaid and other federal health care programs.

47.     The Anti-Kickback Statute (AKS) specifies that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." 42 U.S.C. § 1320a-7b (2013). Accordingly, receiving kickbacks disqualifies all remuneration from Government Payors.

## FACTUAL ALLEGATIONS

### A.    MOHS SURGERY

48.     Mohs micrographic surgery (aka "Mohs surgery") is a specialized technique for the removal of skin cancer, and is reserved for particular types of skin cancers, including skin cancers that have recurred following previous treatment, cancers that are at high risk of recurrence, cancers located in specific areas of the body, large tumors, and neurotropic lesions. It is most commonly used to remove basal cell carcinoma ("BCC") and, much less frequently, squamous cell carcinoma ("SCC").

49.     BCC and SCC are both types of non-melanoma skin cancer ("NMSC"). NMSCs most frequently occur on the head and neck.

50.     The surgical procedure has also been used to remove melanoma and other malignancies of the skin and mucous membranes.  Mohs surgery is a tissue-sparing procedure, with the objective of fully removing the cancer with as little loss of skin as possible.  Thus, it may allow a more cosmetically aesthetic or functional post-surgical result, in specific areas, than other treatment modalities.

51.     Historically, Mohs surgery is often performed by dermatologists

because of their expertise in skin cancer pathophysiology, cutaneous histopathology, and dermatologic surgery, including their ability to repair defects. ("Defect" means the surgical wound created by the removal of the specimen.)

52.     Training programs in Mohs surgery are available throughout the U.S. via a one (1) or two (2)-year post-residency fellowship.  In 2003, the Accreditation Council for Graduate Medical Education approved procedural dermatology fellowships in which Mohs surgery is often the fellowships' centerpiece.

53.     Mohs surgery is usually performed in a medical office properly equipped for the procedure.  (It need not be performed in a specialized outpatient surgical facility.)  The procedure may take several hours, depending on the extent of the cancer. If facial reconstruction is needed (e.g., a flap) after the Mohs surgery, a lot of additional time is needed.

54.     Mohs surgery is a meticulous technique that provides complete microscopic margin control through the taking of horizontal frozen histological sections of the surgical margins of the excised tumor, for the most complete microscopic examination possible.  It requires a physician trained in Mohs surgery and pathology to accurately excise and map tumor extensions.

55.     The surgery is performed in stages (or "levels") in which the physician removes a single layer of tissue, and performs additional stages, if necessary for each stage, to clear the area of cancer.  (A "stage" or "level" in Mohs surgery is an individual excision in which tissue is removed from the patient, oriented, processed, and microscopically reviewed.)

56.     After each stage of Mohs surgery, the surgeon examines the excised skin with a microscope for the presence of cancer, acting in a dual role as surgeon and pathologist.  Only if cancer remains present should the physician proceed to the next stage of removing additional tissue.

57.     The goal of Mohs surgery is excision of cutaneous and mucosal malignancies with maximal cure rates and tissue sparing.

58.     Mohs surgery is not the only way of treating skin cancer and other cutaneous tumors, which may be treated successfully by standard fusiform excision, cryotherapy, radiation therapy, curettage and electrodessication, intralesional interferon, topical and intralesional 5-fluorouracil, and ablative laser treatment. These alternative methods can provide excellent results.

59.     Mohs surgery is indicated in situations where other treatment modalities have failed.  The Mohs technique is used for recurrent tumors or those at high risk for recurrence, those with clinically indistinct margins, and for those tumors that are anatomically located where tissue conservation is important.  Such locations include the eyelids, ears, nose, lips, and fingers.

60.     Because Mohs surgery is not the exclusive way to treat suspected skin cancer, Medicare will pay for Mohs surgery as both reasonable and necessary only if performed based on certain current, accepted diagnoses and indications, and only if the surgery was performed as indicated by the CPT code used to claim payment. Mohs is a bundled code and can only be bundled if the same doctor performs all elements of the procedure—otherwise, the lower reimbursable, separate codes are to be used (for essentially the same overall process).  Medicare also separately reimburses for each stage of Mohs surgery performed in removing cancer.  Hence, the more stages of Mohs surgery that are performed, the higher the reimbursement from Medicare.

61.     Although Mohs surgery is not a high-risk form of surgery, it is not without its significant risks.  Caution must be taken to ensure that the vital dyes are pure and sterile, to minimize the risk of placing infected material into the surgical site.  Mohs surgery frequently may involve the nasal, buccal, conjunctiva, and anogenital mucosa. Proper stabilization, exposure, and instrumentation are essential when working on nasal or oral mucosa to ensure access and hemostasis, and thereby prevent uncontrollable bleeding and aspiration of blood.  Further, muscle is commonly encountered during Mohs surgery.  Facial muscle lies just below the

dermis, often separated by a thin band of connective tissue and little or no fat.
Conservation of function is important for muscle groups. To minimize unnecessary
muscle damage, the Mohs surgeon must attempt to split muscles and take only
superficial portions for evaluation.

62.    Similarly, nerve tissue is commonly encountered during Mohs surgery.
Sacrifice of motor nerves can be debilitating, disfiguring, and distressing. Care must
be taken to protect named nerves-although these may have to be removed if there is
tumor involvement.

63.    As with other forms of surgery, anesthesia poses its own set of risks.
Mohs surgery may require several hours to complete; injecting a mixture of short-
and long-acting local anesthetics, such as lidocaine and bupivacaine, imparts more
prolonged anesthesia and enhances patient comfort.  To further reduce
intraoperative pain, some surgeons apply lidocaine jelly for EMLA topical
anesthetic on the wound between stages.  Cutaneous and mucosal Mohs surgery is
usually performed under local anesthesia, using a combination of direct infiltration
and regional nerve blocks.  Lingual, laryngotracheal, esophageal, and anogenital
surgery may require conscious sedation or general anesthesia.

64.    Mohs surgery may also leave a scar.  In many cases, however, there is
little or no scarring.

65.    Mohs surgery is efficient and effective, because it allows the one
surgeon to immediately perform the microscopic examination while the patient
waits.  This allows (and requires) the single surgeon to remain focused on a single
case until all cancerous cells have been removed.

66.    To bill and receive reimbursement from federal healthcare programs for
Mohs-surgical services, the surgeon must perform both the excision and the
histologic evaluation.  In such cases, the surgeon would file a claim using Mohs-
specific Current Procedural Terminology (CPT) codes:  CPT 17311-17315.  The
surgical pathology codes 8830-88309, 88331-88332, and 88342 are part of the Mohs

surgery and are bundled into 17311-17315.  The surgeon should not append Modifier 59 to these pathology codes unless they pertain to a separate biopsy/excision that does not involve the Mohs surgery.

67.    If either the excision or the histologic evaluation is delegated to another physician who reports the services separately, the Mohs-specific CPT codes should not be reported.  Where the surgeon performs an excision using Mohs surgical techniques but does not personally perform the histologic evaluation, the surgeon must bill for the excision using standard excision codes for any medically necessary services (e.g., CPT 11600 – 11646).

68.    CMS has promulgated a certain "MLN Matters® Special Edition Article" alerting stakeholders to the impermissibility of billing for Mohs surgeries when the interpretation is performed by someone other than the Mohs surgeon.  *See* Ctrs. For Medicare & Medicaid Servs., Guidance to Reduce Mohs Surgery Reimbursement Issues (June 27, 2013) ("You may not bill Medicare for these procedures if preparation or interpretation of pathology slides is performed by a physician other than the Mohs surgeon.").  It is common knowledge in the industry that in order to bill for the Mohs codes, the same doctor has to perform all parts of the procedure.

**B.    MOHS SURGERY OBLIGATION FOR ACCURACY**

69.    At all relevant times herein, Dr. Jesse Mitchell has been a participating physician in the Medicare Part B Program.

70.    The vast majority of Defendants' patients indicated for Mohs surgery are over the age of 65 and are Medicare beneficiaries.

71.    Medicare's medical review policy requires—among other things—that a physician who claims payment for performing Mohs surgery document in the patient's medical record the necessity of the surgery, include in the medical record a pathologic description of the slides, and retain all slides.

72.    Defendants electronically submitted claims (completed "HCFA

1    1500s") to the Medicare Part B Program.

2         73.    Dr. Mitchell agreed in his electronic enrollment form application with

3    Medicare, among other things, that he would be responsible for all Medicare claims

4    submitted to HCFA/CMS relating to Dr. Mitchell's services, whether submitted

5    personally by Dr. Mitchell, or by his employees or agents, and that he would submit

6    claims that were accurate, truthful and complete, and based on medical services that

7    were reasonable and necessary.

8         74.    However, they were not accurate, truthful, complete, reasonable or

9    necessary, as set forth herein.

10        **C.    CPT CODES**

11        75.    Because CMS uses CPT codes as the exclusive means of billing for

12   medical services provided under Part B, a provider must select from the approved

13   list of CPT codes in order to submit claims for payment.  A provider must certify an

14   understanding of the meaning of each code, and that the services rendered match the

15   descriptions.  Medicare will not pay for any service not properly rendered and

16   documented.

17        76.    Effective January 1, 2007, the CPT book specifies that the surgeon

18   must perform both the excision and the microscopic examination portion for each of

19   the primary CPT codes involved with Mohs surgery (and the ones used by

20   Defendants here).  If the microscopic examination is performed by anyone other

21   than the surgeon performing the excision, it is not a Mohs procedure—rather it is

22   separate procedures (not bundled) reimbursed at a lower rate:

23        17311    Mohs micrographic technique, including removal of all gross

24                 tumor, surgical excision of tissue specimens, mapping, color

25                 coding of specimens, microscopic examination of specimens **by**

26                 **the surgeon**, and histopathologic preparation including routine

27                 stain(s) (e.g., hematoxylin and eosin, toluidine blue), head, neck,

28                 hands, feet, genitalia, or any location with surgery directly

1    involving muscle, cartilage, bone, tendon, major nerves, or

2    vessels; first stage, up to 5 tissue blocks.

3    17312    Mohs micrographic technique, including removal of all gross

4    tumor, surgical excision of tissue specimens, mapping, color

5    coding of specimens, microscopic examination of specimens **by**

6    **the surgeon**, and histopathologic preparation including routine

7    stain(s) (e.g., hematoxylin and eosin, toluidine blue), head, neck,

8    hands, feet, genitalia, or any location with surgery directly

9    involving muscle, cartilage, bone, tendon, major nerves, or

10    vessels; each additional stage after the first stage, up to 5 tissue

11    blocks (list separately in addition to code for primary procedure).

12    17313    Mohs micrographic technique, including removal of all gross

13    tumor, surgical excision of tissue specimens, mapping, color

14    coding of specimens, microscopic examination of specimens **by**

15    **the surgeon**, and histopathologic preparation including routine

16    stain(s) (e.g., hematoxylin and eosin, toluidine blue), of the

17    trunk, arms, or legs; first stage, up to 5 tissue blocks.

18    17314    Mohs micrographic technique, including removal of all gross

19    tumor, surgical excision of tissue specimens, mapping, color

20    coding of specimens, microscopic examination of specimens **by**

21    **the surgeon**, and histopathologic preparation including routine

22    stain(s) (e.g., hematoxylin and eosin, toluidine blue), of the

23    trunk, arms, or legs; each additional stage after the first stage, up

24    to 5 tissue blocks (list separately in addition to code for primary

25    procedure).

26    17315    Mohs micrographic technique, including removal of all gross

27    tumor, surgical excision of tissue specimens, mapping, color

28    coding of specimens, microscopic examination of specimens **by**

1     **the surgeon**, and histopathologic preparation including routine

2     stain(s) (e.g., hematoxylin and eosin, toluidine blue), each

3     additional block after the first 5 tissue blocks, any stage (list

4     separately in addition to code for primary procedure).

5     77.     CPT Codes 17311-17315 are used for Mohs surgery when tumor

6 selection criteria are met and the Mohs surgeon acts as surgeon and pathologist. If

7 Mohs surgery is performed on the same day as the E/M services, a -25 modifier is to

8 be used with the appropriate E/M code. If an unrelated major surgical procedure

9 was performed in addition to the Mohs surgery, a -57 would be attached to the E/M

10 code instead of the -25.

11     78.     As suggested above, the following surgical and laboratory procedures

12 are bundled into the 17311-17315 codes: clinical evaluation of tumor margins,

13 outlining of tumor margins with skin-marking pens, reference-mark placement, local

14 anesthesia of the tumor area, "debulking" of the tumor, surgical excision of the first

15 stage (layer, or level), division of the specimen into smaller sections (if done),

16 chroma-coding of all sections, mapping, embedding, cutting, and staining of the

17 histopathology slides, complete microscopic slide evaluation by the surgeon, and

18 transfer of the histologic findings to the Mohs map.

19     79.     If the margins of the first stage are clear of cancer, and if the defect will

20 be allowed to heal by secondary intention, hemostasis, bandaging, and post-

21 operative instructions are also bundled with codes 17311-17315.

22     80.     The excision of the first layer of tissue may be totally embedded ("TE")

23 and processed as a single specimen ("Texl") or may be of a size or complexity

24 requiring division into multiple smaller sections.

25     81.     Dividing the specimen into five or fewer sections is bundled within

26 code 17311-17315. No matter how many cuts are put on a slide or how many slides

27 are made, these are all bundled into code 17311-17315.

28     82.     When the specimen removed in the first stage, or any subsequent stage,

1    is so large and/or complex that it requires division into more than five sections, for

2    each additional stage, depending on the body area, 17312-17315 may be applied.  H

3    & E staining and/or toluidine blue staining are also bundled within code 17311-

4    17315, as noted above.

5        83.    If more than one separate tumor is appropriately treated using Mohs

6    excision on the same date of service, each tumor is billed separately using Mohs

7    codes 17311 through 17315.  If the stage one specimen is not clear of cancer, one or

8    more additional stages will need to be excised until clear margins are obtained.

9    These additional stages are coded as 17312 for the additional stage for the head,

10   neck, hands, feet, genitalia, or any area involving muscle, bone, nerves, vessels, or

11   cartilage; 17313 for the first stage for the trunk, arms or legs; 17314 for each

12   additional stage after stage one for the trunk, arms, or legs; and, 17315 each

13   additional block after the first five tissue blocks, any stage.

14       **D.    FRAUDULENTLY BILLING FOR MOHS**

15       84.    Defendants have engaged in a scheme to defraud federal healthcare

16   programs wherein their surgeons bill for Mohs surgeries using the Mohs-specific

17   CPT codes despite performing only the excision of potentially-cancerous cells.

18   Because a Mohs surgery, by its nature, requires the same surgeon to perform both

19   components, every claim by Defendants for payment for Mohs surgery is false,

20   because there is no record of Dr. Mitchell ever performing the actual procedure,

21   which, in fact, he did not perform.

22       85.    Dr. Mitchell is not qualified to perform the Mohs surgeries he billed the

23   government for.  He has not completed the necessary residency or fellowship

24   requirements for performing the procedures.

25       86.    When Defendants billed Medicare for the work performed, they acted

26   with, at least, reckless disregard for what the codes they used represented.

27   Defendants had a choice of codes, and they chose a code that represented a

28   procedure they did not perform, when they knew there were codes signifying what

1    they actually did.  Importantly, the codes they selected and used to claim federal
2    funds reimbursed at a much higher rate than the codes representing the procedures
3    they performed.  Additionally, the volume of the non-Mohs procedures was much
4    greater than would be temporally possible if Defendants had performed the services
5    for which they billed federal payors.

6    87.    Specifically, Dr. Jesse Mitchell performs the excision of potentially-
7    malignant lesions, but does not also perform any histologic evaluation.  Instead,
8    Advanced Dermatology has sent the frozen section to Dr. Roupen Yaghsezian of
9    Roupen Yaghsezian, M.D., Inc., Laguna Niguel, CA (or other pathologists), to have
10   the slides interpreted.  Dr. Yaghsezian is a quasi-retired dermapathologist who has
11   agreed to perform the interpretive services as part of a side arrangement.  Relator
12   understands that Dr. Yaghsezian often seeks out these types of arrangements, having
13   previously contacted Relator to perform interpretative services (which Relator
14   declined).  Other pathologists performed the same services under similar
15   arrangements as Dr. Yaghsezian.

16   88.    Dr. Mitchell was required to provide information regarding Mohs
17   surgery to his patients before they consented to the procedure.  That information was
18   reviewed by both Dr. Mitchell and the patients and indicated that a Mohs surgeon
19   performs the excision and the microscopic examination.  By providing the
20   information, Dr. Mitchell misled his patients about who would be performing the
21   examination, which formed a basis for their consent to the surgery.  Because he was
22   responsible to understand the information transmitted to his patients to form the
23   basis for their informed consent, Dr. Mitchell also knew that a procedure involving
24   more than one physician was, by definition, not a Mohs procedure.

25   89.    Relator first became aware of this arrangement after speaking with Dr.
26   Fred Shahan, a dermatologist practicing in San Diego, California.

27   90.    Dr. Shahan informed Relator in 2017 that he had learned from a Mohs
28   technician who assisted Dr. Mitchell in performing the Mohs-like procedure that Dr.

_____

1   Mitchell sent all Mohs slides to Dr. Yaghsezian.

2       91.    Relator confirmed these happenings upon speaking with former

3   Advanced Dermatology employee, Mr. Cyrus Pratt.  Mr. Pratt served as a

4   Physician's Assistant ("PA") for Dr. Mitchell for approximately two years.  Mr.

5   Pratt confirmed that Dr. Mitchell would perform the excision, but he would never

6   interpret the slides.  Instead, Dr. Yaghsezian (or another pathologist) would perform

7   all interpretations.  On days when Dr. Mitchell performed Mohs-like procedures, Dr.

8   Yaghsezian (or the other pathologist) would visit the office location and perform

9   said services.

10       92.    In fact, Dr. Mitchell would not even perform or supervise the closure of

11   the surgical site, leaving Mr. Pratt or other PAs to perform that task.  Because the

12   wound closure by the surgeon is an element of Mohs surgeries, the practice of

13   having a PA close the wound rendered later claims for Mohs surgeries further false.

14   Several times, Dr. Mitchell directed PAs to perform the excision on procedures that

15   were later billed as Mohs surgeries.

16       93.    Dr. Yaghsezian's main point of contact at Advanced Dermatology was

17   Chris Clem.  In fact, between 2017, when Dr. Yaghsezian first started performing

18   pathology services for Advanced Dermatology, through November 2020, when he

19   stopped, Dr. Yaghsezian believed, and still believes, Chris Clem was the owner and

20   manager of Advanced Dermatology.

21       94.    Dr. Yaghsezian has admitted that he performed the microscopic

22   examination portion of all Mohs-like procedures while working with Advanced

23   Dermatology, and that he received a flat daily rate for his services, which varied

24   depending on the location of the office he was visiting.  For the offices in Riverside,

25   San Bernardino, and Hemet, Dr. Yaghsezian's daily rate was $2500.  For the offices

26   in Temecula, Palm Springs, La Quinta, and Victorville, his rate was $3,000 per day.

27   Dr. Yaghsezian was paid by check at the end of each month.  Chris Clem would sign

28   and deliver the check.  Dr. Yaghsezian never received an IRS Form 1099 for his

services.  These rates represented a significant discount in the cost of pathology services, and Dr. Mitchell and Advanced Dermatology billed and collected more for the procedures performed than would have been possible had the proper codes (and NPIs) been used.

95.    Mr. Pratt also conveyed to Relator that Advanced Dermatology pays Dr. Yaghsezian under the table for providing these interpretive services.  Dr. Yaghsezian has never been employed by Advanced Dermatology.  Moreover, Advanced Dermatology and Dr. Yaghsezian have not executed a written agreement setting forth the exact services to be performed.

96.    Wanting to confirm Dr. Yaghsezian's role in the fraudulent scheme, Relator called Dr. Yaghsezian in 2020.  Dr. Yaghsezian confirmed that he performs the histologic evaluation portion of the Mohs-like procedure for the Advanced Dermatology physicians.

97.    According to Mr. Pratt, Advanced Dermatology performs approximately 35 Mohs-like procedures per office location (of which there are ten) per day, on days when Dr. Mitchell would schedule the procedures.  Dr. Yaghsezian has admitted he would visit an Advanced Dermatology four (4) to five (5) days per month, performing about 20-30 microscopic examinations per day during the time he worked with Advanced Dermatology.  The days on which these Mohs-like procedures were performed were known as "Mohs days," and no such procedures were performed on non- "Mohs days."

98.    If a single physician performs the excisions and examination, as indicated by the CPT codes, the procedure will frequently take several hours.  By only performing the excisions and leaving the rest to PAs and the pathologist, Advanced Dermatology and Dr. Mitchell can perform a large number of Mohs-like procedures, which are then billed as actual Mohs procedures.  In other words, by not doing the Mohs procedure in the way required to bill a Mohs procedure, Defendants can collect more money from Medicare than would even be possible if they either

1   did it properly or billed it accurately.

2       99.   On each day Dr. Yaghsezian visited Advanced Dermatology, he would

3   be provided a room at the location where he would set up his microscope.  Dr.

4   Mitchell would perform the excision in a separate room, then send a technician to

5   Dr. Yaghsezian's room with slides.  Dr. Yaghsezian examined the slides and made

6   written notes on a form, and also on a white board in the room.  Eventually, Dr.

7   Mitchell would come to the room and review the information, then return to the

8   procedure room.  Before Dr. Yaghsezian started performing the pathology for

9   Advanced Dermatology's Mohs-like procedures in 2017, the same services were

10  provided by a Dr. Nguyen.

11      100.  In 2017, Dr. Mitchell submitted claims for the following Mohs-specific

12  CPT codes:  17311, 17312, 17313, and 17314.

13      101.  In 2017, Dr. Mitchell submitted claims for CPT code 17311 no fewer

14  than 85 times for no fewer than 70 Medicare beneficiaries.  For that year, the

15  Average Medicare Payment for CPT Code 17311 was $336.97.  In 2017, for MAC

16  Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility

17  price for CPT 17311 was $700.26 and the Facility Price was $396.28.

18      102.  In 2017, Dr. Mitchell submitted claims for CPT code 17312 no fewer

19  than 77 times for no fewer than 44 Medicare beneficiaries.  For that year, the

20  Average Medicare Payment for CPT Code 17312 was $307.69.  In 2017, for MAC

21  Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility

22  price for CPT 17312 was $412.87 and the Facility Price was $210.73.

23      103.  In 2017, Dr. Mitchell submitted claims for CPT code 17313 no fewer

24  than 63 times for no fewer than 47 Medicare beneficiaries.  For that year, the

25  Average Medicare Payment for CPT Code 17313 was $296.96.  In 2017, for MAC

26  Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility

27  price for CPT 17313 was $655.52 and the facility price was $355.41.

28      104.  In 2017, Dr. Mitchell submitted claims for CPT code 17314 no fewer

than 43 times for no fewer than 29 Medicare beneficiaries.  For that year, the Average Medicare Payment for CPT Code 17314 was $295.55.  In 2017, for MAC Locality 0111262 Riverside-San Bernardino-Ontario, California, the non-facility price for CPT 17314 was $396.57 and the facility price was $195.59.

105.   PAs and others at Advanced Dermatology have commented on the fact that Dr. Mitchell calls the procedure Mohs, but that what he does is not Mohs, and that billing for Mohs procedures would misrepresent the services rendered. Knowledge by these agents and employees is imputed to Advanced Dermatology.

106.   Advanced Dermatology generates an operative report for each Mohs-like procedure.  Upon information and belief, each of these operative reports affirmatively and explicitly states that the surgeon performed all major facets of an actual Mohs procedure, including the microscopic examination and the wound closure.  At the direction of Chris Clem, Defendants and Dr. Mitchell engaged directly in the fabrication of these records.  Not only does this constitute fraud in its own right, but it demonstrates that each of the Defendants knew that what they were doing was wrong.

107.   By submitting claims to Medicare for Mohs-specific services without the surgeon performing the histologic evaluation portion, Advanced Dermatology has submitted false claims for payment.  The amounts received include reimbursement for services Advanced Dermatology did not perform, thereby allowing Advanced Dermatology to recoup amounts greater than if they had submitted claims with general excision codes.

108.   By contracting with a separate doctor to perform the microscopic examination, the procedures lost some of the efficiency and effectiveness that make a Mohs surgery unique (for which Medicare pays a premium).  Part of the value of the procedure to federal payors is that the surgeon who performs the excision knows where to look during the microscopic examination.  Some of the efficiency indicated by the code was lost with Defendants' scheme, both in the time it took for Dr.

1    Yaghsezian to orient himself and the time and understanding lost in communicating

2    findings to Dr. Mitchell.  Additionally, while Dr. Yaghsezian was performing the

3    pathology, Dr. Mitchell would be performing other excisions that would later be

4    billed as Mohs procedures, rather than focusing on the case at hand.  There are

5    proper codes that actually match what Defendants were doing and they should have

6    been used and the proper NPIs should have been billed.  By billing Mohs,

7    Defendants have misled the government in order to obtain a higher payout.

8        109.   In addition to falsely claiming federal funds for Mohs procedures not

9    performed, all such claims were further false because they were billed under the

10   National Provider Identifier (NPI) number of Dr. Mitchell (#1235357252) or the

11   company.  By so billing, Defendants represented to the government that Dr.

12   Mitchell had performed services he had not actually performed.  The falsity of such

13   claims with respect to who performed the service created a cause of action that was

14   separate and distinct from billing for procedures not performed.

15       110.   Dr. Yaghsezian operates under his own NPI number (#1215051669),

16   and did not bill Medicare for Mohs procedures while working with Dr. Mitchell.

17   Instead, he collected his daily fee of $3,000 or $2,500, tax free, in monthly checks.

18   The requirement is that each unique physician NPI that is involved in a procedure or

19   a claim be identified.  Billing under the wrong NPI—even where the procedure is

20   necessary and actually performed—is a violation of the FCA.

21       **E.    AKS VIOLATIONS**

22       111.   The claims for Mohs-specific services are made further false because

23   they are the product of kickbacks actionable under the Federal Anti-Kickback

24   Statute, 42 U.S.C. § 1320a-7b(b).

25       112.   The Anti-Kickback Statute prohibits anyone from knowingly and

26   willfully offering, providing, soliciting, or receiving remuneration to induce referrals

27   for items or services payable under federal healthcare programs.

28       113.   Here, Advanced Dermatology knowingly and willfully paid Dr.

Yaghsezian, at a deeply discounted rate, to perform interpretive services so that
Advanced Dermatology could bill using the Mohs-specific CPT codes (which
command higher rates of reimbursement) as opposed to general excision CPT codes.

114.   Advanced Dermatology in fact billed Medicare for these services, as
detailed above.

115.    Advanced Dermatology received remuneration for these referrals in
the form of Dr. Yaghsezian's reduced fees for interpretive services, which, when
billed as a component of Mohs surgeries, and at a much greater volume, resulted in
additional and unearned profit to Advanced Dermatology.  Even were there an
appropriate arrangement (not a kickback), all these details would have to have been
provided on the claim and any savings would have to have been passed on to
Medicare.

116.   Dr. Yaghsezian has admitted he accepted the reduced daily rate, and
that he never received any tax documents from Advanced Dermatology for his work
there.

117.   The excess funds Advanced Dermatology received by claiming Mohs
surgeries was far greater than the daily rate paid to Dr. Yaghsezian.  As a result, the
remuneration (i.e. the cost saved by contracting with Dr. Yaghsezian at a significant
discount, and the huge volume of cases per day) was thus exchanged for the
thousands of consistent referrals Advanced Dermatology made to Dr. Yaghsezian
for his pathology services.  In this scheme, the pathologist allows the referring entity
to bill for services that they are not providing to the referral patients as though they
did perform the services.  The pathologist is remunerating Defendants by accepting
a lower pay for the referred patients and allowing Defendants to receive payment for
services not rendered to the referred patients.

118.   Because "a claim that includes items or services resulting from a
violation of this section constitutes a false or fraudulent claim for purposes of [the
FCA]," every claim made for Mohs surgery, from the time Dr. Yaghsezian started in

2017 until he stopped working with Advanced Dermatology was false, and government payors were not authorized to knowingly pay the claims.  42 U.S.C. § 1320a-7b (2013).  This also includes the same process undertaken by other pathologists at other times.  Moreover, the referred patients were tainted and any claim for them should not be submitted and would not be paid by the Government.

119.   If only one purpose of the exchange of remuneration is to induce referrals, the exchange constitutes an unlawful kickback.  The fact that Advanced Dermatology never issued tax documents indicates their desire to keep this scheme a secret, and is evidence of their knowledge of wrongdoing.

120.   While the Anti-Kickback Statute affords stakeholders certain safe harbors that may immunize these sorts of arrangements from liability, the requirements of potentially applicable safe harbors have not been met here.  Specifically, two safe harbors might have shielded the arrangement from liability: (1) The employee safe harbor; and (2) the personal services and management contracts safe harbor.

121.   The employee safe harbor immunizes payments made from an employer to an employee, who has a bona fide employment relationship with the employer, for employment in the furnishing of any item or service for which payment is made in whole or in part by a federal healthcare program.  42 C.F.R. §1001.952(i).  Here, Dr. Yaghsezian is not a W2 employee of Advanced Dermatology, and payments are made to Dr. Yaghsezian's medical corporation, Roupen Yaghsezian, M.D., Inc.  Accordingly, the employee safe harbor does not protect the payments.

122.   The personal services and management contracts safe harbor immunizes payments made by a principal to an agent as compensation for the services of the agent as long as seven standards are met.  42 C.F.R. §1001.952(d).  These include, *inter alia*, that the agency agreement be set out in writing and signed by the parties, and that the agency agreement covers and specifies all the services

the agent provides to the principal for the term of the agreement.  Here, Advanced Dermatology and Dr. Yaghsezian have not memorialized their arrangement in an executed, written agreement specifying the services Dr. Yaghsezian provides. Instead, Advanced Dermatology pays Dr. Yaghsezian according to an unwritten, "under the table" arrangement.  Accordingly, the personal services and management contract does not protect the payments.

**F.    MEDICALLY UNNECESSARY PROCEDURES**

123.   Dr. Mitchell, directly and through Advanced Dermatology, has been conducting medically unnecessary Mohs surgeries since Advanced Dermatology was created.

124.   Under the applicable standard of care, Mohs surgery is normally performed only after a preliminary biopsy is done, is sent off to a lab, and is proven to be skin cancer (most frequently BCC; much less often, squamous cell carcinoma).

125.   If the clinician suspects a BCC, a skin biopsy should be performed. Either a shave or punch biopsy is appropriate based upon specific considerations.

126.   The existence of a biopsy-proven or suspect BCC (or other NMSC) does not necessarily mean that Mohs surgery is the proper treatment modality. Mohs surgery, which is more elaborate and expensive than other treatment modalities, is a specialized surgical procedure mostly used for the removal of high-risk skin cancers and/or those in functionally or cosmetically sensitive areas.

127.   The relatively simple, less expensive alternative to Mohs surgery, of electrodessication and curettage ("ED&C"), is the most common treatment method used by dermatologists for low-risk, primary, non-infiltrative BCCs < 1.5 cm in diameter.  Furthermore, excisional surgery of selected BCCs can offer excellent results when appropriate margins are used.

128.   Indeed, a procedure may not be needed at all. Given the slow growth of most BCCs, it is acceptable to monitor a lesion with low clinical suspicion when a biopsy is not an ideal choice because of location or patient preference.  In this case,

1    the lesion should be monitored every 3 to 6 months. Any change in the lesion should

2    prompt a biopsy.  In general, skin biopsies are quick and well tolerated procedures

3    and should be performed when warranted by clinical suspicion.

4        129.   In a Mohs surgery practice, each time the surgeon removes a

5    stage/level, the histology technician makes a frozen-section slide of the margins for

6    the surgeon.

7        130.   The surgeon uses that frozen-section slide to determine whether there is

8    malignancy, and to determine whether any additional stages need to be performed.

9        131.   The Cleveland Clinic reports that each of its full-time Mohs surgeons

10    performed 827 Mohs surgeries, on average, in 2019.  Dr. Yaghsezian has admitted

11    he performed, on average, about 20-40 microscopic examinations as part of

12    Advanced Dermatology's "Mohs" procedures on a given day, and that he did so

13    only four (4) to five (5) days per month.  The range would be from 960-2,400 per

14    year.  This means, with his lowest estimate, Advanced Dermatology and Dr.

15    Mitchell, at the direction of Chris Clem, performed approximately 960 "Mohs"

16    procedures over the 80-100 "Mohs days" per year when the procedures were

17    performed.

18        132.   Additionally, the number of stages of Mohs-like procedures at

19    Advanced Dermatology is "over the top."

20        133.   Each stage (or "level") is a layer of specimen.  One normally only

21    proceeds to take off an additional stage/level if the testing shows that there is cancer

22    in the prior level, and the Cleveland Clinic reported that on average in 2019, a full

23    Mohs procedure consisted of 1.4 stages per case.  The national mean is also 1.4

24    stages per case.

25        134.   But Dr. Mitchell is billing Medicare for two or more stages (i.e., levels)

26    of Mohs surgery for the vast majority of Mohs surgeries allegedly performed.  As

27    noted above, Medicare separately reimburses for each stage of Mohs surgery

28    performed in removing cancer.  Hence, the more stages of Mohs surgery that are

1    performed, the higher the reimbursement from Medicare.

2          135.   One cannot justify performing two or more stages of Mohs surgery on

3    the overwhelming majority of cancerous lesions.

4          136.   Mr. Cyrus Pratt, a former Advanced Dermatology PA, confirmed that

5    Dr. Mitchell intentionally undermeasures the first cut so that he can perform

6    subsequent cuts for additional reimbursement.

7          137.   Mr. Pratt also conveyed to Relator that Dr. Mitchell would perform

8    Mohs where a less invasive or complex procedure could have removed the

9    cancerous lesion.  Often, Mr. Chris Clem, Advanced Dermatology's non-physician

10   part-owner, would edit order forms (or direct a medical assistant to do so) to ensure

11   Mohs-like procedures were being performed as opposed to the less complex (and

12   less lucrative) procedure indicated.  Each of the Defendants knew these procedures

13   were not needed to diagnose or treat their patients' medical conditions.

14         138.   Medical necessity is a separate prerequisite to payment by Medicare of

15   any claim for service to its beneficiaries.

16         139.   Because the additional cuts (and in many instances, the first cuts) were

17   not medically necessary or reasonable, the ensuing claims for payment are false.

18         140.   "Mohs" procedures were not the only ones unnecessarily performed.

19   Mr. Clem instructed the PAs to "biopsy everything," and would keep track of the

20   number of biopsies performed by providers, holding them accountable if the

21   numbers were too low.

22         141.   Where the government has become aware of claims for services that

23   were medically unnecessary, the government has pursued action.  In April 2017, a

24   California dermatologist paid $2 million to resolve allegations that he falsely billed

25   Medicare for unnecessary Mohs procedures.  In February 2019, a medical practice

26   with offices in Michigan and Illinois entered into an agreement with the

27   government, paying more than $875,000 to settle claims involving unnecessary and

28   inflated bills it submitted to Medicare.  In March 2022, several associated medical

_____

testing labs and pain management facilities paid the United States $24.5 million to settle allegations of billing for unnecessary or unreasonable services.

### G.    PHYSICIAN ASSISTANTS BILLING AS PHYSICIANS

142.    Medicare guidelines are clear as to billing procedures regarding PAs. According to CMS guidelines, services that are provided by PAs for medical and surgical services are subject to a reimbursement rate, which is the lesser of 80 percent of the actual charge or 85 percent of the Physician's Fee Schedule amount reimbursement rate for the service being rendered.

143.    Bills submitted to Medicare for services rendered by PAs must indicate the PAs National Provider Identification (NPI) to make Medicare aware that the payment should be made at 85% of the Physician's Fee Schedule.  This mode of billing does not require the physical presence onsite of the physician as long as the service is being billed at the PAs' rates.

144.    In some circumstances the practice will be allowed to bill under the Physician Fee Schedule "incident-to" services even when the services were provided by PAs. However, this would require direct supervision from the physician.  Direct supervision means that the physician needs to be physically on site during the patient's visit, and immediately available to furnish assistance if required when the PA is providing care.

145.    Dr. Jesse Mitchell routinely allows PAs to bill under the physician fee schedule when Dr. Mitchell is not present in the office.  Dr. Jesse Mitchell performs the excision portion of the Mohs procedure, but does not otherwise supervise the many PAs employed by Advanced Dermatology. Dr. Mitchell acts more or less as the figurehead of the practice, leaving the PAs to furnish services to government healthcare program beneficiaries.  Instead of taking an active role in both the provision of and supervision of care, Dr. Mitchell spends much of the workday golfing and reading magazines.

146.    Relator learned from Mr. Pratt, former Advanced Dermatology PA, that

Dr. Mitchell rarely, if ever, was even available by phone to answer his PAs' questions. The PAs, who often had no prior experience working in a dermatologic clinical setting, would have to learn what to do on the job and independent of their physician supervisor.

147. A PA is not a doctor, and is not licensed to practice medicine. A PA is trained in treating various types of conditions, but must have immediate access to a licensed physician. If a PA is not properly supervised, she engages in the unauthorized practice of medicine. Proper supervision ensures an adequate standard of care, and that standard is imposed by specific regulatory requirements, which set forth the minimum criteria for preventing unauthorized medical practice. The main (if not sole) purpose of these requirements is to ensure proper care to the patient. Medicare will not pay claims that fall below this standard of care.

148. Advanced Dermatology employs a family medicine practitioner to "supervise" the PAs, but he does not have the training or qualifications to supervise the dermatology procedures at issue. Up through and including December 31, 2019, California's Medical Practice Act limited the PAs scope of practice to the supervising physician's medical specialty.

149. Moreover, the family medicine practitioner "supervises" more PAs than are permitted under California law. The California Medical Practice Act limits the number of PAs a physician may supervise to four (4). See Bus & Prof. Code § 3516(b). At any given time, the number of PAs employed by Advanced Dermatology greatly exceeds that number. Thus, many PAs performing procedures on behalf of Dr. Mitchell and Advanced Dermatology are practicing unsupervised.

150. To compound these illegalities, Chris Clem, the non-physician, part-owner of Advanced Dermatology, dictates to the PAs and Medical Assistants what they should and should not do with patients, especially as it relates to Mohs surgeries. Often, where less invasive and costly procedures had been selected to remove cancerous lesions, Mr. Clem would cross out the procedure on the order and

1    replace with Mohs.

2        151.    The knowledge of these illegal practices by the PAs constitutes

3    knowledge by Advanced Dermatology, because they are agents and employees of

4    Advanced Dermatology.

5        152.    Because the very purpose of the applicable supervision requirements is

6    to ensure a minimum standard of care in laboratory procedures, that standard is the

7    essence of Medicare's requirement of compliance.  Undisclosed noncompliance

8    hides from Medicare an essential element of the service Medicare promises its

9    beneficiaries.  By misrepresenting to Medicare that they were compliant, Defendants

10   have both implied and expressed certification with conditions that are central to

11   Medicare's policies regarding payment for its beneficiaries' care.

12       153.    By certifying compliance upon the submission of each claim,

13   Defendants masked the fact that there were insufficient safeguards on the quality of

14   patient care.  Without Defendants' assurances that they were compliant with the

15   supervision requirements, federal payors would not have paid the claims.

16       154.    Where the government has become aware of claims for services

17   rendered by non-physicians who were not properly supervised, the government has

18   pursued action.  In 2016, a California healthcare system paid the government $1.5

19   million to settle claims it had billed for services rendered by therapists not

20   authorized to personally perform without meeting required supervision

21   requirements.  In January 2020, a Tennessee doctor paid the government $285,000

22   to resolve allegations that he and his practice had billed Medicare for services

23   rendered by unsupervised nurse practitioners and other non-physicians.  In March

24   2022, Penn State University paid the government nearly $900,000 to settle claims

25   for services rendered by non-physicians who were not properly supervised.

26   **H.    CLIA LICENSING**

27       155.    Section 353 of the Public Health Service Act, as amended by the

28   Clinical Laboratory Improvement Act of 1988 ("CLIA"), requires all laboratories

_____
COMPLAINT
34

that perform tests on human specimens to meet the requirements established by Congress.  The purpose of CLIA is to ensure quality laboratory testing, and is the only means Medicare has of ensuring laboratory services to Medicare patients meet minimum standards.

156.   Obtaining a CLIA license is a major undertaking.  Both the lab director and anyone performing pathology services in a lab setting must be familiar with established protocols and must demonstrate a certain level of skill in the procedures to be conducted.

157.   Every other year, a Mohs surgeon must residence, and this relicensing involves documentation of the Mohs surgeon reading two test slides with an independent pathologist to verify their performance.  This requirement not only ensures the surgeon stays current on the procedure, but also reinforces the surgeon's knowledge of what the surgery entails (i.e., both the excision and the examination by a single doctor).

158.   Upon information and belief, Advanced Dermatology's "Mohs" surgeons have not completed the relicensing requirements.  By not engaging in the required relicensing, Dr. Mitchell not only misrepresents his qualifications to both patients and payors, but he also willfully excludes himself from information that reinforces the inherent requirements and characteristics of Mohs surgeries and appropriate billing for that or related procedures.

159.   While Advanced Dermatology submits claims for Mohs procedures based in part on what Dr. Mitchell does in a Mohs-like procedure, the additional step of claiming licensure in connection with these claims would be unnecessary based on the work Dr. Mitchell actually performs.  In order to reap the benefits of their scheme, Defendants have not only jumped through all of the regulatory and logistical hoops of obtaining a license, but also have affirmatively hidden the fact that they perform Mohs-like procedures in unlicensed labs.

160.   Advanced Dermatology inappropriately submits claims for payment

without disclosing the appropriate CLIA licensing location.

161.   When submitting a claim for payment, each claim requires a CLIA license ID.  Moreover, in California, each physical location (address) where the Mohs procedure is done requires its own unique CLIA license.

162.   Advanced Dermatology submits claims for payment under a single CLIA license ID (CLIA #05D2080392) despite providing Mohs surgeries across several of its locations.

163.   Because the very purpose of CLIA is to ensure a minimum standard of care in laboratory procedures, that standard is the essence of Medicare's requirement of CLIA compliance.  Undisclosed noncompliance hides from Medicare an essential element of the service Medicare promises its beneficiaries.  By misrepresenting to Medicare that they were compliant, Defendants have both implied and expressed certification with conditions that are central to Medicare's policies regarding payment for its beneficiaries' care.

164.   By certifying compliance upon the submission of each claim, Defendants masked the fact that there were insufficient safeguards on the quality of patient care.  Without Defendants' assurances that they were compliant with CLIA requirements, federal payors would not have paid the claims.  Without CLIA requirements, the government is not receiving reliable information and patients are undergoing worthless processes and tests.

165.   Where the government has become aware of claims for services that violated CLIA requirements, the government has pursued action.  In 2016, a laboratory company paid more than $6 million to the government, in settlement of claims regarding CLIA noncompliance.  Two company executives also pleaded guilty to obstruction of CMS's administration of the CLIA program for hiding the noncompliance.

I.    CHRIS CLEM

166.   As indicated above, Chris Clem is the functional head and CEO of

Advanced Dermatology.  In addition to making high- and low-level decisions on operations, Mr. Clem is the ultimate authority, and even Dr. Mitchell, the putative owner of Advanced Dermatology, answers to him.  Employees have worried that Mr. Clem would fire them if they disagreed with his policies or medical decisions, and he has threatened employees with termination.  He has also retaliated against employees who tried to get Defendants to do things right or threatened to turn in Defendants or Mr. Clem.  Mr. Clem signed the checks paid to contract providers and some employees.

167.   For example, Mr. Clem implemented a rule that providers are not to give differential diagnoses, and has reprimanded and threatened providers for giving patients differential diagnoses.  A differential diagnosis identifies more than one possible cause for a symptom or set of symptoms a patient is experiencing.  Mr. Clem enforced definitive diagnoses that would justify specific treatments (like Mohs), when a differential diagnosis would be more appropriate, and threatened termination if an employee did not comply with this policy.

168.   Mr. Clem was also known to change doctors' procedure recommendations based on a patient's insurance.  Mr. Clem would review the chart and recommendation, question an employee about insurance, and if the insurance were part of a capitated plan, he would change the recommendation to a less expensive procedure.  For fee-for-service plans, he would change the recommendation to a more expensive procedure.  Mr. Clem also had administrative staff and others change (or falsify) medical records.

169.   Upon information and belief, Mr. Clem attended law school, but has not been admitted to the California bar.  Dr. Mitchell has told other employees that Mr. Clem is a powerful attorney, and that he will cause legal trouble for them if they do not do as Clem directs.  They are told to do what Mr. Clem wants or face severe retaliation.  Mr. Clem is not a doctor, but makes both broad and specific medical decisions about Advanced Dermatology's patients, including the classification of

non-Mohs procedures as Mohs procedures, the kickback arrangement with Dr. Yaghsezian (and other pathologists), sidestepping licensing and supervision requirements, and performing and billing for unnecessary services.

170.   Upon information and belief, Mr. Clem is a part-owner of Advanced Dermatology, but has taken steps to hide his ownership/directorship/association with the company.  Mr. Clem signs the checks paid to contract providers.

171.   Medicare will not pay for medical services provided or directed by a non-physician, and its billing system tracks all physicians involved in providing the care.  By making medical decisions but submitting claims indicating Dr. Mitchell or another provider is deciding on patient care, Mr. Clem, along with Advanced Dermatology, and Dr. Mitchell, perpetrated fraud on Medicare.

### J.    DESERT DERMATOLOGY

172.   Desert Dermatology is a relatively new practice, incorporated in 2019 and opened in 2020.  Its website features the same doctors listed by Advanced Dermatology.  Desert Dermatology offers fewer services than Advanced Dermatology, but purports to offer Mohs surgeries, despite the fact that no surgeon at Desert Dermatology ever performs the procedure.  Upon information and belief, the practice operates in the same manner as Advanced Dermatology in every respect alleged herein.

**FIRST CAUSE OF ACTION**

**(False or Fraudulent Claims)**

**(FCA 31 U.S.C. § 3729(a)(1)(A))**

**(Cal. Govt. Code § 12651 *et seq.*)**

173.   Relator hereby incorporates and re-alleges all other paragraphs as if fully set forth herein.

174.   As set forth above, Defendants, by and through their agents, officers, and employees, knowingly presented, or caused to be presented to the United States Government and the State of California numerous false or fraudulent claims for

1   payment or approval, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(A) and/or the
2   California False Claims Act, Cal. Govt. Code § 12651 *et seq.*

3       175.   Due to Defendants' conduct, the United States and the State of
4   California have suffered substantial damages.

5       176.   The United States and the State of California are entitled to treble
6   damages based upon the amount of damage sustained by them in an amount that will
7   be proven at trial.

8       177.   The United States and the State of California are entitled to the largest
9   civil penalty allowed by law for each of the false claims.

10      178.   Relator is also entitled to his attorney's fees and litigation expenses.

**SECOND CAUSE OF ACTION**

**(False Statements)**

**(FCA 31 U.S.C. § 3729(a)(1)(B))**

**(Cal. Govt. Code § 12651 *et seq*.)**

15      179.   Relator hereby incorporates and re-alleges all other paragraphs as if
16  fully set forth herein.

17      180.   As set forth above, Defendants, by and through their agents, officers
18  and employees, knowingly made, used, or caused to be made or used, a false record
19  or statement material to a false or fraudulent claim, in violation of the FCA, 31
20  U.S.C. § 3729(a)(1)(B) and/or the California False Claims Act, Cal. Govt. Code §
21  12651 *et seq*.

22      181.   Due to Defendants' conduct, the United States and the State of
23  California have suffered substantial damages.

24      182.   The United States and the State of California are entitled to treble
25  damages based upon the amount of damage sustained by them in an amount that will
26  be proven at trial.

27      183.   The United States and the State of California are entitled to the largest
28  civil penalty allowed by law for each of the false claims.

1    184.   Relator is also entitled to his attorney's fees and litigation expenses.

2                        **THIRD CAUSE OF ACTION**

3                             **(Failure to Repay)**

4                      **(FCA-31 U.S.C. § 3729(a)(1)(G))**

5                       **(Cal. Govt. Code § 12651 *et seq.*)**

6    185.   Relator hereby incorporates and re-alleges all other paragraphs as if

7    fully set forth herein.

8    186.   As set forth above, Defendants, by and through their agents, officers,

9    and employees, knowingly made, used, or caused to be made or used a false record

10   or statement material to an obligation to pay or transmit property or money to the

11   United States Government and the State of California and  knowingly concealed or

12   knowingly and improperly avoided or decreased an obligation to pay or transmit

13   property or money to the United States Government and the State of California, in

14   violation of the FCA, 31 U.S.C. § 3729(a)(1)(G) and/or the California False Claims

15   Act, Cal. Govt. Code § 12651 *et seq.*

16   187.   Due to Defendants' conduct, the United States and the State of

17   California have suffered substantial damages.

18   188.   The United States and the State of California are entitled to treble

19   damages based upon the amount of damage sustained by them in an amount that will

20   be proven at trial.

21   189.   The United States and the State of California are entitled to the largest

22   civil penalty allowed by law for each of the false claims.

23   190.   Relator is also entitled to his attorney's fees and litigation expenses.

24                          **PRAYER FOR RELIEF**

25        **WHEREFORE**, Relator prays for judgment:

26   a.     awarding the United States and the State of California damages

27   sustained by them for each of the false claims;

28   b.     awarding the United States and the State of California treble damages

_____

1    sustained by them for each of the false claims;

2        c.    awarding the United States and the State of California the largest civil

3    penalty allowed by law for each of the false claims;

4        d.    awarding Relator 30% of the proceeds of this action and any alternate

5    remedy or the settlement of any such claim;

6        e.    awarding Relator his litigation costs and reasonable attorney's fees; and

7        f.    granting such other relief as the Court may deem just and proper.

8

9    DATED:  April 29, 2022        SCHONBRUN SEPLOW HARRIS
10                                 HOFFMAN & ZELDES LLP

11                                 BOTHWELL LAW GROUP, P.C.

12
                                       */s/ Wilmer J. Harris*
13                                 By: _____

14                                     Wilmer J. Harris
                                       Mike Bothwell
15                                 Attorneys for Relator, Randy Jacobs
16

17

18                            **<u>JURY DEMAND</u>**

19        Plaintiff hereby demands a jury trial on all issues triable to a jury.

20

21   DATED:  April 29, 2022        SCHONBRUN SEPLOW HARRIS
                                   HOFFMAN & ZELDES LLP
22

23                                 BOTHWELL LAW GROUP, P.C.

24                                     */s/ Wilmer J. Harris*

25                                 By: _____

26                                     Wilmer J. Harris
                                       Mike Bothwell
27                                 Attorneys for Relator, Randy Jacobs

28

_____