UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| Case No. | **EDCV 20-1373 JGB (SHKx)** | Date | September 28, 2022 |
|---|---|---|---|
| Title | *United States of America ex rel. Randy Jacobs v. Advanced Dermatology and Skin Cancer Specialists, P.C., et al.* | | |

| Present: The Honorable | JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE |
|---|---|

| TANISHA CARRILLO | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING Defendant Desert Dermatology's Motion to Dismiss (Dkt. No. 48); (2) DENYING Advanced Dermatology's Motion to Dismiss (Dkt. No 46); (3) DENYING Christopher Clem's Motion to Dismiss (Dkt. No. 49); and (4) VACATING the October 3, 2022 Hearing (IN CHAMBERS)

Before the Court are three motions: (1) a motion to dismiss filed by Defendant Desert Dermatology ("DD Motion," Dkt. No. 48); (2) a motion to dismiss by Defendant Advanced Dermatology ("AD Motion," Dkt. No. 46); and (3) a motion to dismiss filed by Defendant Christopher Clem ("Clem Motion," Dkt. No. 49) (collectively, "Motions"). The Court determines these matters are appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the Motions, the Court **GRANTS** the DD Motion, **DENIES** the AD Motion, and **DENIES** the Clem Motion. The October 3, 2022 hearing is **VACATED**.

## I.   BACKGROUND

On August 25, 2021, Plaintiff relator Randy Jacobs ("Relator") filed a complaint against Defendants Advanced Dermatology & Skin Cancer Specialists, P.C. ("AD"), Dr. Jesse Mitchell ("Dr. Mitchell"), and Dr. Roupen Yaghsezian. ("Complaint," Dkt. No. 1.) On April 29, 2022, Relator filed an amended complaint against Defendants AD, Dr. Mitchell, Christopher Clem, and Desert Dermatology & Skin Cancer Specialists, Inc ("DD"). ("FAC," Dkt. No. 34.) The FAC alleges four causes of action under the Federal and California False Claims Acts: (1)

violation of 31 U.S.C. § 3729(a)(1)(A); (2) violation of 31 U.S.C. § 3729(a)(1)(B); (3) violation of 31 U.S.C. § 3729(a)(1)(G); and (4) violation of Cal. Gov. Code §§ 12651 et seq. (See id.)

On June 17, 2022, AD and Dr. Mitchell filed a joint motion to dismiss and request for judicial notice. (AD Motion, Dkt. No. 46; "RJN," Dkt. No. 47.) On the same day, DD and Mr. Clem filed motions to dismiss. (DD Motion; Clem Motion.)

On July 18, 2022, Relator opposed the DD Motion ("Opp. to DD," Dkt. No. 52.), the Clem Motion ("Opp. to Clem," Dkt. No. 53), and the AD Motion ("Opp. to AD," Dkt. No. 55.) On the same day, Relator opposed the RJN. ("Opp. to RJN," Dkt. No. 54.)

On August 5, 2022, DD replied. ("DD Reply," Dkt. No. 57.) AD replied the same day. ("AD Reply," Dkt. No. 58.) So did Mr. Clem. ("Clem Reply," Dkt. No. 59.) On August 10, 2022, Relator filed an ex parte application for leave to file a surreply. (Dkt. No. 60.) AD opposed the ex parte application on August 11, 2022. (Dkt. No. 61.)

On August 23, 2022, the parties stipulated to continue the hearing on the motions to dismiss from August 29, 2022 to September 26, 2022. (Dkt. No. 62.) The Court approved the stipulation. (Dkt. No. 63.) The Court denied Relator's ex parte application on August 26, 2022. (Dkt. No. 64.) On August 29, 2022, AD filed an ex parte application for leave to file supplemental briefing regarding intervening authority. (Dkt. No. 65.) Relator opposed on September 2, 2022. (Dkt. No. 66.) On September 7, 2022, the Court denied the ex parte application. (Dkt. No. 68.)

## II.     FACTUAL ALLEGATIONS

This action involves allegedly fraudulent conduct in relation to Medicare billing for Mohs surgeries. Relator alleges the following facts, which are assumed to be true for purposes of these Motions.

Relator is a board-certified clinical dermatologist with expertise in skin cancer prevention and treatment. (FAC ¶ 6.) He graduated from the University of Southern California School of Medicine and completed his residency at the Loma Linda University Medical Center. (Id.) He has practiced dermatology for over three decades. (Id.)

AD has offices throughout the Inland Empire—Temecula, Hemet, Riverside, Moreno Valley, and Corona, among others—and its "principal business office" is located at 31720 South Temecula Parkway Suite 200, Temecula, California 92592. (Id. ¶ 7.) DD is an Arizona corporation with locations in Arizona (Gilbert and Glendale). (Id. ¶ 8.) DD is a "related entity to [AD] with common ownership, leadership, and practices." (Id.) Dr. Mitchell is a dermatologist at AD and DD, is listed as the owner of AD, and a director of DD. (Id. ¶ 9.) Mr. Clem is a "non-physician who effectively runs the [AD] and [DD] practices. He is an agent-in-fact." (Id. ¶ 10.) "Employees and vendors of [AD] believe him to be the company's real owner and Chief Operating Officer (CEO)." (Id.) "Mr. Clem directs "both the day-to-day operations

and the broader management of both [AD] and [DD]." (Id.) "He is listed with the Arizona Secretary of State as an officer of [DD]." (Id.)

Mohs micrographic surgery ("Mohs surgery") is a specialized method of skin cancer removal reserved for particular types of skin cancers. (Id. ¶ 48.) Historically, Mohs surgery is performed by dermatologists because of their expertise in skin cancer pathophysiology, cutaneous histopathology, and dermatologic surgery. (Id. ¶ 51.) Mohs surgery training programs, one or two-year long post-residency fellowships, are available across the nation. (Id. ¶ 52.) The surgery involves a meticulous technique which provides complete microscopic margin control through the removal of horizontal frozen histological sections of the excised tumor's surgical margins, for the most complete microscopic examination possible. (Id. ¶ 54.) It requires a physician trained in Mohs surgery and pathology to accurately excise and map tumor extensions. (Id.) The surgery is performed in stages (or levels) in which a physician removes a single layer of tissue, then performs additional stages if necessary to clear the area of cancer. (Id. ¶ 55.) Each "stage" or "level" is an individual excision in which the patient's tissue is removed, oriented, processed, and microscopically examined. (Id.) After each stage, the physician examines the excised skin for cancer via a microscope; thus, the physician acts in the dual role of both surgeon and pathologist. (Id. ¶ 56.) The physician only proceeds to perform subsequent stages if cancer remains present. (Id.)

Medical providers and health care benefit programs utilize well-known and standard insurance processing codes to identify the service provider, the medical diagnoses, and the medical treatments or procedures rendered to a patient. Each licensed medical provider, such as a physician, physician's assistant, or nurse practitioner, has a unique code called a National Provider Identifier, or "NPI." The numerical codes for medical procedures are called "CPT codes" and are published in the American Medical Association's Physicians' Current Procedural Terminology. (Id. ¶ 28.) A provider's NPI, the diagnosis, and the procedure codes are later recorded on a standard claim form known as the Centers for Medicare and Medicaid Services 1500 ("CMS" or "CMS-1500") form, which a provider sends to the health benefit program for payment. (Id. ¶ 29.) When submitted, the health care benefit program relies on such information in evaluation of payment claims. (Id. ¶ 31.) When each claim is submitted for payment, the treating physician certifies to the health care benefit program that (1) the services shown on the form are medically indicated and necessary for the health of the patient and (2) were personally furnished by the physician or were furnished incident to the physician's professional service by the physician's employee under his immediate personal supervision. (Id. ¶ 30.)

Medicare pays for Mohs surgery as both reasonable and necessary only if performed on certain current and accepted diagnoses/indications, and only if the surgery was performed as indicated by the CPT code used to claim payment. (Id. ¶ 60.) Mohs is a "bundled code" and can only be bundled if the same doctor performs all elements of the procedure—otherwise, the lower, and separate, codes are to be used for the same overall process. (Id.) Medicare also reimburses separately for each stage of Mohs surgery performed in removing cancer. (Id.) The more stages of Mohs surgery performed, the higher the Medicare reimbursement. (Id.)

Medicare's medical review policy requires that a Mohs surgery physician document the necessity of the surgery, a pathological description of the slides, and retain all slides. (Id. ¶ 71.)

For the overwhelming majority of cancerous lesions, performing two or more stages of Mohs surgery is unjustified. (Id. ¶ 135.) Dr. Mitchell intentionally under measures the first excision so that he can perform additional excisions—stages—for additional reimbursement. (Id. ¶ 136.) Dr. Mitchell also performs Mohs where a less invasive procedure could have removed the cancer. (Id. ¶ 137.) Mr. Clem, a non-physician, edited order forms (or directed a medical assistant to do so) to ensure Mohs-like procedures were performed as opposed to less complex (and less lucrative) procedures. (Id.) Mr. Clem instructed PAs to "biopsy everything," kept track of the number of biopsies performed, and "[held] them accountable if the numbers were too low." (Id. ¶ 140.) Mr. Clem also changed doctors' procedure recommendations based on a patient's insurance, and had administrative staff and others change (or falsify) medical records. (Id. ¶ 168.) Medical necessity is a separate prerequisite to Medicare payment. (Id. ¶ 138.)

For this procedure, Dr. Mitchell performs the excisions[1] but not the pathology. (Id. ¶ 87.) Instead, AD sends the slides for another doctor to review. (Id.) AD has sent the frozen sections of tissue to Dr. Roupen Yaghsezian, located in Laguna Niguel, for interpretation. (Id.) Dr. Yaghsezian is a quasi-retired dermapathologist who agreed to perform the interpretative services as part of a side arrangement. (Id.) Dr. Yaghsezian previously contacted Relator to offer interpretative services, which Relator declined. (Id.)

In 2017, Dr. Fred Shahan, a dermatologist in San Diego, California, informed Relator that Dr. Mitchell sent all Mohs slides to Dr. Yaghsezian. (Id. ¶ 90.) A former AD physician's assistant ("PA"), Mr. Cyrus Pratt, confirmed that Dr. Mitchell would perform the excision but never interpret the slides. (Id. ¶ 91.) Instead, another doctor would perform the interpretations. (Id.) On the days Dr. Mitchell performed "Mohs-like" procedures, Dr. Yaghsezian, or another pathologist, visited the office and performed the interpretations. (Id.) Dr. Yaghsezian is not a W2 employee of AD. (Id. ¶ 120.) He collected a daily, untaxed fee[2] of $3,000 or $2,500, depending on the office location, paid in monthly checks. (Id. ¶ 110.)

Wound closure by the surgeon is an element of Mohs surgery. (Id. ¶ 92.) Dr. Mitchell, however, often did not perform or supervise the surgical site's closure, which he left to Mr. Pratt or other PAs. (Id.) PAs and other affiliates of AD have commented on the fact that Dr. Mitchell calls the procedure he performs as Mohs surgery but that what he does is not Mohs, and billing for Mohs procedures misrepresents the services rendered. (Id. ¶ 105.) AD and Dr. Mitchell, at the direction of Mr. Clem, performed approximately 960 "Mohs" procedures over the 80-100 "Mohs days" per year when the procedure was performed. (Id. ¶ 131.)

---

[1] On several occasions, Dr. Mitchell directed PAs to perform the excision on procedures later billed as Mohs surgeries. (Id. ¶ 92.)

[2] AD never issued tax documents to Dr. Yaghsezian. (Id. ¶ 119.)

AD generates an operative report for each Mohs-like procedure. (Id. ¶ 106.) Each of these reports affirmatively and explicitly states that the physician performed all major facets of an actual Mohs procedure, including microscopic examination and wound closure. (Id.) There are proper codes that actually match what Defendants were doing (having one physician perform the excision and another doctor perform the pathology). (Id. ¶ 108.) The procedures were billed under the National Provider Identifier ("NPI") number of Dr. Mitchell or the company. (Id. ¶ 109.) The billing NPI represented to the government that Dr. Mitchell performed services not actually rendered because Dr. Mitchell did not perform all parts of the Mohs surgery himself. (Id. ¶¶ 108, 109.)[3] Defendants' billing these procedures as Mohs surgeries allowed them to mislead the government in order to obtain a higher payout. (Id. ¶ 108.) At the direction of Mr. Clem, Defendants engaged in the fabrication of these records. (Id.)

DD is a relatively new practice; it was incorporated in 2019 and began operation in 2020. (Id. ¶ 172.) Its website features the same doctors as AD. (Id.) DD offers fewer services than AD but purports to offer Mohs surgery, despite the fact that no surgeon at DD performs the procedure. (Id.) DD operates in the same manner as AD. (Id.)

### III.   LEGAL STANDARD

**A. Motion to Dismiss Pursuant to Rule 12(b)(2)**

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154-55 (9th Cir. 2006) (citing Fireman's Fund Ins. Co. v. Nat. Bank of Coops., 103 F.3d 888, 893 (9th Cir. 1996)). Because California authorizes jurisdiction to the fullest extent permitted by the Constitution, see Cal. Code Civ. P. § 410.10, the only question the Court must ask is whether the exercise of jurisdiction over the defendant would be consistent with due process. Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant who has sufficient "minimum contacts" with the forum that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945). The two recognized bases for exercising personal jurisdiction over a non-resident defendant are: (1) "general jurisdiction," which arises where defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over him in all matters; and (2) "specific

---

[3] Dr. Yaghsezian operates under his own NPI number and did not bill Medicare for Mohs procedures at the time he performed the pathology for Dr. Mitchell. (Id. ¶ 110.) Instead, he collected a daily, untaxed fee of $3,000 or $2,500, depending on the office location, in monthly checks. (Id.) Medicare requires that each physician involved in a procedure or claim be identified through his unique NPI. (Id. ¶ 110.)

jurisdiction," which arises when a defendant's contacts with the forum give rise to the claim in question. See Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414–16 (1984).

"[A] finding of general jurisdiction permits a defendant to be hauled into court in the forum state to answer for any of its activities anywhere in the world," Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004), while specific jurisdiction claims arise "out of defendant's forum related activities." Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998). "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." Daimler AG v. Bauman, 571 U.S. 117, 137 (2014) (internal quotations omitted). The Supreme Court has limited general jurisdiction over corporations to only those forums where the corporation has continuous and systemic contacts, such that it is essentially at home. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

The Ninth Circuit uses a three-part test to determine if a defendant's contacts with the forum state are sufficient to establish specific jurisdiction. Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995). Specific jurisdiction exists if: (1) the out of state defendant purposefully availed him or herself of the privilege of conducting activities in the forum, consequently invoking the benefits and protections of the forum's laws; (2) the cause of action arose out of the defendant's forum related activities; and (3) the exercise of jurisdiction is reasonable. Myers v. Bennet Law Offices, 238 F.3d 1068, 1072 (9th Cir. 2001); see also Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977).

The plaintiff bears the burden of establishing personal jurisdiction. Martinez v. Aero Caribbean, 764 F.3d 1062, 1066 (9th Cir. 2014). When the motion is based on written materials, the plaintiff must make a "prima facie showing of jurisdictional facts to withstand the motion to dismiss." Id. (quoting Schwarzenegger, 374 F.3d at 800). To make a "prima facie showing," the plaintiff needs to show facts that, if true, would support jurisdiction over the defendant. Lindora, LLC v. Isagenix Int'l, LLC, 198 F. Supp. 3d 1127, 1135 (S.D. Cal. 2016). To determine if a plaintiff met his burden, "uncontroverted allegations in [the] complaint must be taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588-89 (9th Cir. 1996) (quoting WNS, Inc. v. Farrow, 884 F.2d 200, 203 (5th Cir. 1989)).

## B. 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Horosny v. Burlington Coat Factory, Inc., WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015). When evaluating a Rule 12(b)(6) motion, a court must

accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

**C. Fraud: Rule 9(b)**

Claims under the False Claims Act are subject to Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). United States ex rel Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016). Rule 9(b) requires that circumstances constituting a claim for fraud or mistake be pled with particularity. Fed. R. Civ. P. 9(b). Rule 9(b) requires a plaintiff to "identify the 'who, what, when, where and how of the misconduct charged,'" as well as "what is false or misleading about [the purportedly fraudulent conduct], and why it is false." Shimono v. Harbor Freight Tools USA, Inc., 2016 WL 6238483, at *5 (C.D. Cal. Oct. 24, 2016) (quoting Cafasso, ex rel. United States v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)).

**D. Leave to Amend: Rule 15**

Federal Rule of Civil Procedure 15 ("Rule 15") provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'" Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)). Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not

possibly be cured by allegation of other facts." <u>Lopez v. Smith</u>, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted).

## IV.     PERSONAL JURISDICTION OF DESERT DERMATOLOGY

Desert Dermatology ("DD") moves to dismiss the Complaint for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2). Relator responds with a series of legal theories upon which personal jurisdiction over DD might be established.

The FAC alleges the following "jurisdictional facts" concerning DD: DD is "an Arizona corporation with locations in Gilbert and Glendale, Arizona." (FAC ¶ 8.) Its corporate address is 2 East Congress St., Suite 900A, Tucson, Arizona 85701. (<u>Id.</u>) "Desert Dermatology is a related entity to Advanced Dermatology with common ownership, leadership, and practices." (<u>Id.</u>) Dr. Jesse Mitchell is a dermatologist at both AD and DD and serves as a director of DD. (<u>Id.</u>) Christopher Clem directs and manages both AD and DD. (<u>Id.</u>) He is listed with the Arizona Secretary of State as an officer of DD; the listing references a Temecula, California address for him. (<u>Id.</u>)

The FAC contains a sole substantive paragraph alleging illegal conduct by DD:

> Desert Dermatology is a relatively new practice, incorporated in 2019 and opened in 2020. Its website features the same doctors listed by Advanced Dermatology. Desert Dermatology offers fewer services than Advanced Dermatology, but purports to offer Mohs surgeries, despite the fact that no surgeon at Desert Dermatology ever performs the procedure. Upon information and belief, the practice operates in the same manner as Advanced Dermatology in every respect alleged herein.

(<u>Id.</u> ¶ 172.)

DD argues that Plaintiff cannot establish either general or specific jurisdiction over it. As DD notes, it is undisputed that DD is an Arizona corporation, headquartered in Arizona. (DD Motion at 7; FAC ¶ 8.) It only operates offices in Arizona. (<u>Id.</u>) Further, Plaintiff does not allege that DD has "contracted with California vendors, accepted California patients, or even to have advertised or solicited business in or from California." (DD Motion at 7.) Indeed, DD "is not alleged to have conducted any activities at all in California, or to have availed itself of California's laws and protections." (<u>Id.</u>) As DD characterizes Plaintiff's allegations and evidence, the purported basis for personal jurisdiction appears to rest on (1) Dr. Mitchell and Christopher Clem's ownership or financial interests in DD; (2) Similarities in the AD and DD websites; (3) The appearance of Dr. Mitchell and other AD doctors on the DD website; (4) and the barebones allegation that DD "operates in the same manner as Advanced Dermatology in every respect alleged herein." (<u>Id.</u>; DD Reply at 11.) DD asserts that this is a deficient showing for either basis of personal jurisdiction.

Plaintiff's opposition cites numerous additional facts in multiple lengthy footnotes (Opp. to DD at 4-5) and in the body of his motion. (Opp. to DD at 7-17.) Many of these facts would potentially be helpful to establish personal jurisdiction over DD. For instance, Plaintiff claims that DD conducts numerous transactions out of California; its management and operations are directed out of California by Chris Clem; the false billing and overpayment claims involving both AD and DD are processed by the same Medicare Administrative Contractor in California; the hiring, firing, management and supervision of DD's employees occurs in California; Dr. Mitchell travels from California to Arizona to perform medical services; the compensation of doctors and other employees of DD goes through California; and so forth. (Id. at 4-5, 7-17.) The problem for Plaintiff, though, is that he has failed to either allege these facts in the FAC or submit competent evidence of them, such as affidavits attesting to their truth. At this stage, the Court must take uncontested allegations in the complaint as true and must resolve conflicts between the facts contained in the parties' affidavits in the plaintiff's favor. Am. Tel. & Tel. Co., 94 F.3d at 588-89. Of course, that does not mean a plaintiff may simply assert an array of key facts in its opposition to a motion to dismiss for lack of jurisdiction without providing supporting evidence for them, or even alleging them in a complaint. See, e.g., City & Cnty. of San Francisco v. Purdue Pharma L.P., 491 F. Supp. 3d 610, 634 (N.D. Cal. 2020) (a plaintiff can make a prima facie showing of personal jurisdiction by "producing admissible evidence") (emphasis added). As DD rightfully notes, such a practice would impermissibly circumvent the pleading standards regarding the existence of personal jurisdiction. (DD Reply at 7.)[4]

The four declarations that Plaintiff does offer allege little in the way of the necessary "jurisdictional facts" to establish personal jurisdiction.[5] Two declarations, from Sarah Barnes and Dr. Roupen Yaghsezian, fail to mention DD, or any facts concerning Arizona-related activity, altogether. (Opp. to DD, Ex. E (Barnes Decl.)); Ex. F (Yaghsezian Decl.)) Darek Anderson, a

---

[4] To the extent that Desert Dermatology asserts that a strict interpretation of the hearsay rule applies in reviewing such evidence, though, the Court disagrees. Whether hearsay statements may support a finding of personal jurisdiction is somewhat unsettled. However, "[s]ome district courts in the Ninth Circuit have employed the Federal Circuit's rule that 'hearsay may be considered at the 12(b)(2) stage if it bears 'circumstantial indicia of reliability.''" Skye Orthobiologics, LLC v. CTM Biomed., LLC, 2021 WL 6102520, at *6 n.6 (C.D. Cal. Feb. 9, 2021) (citing Mitan v. Feeney, 497 F. Supp. 2d 1113, 1117 n.3 (C.D. Cal. 2007) (quoting Beverly Hills Fan Co. v. Royal Sovereign Corp., 21 F.3d 1558, 1562 (Fed. Cir. 1994)). The Court gives the declarations submitted here, and those in any future filings, the proper weight they deserve. The Court's factual findings evaluate whether the facts asserted have an adequate foundation, fall within the personal knowledge of the declarant, and bear indicia of reliability, regardless of whether they arguably relate hearsay statements.

[5] Multiple declarations submitted by Plaintiff appear to be scanned documents, in violation of L.R. 5-4.3.1, which requires that all electronically filed documents be created by publishing the document to PDF and not by scanning paper documents. The Court will strike future filings that violate this rule.

physician's assistant who formerly worked as a contractor for Advanced Contractor, submits a declaration that contains only indirect and vague references to DD. (Opp. to DD, Ex. A (Anderson Decl.))  He declares that Mr. Clem set up clinics in Arizona. (Anderson Decl. ¶ 4.)  He also asserts that, after he stopped working for AD, Mr. Clem sent him an email, noting he was looking to expand into Arizona.  (Id. ¶ 14.)  "[His] understanding is that this practice was set up in Phoenix and is run the same way, with the same doctors," and "believe[s] it is called Desert Dermatology or something similar."  (Id.) The declaration does not provide any basis for these assertions and seems to evince a lack of surety about them.  The only other reference to DD submitted in the declarations comes from a former AD employee, Teresa Enriquez, who simply notes that Mr. Clem owns DD in Arizona.  (Opp. to DD, Ex. D (Enriquez Decl.) ¶ 4.)  Plaintiff submits no declarations (or any other form of evidence) from any individual who appear to have personal knowledge or direct interaction with DD or its Arizona-based operations.

Beyond the declarations, Plaintiff submits evidence that both AD and DD share the same registered agent and counsel.  (Opp. to DD at 9-10, Ex. B.)  Plaintiff also demonstrates that the Arizona Secretary of State's records indicate that DD is owned and managed by Mr. Clem and Dr. Mitchell.  (Opp. to DD at 10, Ex. C.)

Plaintiff marshals this limited evidence in support of two sweeping assumptions: first, that since DD appears to be run by the same people, it must be engaged in the same illegal conduct as AD; and second, that since those individuals are California-based, the same illegal conduct must flow directly from California contacts as well.  Of course, Relator may very well be able to establish the truth of these assumptions, if given the opportunity.  For now, though, he offers a thin evidentiary record and a barebones pleading against DD; only four of the 190 paragraphs of the FAC reference it all.  Plaintiff thus asks the Court to fill significant factual gaps and draw numerous logical inferences to find personal jurisdiction.  As the allegations and factual record currently stand, the Court cannot do so.

Without treating DD and AD as the same entity (an argument address below), Plaintiff cannot establish general jurisdiction over DD.  General jurisdiction over corporations exists in forums where the corporation has continuous and systemic contacts, such that it is essentially at home. Goodyear, 564 U.S. at 919.  "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction." Daimler, 571 U.S. at 137 (internal quotations omitted).  "Only in an 'exceptional case' will general jurisdiction be available anywhere else."  Martinez v. Aero Caribbean, 764 F.3d 1062, 1070 (9th Cir. 2014).  The defendant's activities within the state must be extensive, wide-ranging, or "substantial, continuous and systematic." Kransco Mfg., Inc. v. Markwitz, 656 F.2d 1376, 1378 (9th Cir. 1981).

None of the paradigm bases for general jurisdiction in California are present: it is undisputed that Arizona is DD's state of incorporation and principal place of business.  Plaintiff does not allege that DD is registered or authorized to do business in California, pays California taxes, or has a physical business presence in the state.  Accordingly, DD is not "essentially at home" in California.  See Martinez, 794 F.3d at 1070.

The same is true for specific personal jurisdiction. In order to exercise specific jurisdiction over a non-resident defendant, the Court must find that (1) the defendant either purposely availed himself of the privilege of conducting business in the forum state or purposely directed his activities at residents of the forum state; (2) the cause of action arises out of or results from the non-resident defendant's forum-related contacts; and (3) the forum's exercise of personal jurisdiction over the non-resident would comport with "fair play and substantial justice." Burger King v. Rudzewics, 471 U.S. 462, 477–487 (1985); Davis v. Metro Prods., Inc., 885 F.2d 515, 520 (9th Cir. 1989). The plaintiff bears the burden of satisfying the first two prongs of this test. Sher v. Johnson, 911 F.2d 1357, 1361 (9th Cir. 1990); Advanced Skin & Hair, Inc. v. Bancroft, 858 F. Supp. 2d 1084, 1089 (C.D. Cal. 2012). If a plaintiff succeeds in satisfying both, then the burden shifts to the defendant to present a "compelling case" that the exercise of specific jurisdiction would not be reasonable. Id.

The Court need not undertake a lengthy analysis of the three prongs on the record before it. Relator never alleges or asserts that DD does business in California, treats California patients, or even attempts to solicit business from California residents. None of the allegations involve any procedures performed at DD, or practices related to billing or payment at DD, except at the highest level of generality, namely that "the practice operates in the same manner as Advanced Dermatology in every respect." (FAC ¶ 172.) Without pleading or asserting facts that will establish these California contacts, Relator's case for personal jurisdiction fails at the "purposeful availment" or "purposeful direction" step. See Burger King, 471 U.S. at 477-487.

Relator offers multiple intriguing legal theories concerning personal jurisdiction that might be meritorious with the allegations and facts to support them. If it is true that DD's corporate decision-making, administrative functions and operations are directed entirely from California, not Arizona, there may be a case to establish general personal jurisdiction on a Perkins theory. See Perkins v. Benguet Consol. Min. Co, 342 U.S. 437 (1952) (finding general personal jurisdiction in Ohio over Philippines mining corporation that stopped mining operations and relocated its president to Ohio during the Japanese occupation of the Philippines in World War II). Similarly, there may be a basis to find personal jurisdiction on any of the alternate, "duck test"[6] theories asserted by Relator: that DD is either a mere "office of" AD; it is the same enterprise as AD; or it is AD's alter ago. (Opp. to DD at 8-16.) Essentially all that Plaintiff has competently established or alleged thus far, however, is that two key individuals are involved in both entities. That is clearly an insufficient basis on which any of these theories may be maintained. See, e.g., Doe v. Unocal Corp., 248 F.3d 915, 925–27 (9th Cir. 2001); Am. Tel. & Tel. Co., 94 F.3d at 590-91; United States v. Bestfoods, 524 U.S. 51, 69–70 (1998).

---

[6] Relator argues, "'[i]f something allegedly looks like a duck and quacks like a duck, it's plausibly alleged to be a duck.' (Quoting Grandesign Advert. Firm, Inc. v. Talon US (Grandesign) LLC, 2021 WL 780477, at *1 (S.D. Cal. Mar. 1, 2021)). Here, [Desert Dermatology] not only *looks like* the duck that is AD, it is the *same duck*." (Opp. to DD at 9) (emphasis in original.)

In sum, the Court concludes that Plaintiff has not met his burden of establishing personal jurisdiction over DD. However, many of the problems referenced above may be remedied by pleading allegations with greater specificity and presenting additional, competent evidence of "jurisdictional facts."[7] Accordingly, the Court **GRANTS** DD's motion to dismiss for lack of personal jurisdiction, **WITH LEAVE TO AMEND**. See Lopez, 203 F.3d at 1127. Further, as the Court lacks jurisdiction over DD, the Court does not reach DD's motion to dismiss for failure to state a claim.

## V.        FALSE CLAIMS ACT

The False Claims Act ("FCA") makes liable any "person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). A similar provision prohibits the use of material records or statements (or concealment thereof) that "avoids or decreases an obligation to pay or transmit money . . . to the Government." 31 U.S.C. § 3729(a)(1)(G). "In an archetypical qui tam False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1172-73 (9th Cir. 2016) (internal quotations omitted). "As [is also] relevant here . . . a claim under the [FCA] can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." Id. at 1173 (internal quotations omitted). "Under a false certification theory, it is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." Id. (internal quotations omitted) (emphasis in original). Discussed further below, false certification may be express or implied, depending on the Defendant's alleged conduct. See United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1017 (9th Cir. 2018).

The three subsections of the FCA at issue here impose liability where one person or entity commits a violation through its control of the actions of another person or entity. For instance, subsection (a)(1)(A) of section 3729 imposes liability on "any person who . . . knowingly presents, or **causes to be presented**, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). Subsections (a)(1)(B) and (a)(1)(G) repeat the emphasized language. 31 U.S.C. § 3729(a)(1)(B), (G); see also United States v. Mackby, 261 F.3d 821, 827-28 (9th Cir. 2001) ("[A] person need not be the one who actually submitted the

---

[7] The Court acknowledges Plaintiff's request for discovery on jurisdiction, which Relator asserts would be necessary to establish additional facts. The Court declines to order discovery on the issue at this time. Plaintiff appears to be aware of numerous additional facts unalleged in the Complaint and for which he has not provided supporting evidence thus far. If Plaintiff chooses to file an amended complaint, he should address the deficiencies cited by the Court in its pleadings and in an opposition to any further motions to dismiss. The Court may consider ordering discovery or holding an evidentiary hearing at a future date.

claim forms in order to be liable"); 31 U.S.C. § 3729(b)(2)(A) (broadly defining "claim" as including "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that . . . is presented to an officer, employee, or agent of the United States"). To state a claim under the FCA, a relator must allege: "(1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material, causing (4) the government to pay out money or forfeit moneys due." United States ex rel. Campie v. Gilead Sciences, Inc., 862 F.3d 890, 902 (9th Cir. 2017).

### A.  Joint Arguments

The Court first addresses the arguments in which Defendants join as to the elements of Relator's FCA claims.

#### 1.  Falsity

Defendants contend that Relator has not sufficiently alleged the element of falsity because (1) Relator did not identify any claim where AD "incorrectly certified its compliance with laws or regulations, let alone the Medicare guidance" and (2) Relator failed to allege that AD ever agreed to expressly comply with "sub-regulatory" guidance. (AD Motion at 11.) Defendants further argue that AD's use of CPT codes does not qualify as a "false statement" because "no allegation of separate billing by another physician is in the FAC." (Id. at 8-9.) Defendants are incorrect.

Under the FCA, claims may be "factually false" or "legally false." "In an archetypical qui tam False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent." United Healthcare Ins. Co., 848 F.3d at 1172-73 (internal quotations omitted). Such claims are referred to as factually false claims. See Campie, 862 F.3d at 900. Legally false certifications can be established in two ways: (1) express false certification, which "means that the entity seeking payment falsely certifies compliance with a law, rule or regulation as part of the process through which the claim for payment is submitted," and (2) "implied false certification, which occurs when an entity has previously undertaken to expressly comply with a law, rule, or regulation but does not, and that obligation is implicated by submitting a claim for payment even though a certification of compliance is not required in the process of submitting the claim." Rose, 909 F.3d at 1017.

In support of their argument, Defendants assert that the only situation in which the Mohs code cannot be used, per the CPT Codebook, is "[i]f either of these responsibilities is delegated to another physician or other qualified health professional who reports the services separately, these codes should not be reported." (AD Motion at 8-9) (citing RJN Ex. 1).[8] Defendants selectively quote the cited passage, which specifically provides that:

---

[8] AD requests judicial notice in support of its Motion. (See RJN.) The CPT Codebook is subject to judicial notice as it is a publicly available government document. See Lee v. City of Los Angeles, 250 F.3d 668, 689–90 (9th Cir. 2001) (finding records on file with agencies to be judicially noticeable); Perkins v. LinkedIn Corp., 53 F. Supp. 3d 1190, 1204 (N.D. Cal. 2014)

> Mohs micrographic surgery is a technique for the removal of complex or ill-defined skin cancer with histologic examination of 100% of the surgical margins. **It requires the integration of an individual functioning in two separate and distinct capacities: surgeon and pathologist**. **If either of these responsibilities** is **delegated to another physician or other qualified health care professional who reports the services separately**, these codes should not be reported.

(RJN Ex. 1) (emphasis added.) Defendants do not deny or negate the allegations that Dr. Mitchell performed only the excisions. Instead, they appear to argue that the third sentence is a conjunctive mandate: that (1) if either of the responsibilities is delegated to another physician or qualified health care profession who (2) reports the services separately, only then should the codes not be reported. Defendants argue that the other physicians did not satisfy the second step, thus they were allowed to use the codes, or, alternatively, that since both doctors did not bill for Mohs surgery, it was permissible. This logic is questionable at best. Medicare requires that each physician must use their own NPI when they are involved in a procedure, as alleged in the FAC. The mandate assumes that physicians adhere to this requirement when they are involved in procedures. The 2022 Medicare NCCI CPT Coding Policy Manual[9] casts doubt on Defendants' interpretation:

> **A single physician performs both the surgery and pathologic examination of the specimen**(s). The Mohs micrographic surgery CPT codes include skin biopsy and excision services (CPT codes 11102-11107, 11600-11646, 17260-17286) and pathology services (88300-88309, 88329-88332). Reporting these latter codes in addition to the Mohs micrographic surgery CPT codes is inappropriate.

(2022 Medicare NCCI Policy Manual Chapter 3, III-6 ("Mohs Micrographic Surgery")).

Relator specifically alleges that the pathologist did not report his services **at all** so that Dr. Mitchell could represent that he conducted a Mohs surgery and bill for the procedure, even

---

(noting that publicly available websites are judicially noticeable). The request for judicial notice as to the remaining documents is **DENIED** because they are unnecessary to the resolution of the Motion.

[9] The Court takes judicial notice of this government document on its own motion. The document, retrieved from the Centers of Medicare and Medicaid Services (available at https://www.cms.gov/medicare-medicaid-coordination/national-correct-coding-initiative-ncci/ncci-medicare/medicare-ncci-policy-manual), is Chapter III of the National Correct Coding Initiative Policy Manual for Medicare Services.

though he merely performed excisions, and then provide an under the table payment to the pathologist. Relator also alleges that Dr. Mitchell explicitly directed PAs to conduct both the excision stage and the wound repair, which Defendants fail to address. Thus, the Court finds that Relator establish the falsity element.

### 2. Scienter

"To plead the element of knowledge under the False Claims Act, a relator must allege that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim." United States ex rel. Silingo v. WellPoint, Inc., 904 F.3d 667, 679 (9th Cir. 2018). "Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally." Id. Even so, "conclusory allegations" of knowledge are insufficient. United States ex rel. Modglin v. DJO Global Inc., 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015).

The allegations raise an inference that AD, Dr. Mitchell, and Mr. Clem knowingly, or with reckless disregard or deliberate indifference, submitted false claims. In Winter, the Ninth Circuit reasoned that "[b]ecause medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary." Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc., 953 F.3d 1108, 1114 (9th Cir. 2020), cert. denied sub nom, RollinsNelson LTC Corp. v. United States ex rel. Winters, 141 S. Ct. 1380 (2021). The FAC alleges that Dr. Mitchell intentionally undermeasures the first excision so that he can perform subsequent excisions for additional reimbursement. (FAC ¶ 136.) Relator also alleges that Dr. Mitchell performs excisions where a less invasive or simpler (but less lucrative) procedure could have removed the cancerous lesion. (Id. ¶ 137.) Mr. Clem also pushed for the more costly Mohs procedure: when order forms listed less invasive and costly procedures to remove cancerous lesions, he crossed out the procedure and replaced it with Mohs. (Id. ¶ 150.) Relator alleges facts that plausibly support an inference that AD, Dr. Mitchell, and Mr. Clem either presented, or caused to be presented, claims for Mohs surgeries where it was not medically necessary to do so. Thus, Relator pleads facts sufficient to support an inference of scienter. See Winter, 953 F.3d at 1114 ("Claims for unnecessary treatment are false claims.")

### 3. Materiality

"[M]ateriality looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." Universal Health Servs., Inc. v. United States, 579 U.S. 176, 193 (2016) (internal quotations and citations omitted). "The FCA defines 'material' as 'having a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." Godecke v. Kinetic Concepts, Inc., 937 F.3d 1201, 1213 (9th Cir. 2019) (quoting 31 U.S.C. § 3729(b)(4)). "Materiality . . . cannot be found where noncompliance is minor insubstantial." Universal Health Servs., Inc., 579 U.S. at 194. When a healthcare provider submits claims with codes and "CMS pays more money" based on the codes, "[t]his establishes

that the [] codes are material." United States ex rel. Ormsby v. Sutter Health, 444 F. Supp. 3d 1010, 1086 (N.D. Cal. 2020) (considering "diagnosis codes").

Relator alleges that the Mohs CPT codes command higher rates of reimbursement than separate codes for excision and pathology. (FAC ¶ 60.) He also alleges that Dr. Mitchell intentionally undermeasured excisions to increase the number of excisions in a procedure, which led to a higher payout. (FAC ¶ 136.) He further alleges that Mr. Clem edited order forms to switch out cheaper, less invasive procedures for more lucrative Mohs surgeries. (Id. ¶ 137.) Taken as true, the Mohs CPT codes affect the payment amount Defendants receive from Medicare. Thus, Relator has pled that the false claims at issue are material.

### 4. Disbursement or Loss

Relator must finally demonstrate that Defendants' allegedly false claims "caus[ed] the government to pay out money or forfeit moneys due." Winter, 953 F.3d at 1114. Defendants do not contest this last element and the Court finds it easily met. A relator "sufficiently plead[s] causation" when he or she alleges that a healthcare provider "submitted false [] codes that caused CMS to pay them money." United States ex rel. Ormsby, 444 F. Supp. 3d at 1086. Here, Relator alleges that Defendants received payments for claims submitted under the Mohs CPT codes. Accordingly, Relator has sufficiently alleged causation.[10]

### B. Mr. Clem's Independent Grounds for Dismissal

Most of the above analysis applies to Mr. Clem's motion to dismiss the complaint, which expressly incorporates (or borrows liberally) from the arguments raised by AD. (See Clem Motion at 7-8.) In addition to those arguments, Mr. Clem essentially only makes one of his own, albeit one asserted repeatedly and in various forms: that the FAC makes vague and conclusory allegations as it relates to his specific conduct.[11] The Court disagrees. The FAC places Mr. Clem at the heart of the alleged misconduct. As Relator's opposition points out, Mr. Clem's motion to dismiss reads more like a motion for summary judgement, repeatedly characterizing facts as mere legal conclusions or suggesting that various assertions have not been, or cannot be, proven. (Opp. to Clem at 6.)

---

[10] The analysis conducted above also demonstrates that Relator has plead with sufficient particularity to satisfy Federal Rule of Civil Procedure 9(b), concerning claims for fraud. The rule demands that a plaintiff allege the "who, what, when, where, and how of the misconduct charged." Kearns v. Ford Motor Co., 567 F.3d 1120, 1124 (9th Cir. 2009) (internal quotations omitted). Plaintiffs "must set forth what is false or misleading about a statement, and why it is false." Becerra v. Dr Pepper/Seven Up, Inc., 945 F.3d 1225, 1228 (9th Cir. 2019) (internal quotations omitted). Plaintiff's pleadings meet these requirements and thus provide adequate notice of the specific fraudulent conduct alleged.

[11] As Plaintiff notes in his opposition, Mr. Clem's motion to dismiss uses the term "vague" or "conclusory" thirty-two times in eight pages of argument. (Opp. to Clem at 6.)

Mr. Clem takes issue with allegations that he "effectively runs" AD or that he is variously described as a "real owner" or "part owner" or "owner and manager" or "agent-in-fact" or "CEO" of AD, which he suggests shows "Relator admits he does not know what exactly Mr. Clem did at Advanced Dermatology." (Clem Motion at 10.) To the contrary, Relator alleges that Mr. Clem plays multiple central roles within the company and that he attempts to hide his true identity to shield his misconduct. (See FAC ¶¶ 10, 93, 94, 106, 131, 137, 140, 150, 166-171.) Elsewhere, Mr. Clem complains that Relator fails to allege "*particular* decisions" that he made or "*particular* instances" of him exercising his authority over the company's practices, though he acknowledges that Plaintiff alleges he systematically directed and participated in the company's illegal conduct. (Clem Motion at 12) (emphasis in original.) The FAC provides many such details, however. To cite just a few, it alleges Mr. Clem personally signed and delivered the checks to Dr. Yaghsezian (FAC ¶ 94); directed the fabrication of records (id. ¶ 106); edited order forms to ensure Mohs-like procedures were performed in lieu of less lucrative ones (or directed another individual to do the same) (id. ¶ 137); demanded that employees "biopsy everything" and held them accountable if numbers were too low (id. ¶ 137); and dictated to medical professionals what they should do with patients, including crossing out less lucrative procedures on order forms and replacing them with Mohs. (Id. ¶ 150). These details illustrate that Relator has sufficiently pled the required elements of its claims against Mr. Clem, just as it has against AD.

**C. Impact of Pacific Dermatology**

On August 29, 2022, AD filed an ex parte application for leave to file supplemental briefing regarding intervening authority, concerning an August 16, 2022 order of this Court, United States of America ex rel. Randy Jacobs v. Pacific Dermatology Institute, Inc., et al., Case No. EDCV-20-1906 JGB (SHKx). (Dkt. No. 65.) Relator opposed the ex parte application on September 2, 2022. (Dkt. No. 66.) On September 7, 2022, the Court denied the ex parte application in a brief order in which it did not explain its reasoning. (Dkt. No. 68.) The Court takes this opportunity to briefly explain its order and to reject any argument that Pacific Dermatology supports the instant motions to dismiss.

Pacific Dermatology involves similar claims alleged by Relator against a different dermatology clinic with various California locations, Pacific Dermatology Institute, Inc. In Pacific Dermatology, this Court issued an order granting in part and denying in part Defendants' motion to dismiss for failure to state a claim. Pacific Dermatology, Dkt. No. 54. As AD noted in its ex parte application, "[a]lthough there are significant differences between the complaints and arguments in the two cases, both involve allegations of incorrect billing for Mohs procedures." (Dkt. No. 65.)

Some of the claims and arguments from Pacific Dermatology are not at issue here. When it did consider parallel issues, for the most part, this Court reached the same outcome in both of its decisions, applying similar reasoning. In a few places, however, the factually distinct allegations command different results.

In Pacific Dermatology, this Court held that Relator had failed to plausibly allege scienter for Dr. Mudge, a dermatologist who allegedly engaged in similar conduct to Dr. Mitchell in the instant case. Pacific Dermatology, Dkt. No. 54, at *12. This Court reasoned that Relator had failed to allege Dr. Mudge understood or should have understood that delegating interpretation of the slides to another doctor, Dr. Khodadad Mehraein, fraudulently violated the one-physician rule to bill under the Mohs-specific CPT code. Id. Here, Relator has pled a far more detailed portrait of Dr. Mitchell's involvement in the allegedly fraudulent scheme than Dr. Mudge's limited conduct. Relator alleges Dr. Mitchell is also an owner of AD and a director of DD. (FAC ¶ 9.) Dr. Mitchell agreed in his application with Medicare that he would be the individual responsible for all Medicare claims submitted to HCFA/CMS relating to his services, whether submitted personally or by his employees or agents. (Id. ¶ 73.) Dr. Mudge was simply alleged to have submitted claims for Mohs-specific CPT codes, despite delegating the histological evaluations to Dr. Mehraein. Pacific Dermatology, Dkt. No. 54, at *3. Dr. Mitchell's allegedly fraudulent conduct was far more intricate and severe. According to the FAC, Dr. Mitchell intentionally under measures the first excision so that he can perform additional excisions for additional reimbursement and chooses to perform the surgery where a less invasive (and less lucrative) procedure could have removed the cancer. (FAC ¶¶ 136-37.) While the delegation of slide interpretation to Dr. Mehrain appears to have been relatively formal in Pacific Dermatology, here the doctor to whom the histologic evaluation was delegated, Dr. Yaghsezian, was paid without ever issuing tax documents to him. (Id. ¶¶ 119-120.) While wound closure by the surgeon is an element of Mohs surgery, Dr. Mitchell often did not perform or supervise the surgical site's closure, Relator alleges here; the same claim was not made in Pacific Dermatology. (Id. ¶ 92.) Unlike Dr. Mudge, Dr. Mitchell is allegedly not even qualified to perform the Mohs surgeries he bills the government for, because he has not completed the necessary residency or fellowship requirements for the procedure. (Id. ¶ 85.) These allegations plausibly allege scienter against Dr. Mitchell.

This Court also held in Pacific Dermatology that Relator had failed to plausibly allege its FCA reverse false claim under 31 U.S.C. § 3729(a)(1)(G). Pacific Dermatology, Dkt. No. 54, at *17. This Court rejected the redundancy argument raised in AD's motion to dismiss in the instant case (Motion at 23-24), namely that it is duplicative of the false claim and false statement causes of action. Id. As the order notes, the case law recognizes that submitting a false claim or making a false statement, and later avoiding an obligation to return the money retained from government overpayment, constitutes two distinct wrongful acts. Id. (citing United States v. Mariner Health Care, Inc., 552 F. Supp. 3d 938, 953 (N.D. Cal. 2021)). However, this Court found fault with the specificity of the factual allegations alleged by Relator in support of his reverse false claim and granted the motion to dismiss as to that claim with leave to amend. Id. Here, AD does not raise a parallel argument, and so it is not properly before the Court; even if it were, the greater specificity of Relator's pleadings in the instant case would lead to a different outcome. See, e.g., Intellicheck Mobilisa, Inc. v. Wizz Sys., LLC, 173 F. Supp. 3d 1085, 1108 (W.D. Wash. 2016); United States v. Great Am. Ins. Co. of N.Y., 738 F.3d 1320, 1328 (Fed. Cir. 2013).

## VI.  CONCLUSION

For the reasons above, the Court **GRANTS** the DD Motion and **DISMISSES** the FAC as to **DD WITH LEAVE TO AMEND**, **DENIES** the AD Motion, **DENIES** the Clem Motion, and **VACATES** the October 3, 2022 hearing.  An amended complaint, if any, should be filed by October 11, 2022.

**IT IS SO ORDERED.**