UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA
CIVIL MINUTES—GENERAL

| | | | |
|---|---|---|---|
| Case No. | **EDCV 20-1373 JGB (SHKx)** | Date | February 21, 2024 |
| Title | *United States of America ex rel. Randy Jacobs v. Advanced Dermatology and Skin Cancer Specialists, P.C., et al.* | | |

Present: The Honorable    JESUS G. BERNAL, UNITED STATES DISTRICT JUDGE

| MAYNOR GALVEZ | Not Reported |
|---|---|
| Deputy Clerk | Court Reporter |

| Attorney(s) Present for Plaintiff(s): | Attorney(s) Present for Defendant(s): |
|---|---|
| None Present | None Present |

**Proceedings:** Order (1) GRANTING IN PART AND DENYING IN PART Defendants Advanced Dermatology and Dr. Jesse Mitchell's Motion to Dismiss (Dkt. No. 165); (2) GRANTING IN PART AND DENYING IN PART Defendant Christopher Clem's Motion to Dismiss (Dkt. No. 166); (3) GRANTING IN PART AND DENYING IN PART Defendant SoCal Health Management Services's Motion to Dismiss (Dkt. No. 183); (4) GRANTING Defendant Desert Dermatology's Motion to Dismiss (Dkt. No. 184); and (5) VACATING the February 26, 2024 Hearing (IN CHAMBERS)

Before the Court are two motions: (1) a motion to dismiss filed by Defendants Advanced Dermatology and Dr. Jesse Mitchell ("AD Motion," Dkt. No. 165), in which Defendants Christopher Clem and SoCal Health Management Services join (see Dkt. Nos. 166, 183), and (2) a motion to dismiss filed by Defendant Desert Dermatology ("DD Motion," Dkt. No 184). The motions are brought pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 9(b). The Court determines these matters are appropriate for resolution without a hearing. See Fed. R. Civ. P. 78; L.R. 7-15. After considering all papers filed in support of and in opposition to the Motions, the Court **GRANTS** the DD Motion and **GRANTS IN PART AND DENIES IN PART** the AD Motion. The February 26, 2024 hearing is **VACATED**.

//
//
//

# I.     BACKGROUND

On August 25, 2021, Plaintiff relator Randy Jacobs ("Relator") filed a complaint against Defendants Advanced Dermatology & Skin Cancer Specialists, P.C. ("AD"), Dr. Jesse Mitchell ("Dr. Mitchell"), and Dr. Roupen Yaghsezian ("Dr. Yaghsezian"). ("Complaint," Dkt. No. 1.) On April 29, 2022, Relator filed an amended complaint against Defendants AD, Dr. Mitchell, Christopher Clem, and Desert Dermatology & Skin Cancer Specialists, Inc. ("DD"). ("FAC," Dkt. No. 34.) The FAC alleged four causes of action under the Federal and California False Claims Acts: (1) violation of 31 U.S.C. § 3729(a)(1)(A); (2) violation of 31 U.S.C. § 3729(a)(1)(B); (3) violation of 31 U.S.C. § 3729(a)(1)(G); and (4) violation of Cal. Gov. Code § 12651 et seq. (See id.)

On June 17, 2022, AD and Dr. Mitchell filed a joint motion to dismiss. ("First AD Motion," Dkt. No. 46.) On the same day, DD and Mr. Clem filed motions to dismiss. ("First DD Motion" Dkt. No. 48; "First Clem Motion," Dkt. No. 49.) On September 28, 2022, the Court granted DD's motion and dismissed the FAC with leave to amend, thereby dismissed DD as a defendant, and ordered that any amended complaint be filed by October 11, 2022. ("Order on MTD FAC," Dkt. No. 70.) The Court denied the AD and Clem motions to dismiss. (Id.)

Relator did not file an amended complaint by the Court-imposed October 11, 2022 deadline. Instead, on August 23, 2023, Relator filed a Motion for Leave to File a Second Amended Complaint. ("Motion for Leave to Amend," Dkt. No. 142.) On September 1, 2023, AD and Clem each filed notices of non-opposition. (Dkt. Nos. 148, 148.) The Court granted Relator leave to file a Second Amended Complaint on September 21, 2023. (Dkt. No. 153.) Relator filed the SAC on September 25, 2023. ("SAC," Dkt. No. 153.) The SAC alleged the same four causes of action set out in the FAC and a new claim for conspiracy under U.S.C. § 3729(a)(1)(C). (See id.)

On October 10, 2023, AD and Dr. Jesse Mitchell filed a joint motion to dismiss the SAC pursuant to Rules 12(b)(2), 12(b)(6), and 9(b) of the Federal Rules of Civil Procedure. ("AD Motion," Dkt. No. 165.) That same day, Defendant Clem filed a notice of joinder in the AD Motion. ("Clem Joinder," Dkt. No. 166.) On October 20, 2023, Defendant SoCal Health filed a notice of joinder in the AD Motion. ("SoCal Health Joinder," Dkt. No. 183.) That same day, Defendant Desert Dermatology filed a motion to dismiss the SAC. ("DD Motion," Dkt. No. 184.) In support of its motion, Desert Dermatology filed the following documents:

- Declaration of Dr. Jesse Mitchell ("Mitchell Decl.," Dkt. No. 184-2);
- Declaration of Janelle Stewart ("Stewart Decl.," Dkt. No. 184-3);
- Declaration of Christopher Clem ("Clem Decl.," Dkt. No. 184-4); and,
- Declaration of John C. Gray ("Gray Decl.," Dkt. No. 184-5).

On November 14, 2023, Relator opposed the AD Motion, the Clem Joinder, and the SoCal Health Joinder. ("Opp. to AD Motion," Dkt. No. 195.) On the same day, Relator also

opposed the DD Motion. ("Opp. to DD Motion," Dkt. No. 198.) In support of his Opposition to the DD Motion, Relator filed the following documents:

- Declaration of Mike Bothwell ("Bothwell Decl.," Dkt. No. 198-1);
- Declaration of Cassandra Arreola ("Arreola Decl.," Dkt. No. 198-2); and,
- Index of Exhibits (Dkt. No. 198-3) and Exhibits A–S (Dkt. Nos. 198-4–22).

On November 27, 2023, AD replied. ("AD Reply," Dkt. No. 207.) That same day, DD replied. ("DD Reply," Dkt. No. 208.)[1]

## II. FACTUAL ALLEGATIONS

As the Court explained in detail in its September 28, 2022 order, this action involves allegedly fraudulent conduct in relation to Medicare billing for Mohs surgeries. Relator alleges the following facts, which are assumed to be true for purposes of these Motions.

Relator is a board-certified clinical dermatologist with expertise in skin cancer prevention and treatment. (SAC ¶ 7.) AD has offices throughout the Inland Empire—Temecula, Hemet, Riverside, Moreno Valley, and Corona, among others—and its "principal business office" is located at 31720 South Temecula Parkway Suite 200, Temecula, California 92592. (Id. ¶ 8.) DD is an Arizona corporation with locations in Arizona (Gilbert and Glendale). (Id. ¶ 9.) Its "corporate address" is 2 East Congress St., Suite 900A, Tucson, AZ, 85701. (Id.) DD is a "related entity to [AD] with common ownership, leadership, personnel, and business practices." (Id.) DD is "operated out of California and shares vendors, employees, and resources with Advanced Dermatology." (Id.) DD's "overall management functions, such as the HR manager, are in California," and DD and AD "often transfer resources and personnel between California and Arizona." (Id.) DD's board and shareholder meetings are held in California, and DD's NPI number and IRS EIN are associated with California addresses. (Id.)

Dr. Mitchell is a dermatologist at AD and DD, is listed as the owner of AD, and a director of DD. (Id. ¶ 10.) Clem is a "non-physician who effectively runs the [AD] and [DD] practices. He is an agent-in-fact." (Id. ¶ 11.) "Employees and vendors of [AD] believe him to be the company's real owner and Chief Operating Officer (CEO)." (Id.) Clem directs "both the day-to-day operations and the broader management of both [AD] and [DD]." (Id.) "He is listed with the Arizona Secretary of State as an officer of [DD]." (Id.)

SoCal Health is comprised of a California corporation, with its principal address is 31938 S. Temecula Parkway, Ste #A337, Temecula, CA 925892, and a Nevada corporation, with its principal address of 200 W. Sahara Avenue, Suite 2307, Las Vegas, NV 89102. (Id. ¶ 12.) There

---

[1] The parties' papers repeatedly use Lexis case citations where Westlaw case citations are available. The Standing Order expressly states: "[w]hen citing to legal databases, wherever possible cite to Westlaw rather than Lexis." ("Standing Order," Dkt. No. 14 at 8.) The parties are advised to review and comply with the Standing Order in all respects.

is no functional difference between these entities. (Id.) SoCal Health is owned and operated by Clem, who "provides healthcare management services to" AD and DD through SoCal Health. (Id.) Clem owns and operates SoCal Health from his office in Temecula, California. (Id.) AD transmits payments to SoCal Health. (Id.)

Mohs micrographic surgery ("Mohs surgery") is a specialized method of skin cancer removal reserved for particular types of skin cancers. (Id. ¶ 52.) Historically, Mohs surgery is performed by dermatologists because of their expertise in skin cancer pathophysiology, cutaneous histopathology, and dermatologic surgery. (Id. ¶ 55.) Mohs surgery training programs, one or two-year long post-residency fellowships, are available across the nation. (Id. ¶ 56.) The surgery involves a meticulous technique which provides complete microscopic margin control through the removal of horizontal frozen histological sections of the excised tumor's surgical margins, for the most complete microscopic examination possible. (Id. ¶ 58.) It requires a physician trained in Mohs surgery and pathology to accurately excise and map tumor extensions. (Id.) The surgery is performed in stages (or levels) in which a physician removes a single layer of tissue, then performs additional stages if necessary to clear the area of cancer. (Id. ¶ 59.) Each "stage" or "level" is an individual excision in which the patient's tissue is removed, oriented, processed, and microscopically examined. (Id.) After each stage, the surgeon examines the excised skin for cancer via a microscope; thus, the physician acts in the dual role of both surgeon and pathologist. (Id. ¶ 60.) The physician only proceeds to perform subsequent stages if cancer remains present. (Id.)

Medical providers and health care benefit programs utilize well-known and standard insurance processing codes to identify the service provider, the medical diagnoses, and the medical treatments or procedures rendered to a patient. Each licensed medical provider, such as a physician, physician's assistant, or nurse practitioner, has a unique code called a National Provider Identifier, or "NPI." The numerical codes for medical procedures are called "CPT codes" and are published in the American Medical Association's Physicians' Current Procedural Terminology. (Id. ¶ 31.) A provider's NPI, the diagnosis, and the procedure codes are later recorded on a standard claim form known as the Centers for Medicare and Medicaid Services 1500 ("CMS" or "CMS-1500") form, which a provider sends to the health benefit program for payment. (Id. ¶ 32.) When each claim is submitted for payment, the treating physician certifies to the health care benefit program that (1) the services shown on the form are medically indicated and necessary for the health of the patient and (2) were personally furnished by the physician or were furnished incident to the physician's professional service by the physician's employee under his immediate personal supervision. (Id. ¶ 34.)

Medicare pays for Mohs surgery as both reasonable and necessary only if performed on certain current and accepted diagnoses/indications, and only if the surgery was performed as indicated by the CPT code used to claim payment. (Id. ¶ 64.) Mohs is a "bundled code" and can only be bundled if the same doctor performs all elements of the procedure—otherwise, the lower, and separate, codes are to be used for the same overall process. (Id.) Medicare also reimburses separately for each stage of Mohs surgery performed in removing cancer. (Id.) The more stages of Mohs surgery performed, the higher the Medicare reimbursement. (Id.)

Medicare's medical review policy requires that a Mohs surgery physician document the necessity of the surgery, a pathological description of the slides, and retain all slides. (Id. ¶ 75.) Defendants expressly certified that they would comply with Medicare rules and regulations and submit accurate, truthful claims when enrolling in Medicare and Medicaid. (Id. ¶¶ 16, 17, 21–26, 73, 77.) Defendants also expressly certify that, with each claim submitted, the information included in the claim is complete, accurate, and that the services provided comply with the billed CPT code. (Id. ¶¶ 32, 71, 79.)

For the overwhelming majority of cancerous lesions, performing two or more stages of Mohs surgery is unjustified. (Id. ¶ 156.) Cyrus Pratt, a former AD Physician's Assistant, confirmed that Dr. Mitchell intentionally under measures the first excision so that he can perform additional excisions—stages—for additional reimbursement. (Id. ¶ 157.) Pratt also confirmed that Dr. Mitchell performs Mohs where a less invasive procedure could have removed the cancer. (Id. ¶ 158.) Clem, a non-physician, edited order forms (or directed a medical assistant to do so) to ensure Mohs-like procedures were performed as opposed to less complex (and less lucrative) procedures. (Id.) Clem instructed PAs to "biopsy everything," kept track of the number of biopsies performed, and "[held] them accountable if the numbers were too low." (Id. ¶ 161.) Clem's goal was to maximize the number of Mohs surgeries each day, and if an office had a low number of Mohs on a given day, Clem would often express his frustration and anger to his brother, Jeffrey Clem, who works at Medwest, AD's billing company. (Id. ¶ 202.) Clem also changed doctors' procedure recommendations based on a patient's insurance, and had administrative staff and others change (or falsify) medical records. (Id. ¶ 199.) Medical necessity is a separate prerequisite to Medicare payment. (Id. ¶ 158.)

For this procedure, Dr. Mitchell performs the excisions[2] but not the pathology. (Id. ¶ 91.) Instead, AD sends the slides for another doctor to review. (Id.) AD has sent the frozen sections of tissue to Dr. Roupen Yaghsezian, located in Laguna Niguel, California, for interpretation. (Id.) Dr. Yaghsezian is a quasi-retired dermapathologist who agreed to perform the interpretative services as part of a side arrangement. (Id.) Dr. Yaghsezian previously contacted Relator to offer interpretative services, which Relator declined. (Id.)

In 2017, Dr. Fred Shahan, a dermatologist in San Diego, California, informed Relator that Dr. Mitchell sent all Mohs slides to Dr. Yaghsezian. (Id. ¶ 95.) A former AD physician's assistant ("PA"), Mr. Cyrus Pratt, confirmed that Dr. Mitchell would perform the excision but never interpret the slides. (Id. ¶ 96.) Instead, another doctor would perform the interpretations. (Id.) On the days Dr. Mitchell performed "Mohs-like" procedures, Dr. Yaghsezian, or another pathologist, visited the office and performed the interpretations. (Id.) Dr. Yaghsezian is not a W2 employee of AD. (Id. ¶ 120.) He collected a daily, untaxed fee[3] of $3,000 or $2,500, depending on the office location, paid in monthly checks. (Id. ¶ 117.)

---

[2] On several occasions, Dr. Mitchell directed PAs to perform the excision on procedures later billed as Mohs surgeries. (Id. ¶ 97.)

[3] AD never issued tax documents to Dr. Yaghsezian. (Id. ¶ 126.)

Wound closure by the surgeon is an element of Mohs surgery. (Id. ¶ 97.) Dr. Mitchell, however, often did not perform or supervise the surgical site's closure, which he left to Pratt or other PAs. (Id.) PAs and other affiliates of AD have commented on the fact that Dr. Mitchell calls the procedure he performs as Mohs surgery but that what he does is not Mohs, and billing for Mohs procedures misrepresents the services rendered. (Id. ¶ 111.) AD and Dr. Mitchell, at the direction of Mr. Clem, performed approximately 960 "Mohs" procedures over the 80-100 "Mohs days" per year when the procedure was performed. (Id. ¶ 152.)

AD generates an operative report for each Mohs-like procedure. (Id. ¶ 112.) Each of these reports affirmatively and explicitly states that the physician performed all major facets of an actual Mohs procedure, including microscopic examination and wound closure. (Id.) There are proper codes that actually match what Defendants were doing (having one physician perform the excision and another doctor perform the pathology). (Id. ¶ 114.) The procedures were billed under the NPI number of Dr. Mitchell or the company. (Id. ¶ 116.) The billing NPI represented to the government that Dr. Mitchell performed services not actually rendered because Dr. Mitchell did not perform all parts of the Mohs surgery himself. (Id. ¶ 116.)[4] Defendants' billing these procedures as Mohs surgeries allowed them to mislead the government in order to obtain a higher payout. (Id. ¶ 114.) At the direction of Clem, Defendants engaged in the fabrication of these records. (Id. ¶ 112.)

DD is a relatively new practice; it was incorporated in 2019 and began operation in 2020 in Arizona. (Id. ¶ 231.) Its website features the same doctors as AD, with the same photos and descriptions. (Id. ¶¶ 231, 233.) DD offers fewer services than AD but offers Mohs surgery. (Id. ¶ 231.) DD lists Dr. Mitchell as owner and Clem as officer. (Id. ¶ 240.) Dr. Mitchell travels from California to conduct Mohs surgeries at DD, including on Medicare patients. (Id. ¶ 241.) DD Mohs surgeries are listed on Advanced Dermatology's calendars, which specify the day as an "AZ Mohs Day." (Id. ¶ 243.) Like AD, DD utilizes Pathology Watch to provide pathologists to read Mohs slides, and it addresses the bill to AD and lists the recipient address as Temecula, California. (Id. ¶¶ 239, 245.) The itemized invoices sent by Pathology Watch to DD include costs for both the AD and DD pathology services, and do not address DD as a separate entity, but simply specify what state the services were provided in (California or Arizona). (Id. ¶ 246.) AD and DD share medical equipment between them, and Janelle Stewart has purchased equipment for both AD and DD. (Id. ¶ 254.)

AD, SoCal Health, Dr. Mitchell, Clem, and DD are a single enterprise and alter egos, and DD de facto operates as an office of AD. (Id. ¶ 232.) DD does not maintain a separate identity from AD, SoCal Health, Dr. Mitchell, or Clem. (Id. ¶ 235.) DD's board meetings take place in

---

[4] Dr. Yaghsezian operates under his own NPI number and did not bill Medicare for Mohs procedures at the time he performed the pathology for Dr. Mitchell. (Id. ¶ 117.) Medicare requires that each physician involved in a procedure or claim be identified through his unique NPI. (Id. ¶ 110.)

Temecula, California, and DD's daily operations are managed from Temecula by Clem.  (Id. ¶¶ 236, 237.)  Personnel based in and operating from California, including Clem and Dr. Mitchell, are responsible for DD's management; Clem is responsible for decisions including hiring, firing, and raises.  (Id. ¶ 236.)  DD uses the same California-based personnel as AD for administration and business operations, including Janelle Stewarts, whose email signature identifies her as the Office Manager for "Advanced Dermatology and Skin Cancer Specialists/Desert Dermatology and Skin Cancer Specialists[.]"  (Id. ¶ 247.)  Others, including Clem and Cassandra Arreola, have the same or similar lines.  (Id. ¶¶ 247, 248.)  Clem sends DD Mohs records in the same emails as AD Mohs records using the email he uses for AD business.  (Id. ¶ 257.)  AD and DD also use the same registered agent.  (Id. ¶ 233.)

DD's practice operates in the same manner as AD.  (Id. ¶ 231.)

### III.   LEGAL STANDARD

**A. Motion to Dismiss Pursuant to Rule 12(b)(2)**

"The general rule is that personal jurisdiction over a defendant is proper if it is permitted by a long-arm statute and if the exercise of that jurisdiction does not violate federal due process." Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154-55 (9th Cir. 2006) (citing Fireman's Fund Ins. Co. v. Nat. Bank of Coops., 103 F.3d 888, 893 (9th Cir. 1996)).  Because California authorizes jurisdiction to the fullest extent permitted by the Constitution, see Cal. Code Civ. P. § 410.10, the only question the Court must ask is whether the exercise of jurisdiction over the defendant would be consistent with due process.  Harris Rutsky & Co. Ins. Servs., Inc. v. Bell & Clements Ltd., 328 F.3d 1122, 1129 (9th Cir. 2003).

The Fourteenth Amendment's Due Process Clause permits courts to exercise personal jurisdiction over any defendant who has sufficient "minimum contacts" with the forum that the "maintenance of the suit does not offend traditional notions of fair play and substantial justice." Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  The two recognized bases for exercising personal jurisdiction over a non-resident defendant are: (1) "general jurisdiction," which arises where defendant's activities in the forum state are sufficiently "substantial" or "continuous and systematic" to justify the exercise of jurisdiction over him in all matters; and (2) "specific jurisdiction," which arises when a defendant's contacts with the forum give rise to the claim in question.  See Helicopteros Nacionales de Colombia S.A. v. Hall, 466 U.S. 408, 414–16 (1984).

"[A] finding of general jurisdiction permits a defendant to be hauled into court in the forum state to answer for any of its activities anywhere in the world," Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 801 (9th Cir. 2004), while specific jurisdiction claims arise "out of defendant's forum related activities."  Panavision Int'l, L.P. v. Toeppen, 141 F.3d 1316 (9th Cir. 1998).  "With respect to a corporation, the place of incorporation and principal place of business are paradigm bases for general jurisdiction."  Daimler AG v. Bauman, 571 U.S. 117, 137 (2014) (internal quotations omitted).  The Supreme Court has limited general jurisdiction over corporations to only those forums where the corporation has continuous and systemic contacts,

such that it is essentially at home. Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 919 (2011).

The Ninth Circuit uses a three-part test to determine if a defendant's contacts with the forum state are sufficient to establish specific jurisdiction. Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995). Specific jurisdiction exists if: (1) the out of state defendant purposefully availed him or herself of the privilege of conducting activities in the forum, consequently invoking the benefits and protections of the forum's laws; (2) the cause of action arose out of the defendant's forum related activities; and (3) the exercise of jurisdiction is reasonable. Myers v. Bennet Law Offices, 238 F.3d 1068, 1072 (9th Cir. 2001); see also Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977).

The plaintiff bears the burden of establishing personal jurisdiction. Martinez v. Aero Caribbean, 764 F.3d 1062, 1066 (9th Cir. 2014). When the motion is based on written materials, the plaintiff must make a "prima facie showing of jurisdictional facts to withstand the motion to dismiss." Id. (quoting Schwarzenegger, 374 F.3d at 800). To make a "prima facie showing," the plaintiff needs to show facts that, if true, would support jurisdiction over the defendant. Lindora, LLC v. Isagenix Int'l, LLC, 198 F. Supp. 3d 1127, 1135 (S.D. Cal. 2016). To determine if a plaintiff met his burden, "uncontroverted allegations in [the] complaint must be taken as true, and 'conflicts between the facts contained in the parties' affidavits must be resolved in [the plaintiff's] favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.'" Am. Tel. & Tel. Co. v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588-89 (9th Cir. 1996) (quoting WNS, Inc. v. Farrow, 884 F.2d 200, 203 (5th Cir. 1989)).

### B. Motion to Dismiss Pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6) ("Rule 12(b)(6)"), a party may bring a motion to dismiss for failure to state a claim upon which relief can be granted. Rule 12(b)(6) must be read in conjunction with Federal Rule of Civil Procedure 8(a), which requires a "short and plain statement of the claim showing that a pleader is entitled to relief," in order to give the defendant "fair notice of what the claim is and the grounds upon which it rests." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007); see Horosny v. Burlington Coat Factory, Inc., WL 12532178, at *3 (C.D. Cal. Oct. 26, 2015). When evaluating a Rule 12(b)(6) motion, a court must accept all material allegations in the complaint — as well as any reasonable inferences to be drawn from them — as true and construe them in the light most favorable to the non-moving party. See Doe v. United States, 419 F.3d 1058, 1062 (9th Cir. 2005); ARC Ecology v. U.S. Dep't of Air Force, 411 F.3d 1092, 1096 (9th Cir. 2005); Moyo v. Gomez, 32 F.3d 1382, 1384 (9th Cir. 1994).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Twombly, 550 U.S. at 555 (citations omitted). Rather, the allegations in the complaint "must be enough to raise a right to relief above the speculative level." Id.

To survive a motion to dismiss, a plaintiff must allege "enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570; Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully. Where a complaint pleads facts that are 'merely consistent with' a defendant's liability, it stops short of the line between possibility and plausibility of 'entitlement to relief.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). The Ninth Circuit has clarified that (1) a complaint must "contain sufficient allegations of underlying facts to give fair notice and to enable the opposing party to defend itself effectively," and (2) "the factual allegations that are taken as true must plausibly suggest an entitlement to relief, such that it is not unfair to require the opposing party to be subjected to the expense of discovery and continued litigation." Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011).

### C. Fraud: Rule 9(b)

Claims under the False Claims Act are subject to Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). United States ex rel Swoben v. United Healthcare Ins. Co., 848 F.3d 1161, 1180 (9th Cir. 2016). Rule 9(b) requires that circumstances constituting a claim for fraud or mistake be pled with particularity. Fed. R. Civ. P. 9(b). Rule 9(b) requires a plaintiff to "identify the 'who, what, when, where and how of the misconduct charged,'" as well as "what is false or misleading about [the purportedly fraudulent conduct], and why it is false." Shimono v. Harbor Freight Tools USA, Inc., 2016 WL 6238483, at *5 (C.D. Cal. Oct. 24, 2016) (quoting Cafasso, ex rel. United States v. Gen. Dynamics C4 Sys., Inc., 637 F.3d 1047, 1055 (9th Cir. 2011)).

### D. Leave to Amend: Rule 15

Federal Rule of Civil Procedure 15 ("Rule 15") provides that leave to amend "shall be freely given when justice so requires." Fed. R. Civ. P. 15(a). The Ninth Circuit has held that "'[t]his policy is to be applied with extreme liberality.'" Eminence Capital, L.L.C. v. Aspeon, Inc., 316 F.3d 1048, 1051 (9th Cir. 2003) (quoting Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 712 (9th Cir. 2001)). Generally, a "district court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by allegation of other facts." Lopez v. Smith, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotation marks and citation omitted).

## IV.   DESERT DERMATOLOGY

In its September 28, 2022 order, the Court dismissed DD from this action for lack of personal jurisdiction. (See Order on MTD FAC.) The Court also denied Relator's request to take jurisdictional discovery, in large part because Relator suggested in his opposition that he was already "aware of numerous additional facts unalleged in the Complaint" but failed to produce adequate supporting evidence of those facts (and failed to allege them in the Complaint, as

Relator admitted).  (See id. at 12 n.7.)  The Court granted Relator leave to amend but ordered that "[a]n amended complaint, if any, should be filed by October 11, 2022."  (Id. at 19.)

Despite the Court's clear order, and despite Relator's assertion that he was "aware of numerous additional facts unalleged in the Complaint," Relator did not file an amended complaint before the Court-ordered October 11, 2022 deadline.  Instead, in April 2023 (six months after this Court's order), Relator issued a subpoena to DD which requested documents which might support Relator's jurisdictional theories and had little to do with Relator's claims against the Defendants still involved in the action.  (See Gray Decl. ¶¶ 2–3, Ex. 1.)  By way of example, the subpoena requested all documents "in any way related to any contact with the State of California or any person or entity in that state," "in any way related to AD's relationship with DD," "in any way related to DD's relationship with Chris Clem," and "in any way related to DD's relationship with Dr. Jesse Mitchell."  (See id.)  After DD met and conferred with Relator about the subpoena, Relator initiated an action to enforce his subpoena in the District of Arizona—a matter which remains pending before that court.  See Case No. 2:23-mc-00032-DWL (D. Ariz.).

On February 2, 2023, the Court set the initial Civil Trial Scheduling Order, which included a deadline for amendment of the pleadings by April 24, 2023.  (See Dkt. No. 90.)  Upon joint stipulation by the parties remaining in the action (that is, not including DD, which was dismissed), the Court later moved the amendment deadline to August 24, 2023.  (See Dkt. No. 100.)

On August 23, 2023—nearly eleven months after the order dismissing DD as a defendant—Relator filed a motion for leave to file his SAC.  (See Motion for Leave to Amend.)  None of the remaining defendants opposed the motion.  (See Dkt. Nos. 148, 149.)  In his motion, Relator informed the Court that the SAC would add "additional" parties DD, SoCal Health, and Premier Urgent Care Centers of California, P.C.  (See Motion for Leave at 1.)  DD, of course, had been dismissed from the action nearly a year prior, while SoCal Health and Premier were not named in any previous iteration of Relator's complaint.

Curiously, the motion is devoid of any reference to the Court-ordered deadline by which Relator was to file his SAC: October 11, 2023.  Relator instead offered the following description of the Court's September 28, 2022 order:

> The Court also noted that Relator had failed to allege additional facts mentioned in his opposition to the Motion to Dismiss that would be helpful to establish personal jurisdiction or to submit competent evidence of them, such as affidavits. [Order on MTD FAC] at 9. **At the end of the Order, the Court reminded Relator to amend by the date in the scheduling order for amending**. Id. at 19; see ECF 100 (August 24, 2023).

(Motion for Leave to Amend at 3 (emphasis added).)  That description is false.  The Court clearly ordered that "[a]n amended complaint, if any, should be filed by October 11, 2022."

(Order on MTD FAC at 19.)  Yet Relator somehow managed to read that unambiguous instruction and erroneously conclude that the Court "reminded Relator to amend by the date in the scheduling order for amending."  The absurdity of that conclusion renders it challenging for the Court to believe that Relator merely erred.  The September 28, 2022 order made no reference to the Scheduling Order.  (See id.)  That fact is unsurprising, as the Scheduling Order was not entered by the Court until February of the following year.  (See Dkt. No. 90.)  The Court thus surmises that Relator disregarded the Court-ordered deadline by which he was to file his SAC, and, many months later, chose to omit any reference to that blown deadline in his motion for leave to file his SAC, knowing that the Court might deny his motion on that basis.  Relator's conduct is unacceptable.

Relator attempts to argue that the SAC was timely because after the Court issued its September 28, 2022 order, it then set a different deadline for amending pleadings in its Scheduling Order, extended that deadline, and later permitted the filing of the SAC upon Relator's unopposed motion for same.  (Opp. to DD Motion at 1–2.)  Not so.  As DD points out, "there is nothing incongruous about the Court setting one deadline for amendments to cure pleading deficiencies *as to a dismissed party* (as it did with respect to DD in the 2022 Order) and setting a later, separate deadline for all other amendments."  (Reply to DD Motion at 2.)  There is simply no connection between the October 11, 2022 deadline imposed by the September 28, 2022 order and the later-issued Scheduling Order.  Relator failed to comply with this Court's order.

Nor is the Court persuaded that its decision to allow Relator to file the SAC deems the SAC timely.  As explained above, Relator made material misrepresentations to the Court by omitting any reference to the October 11, 2022 deadline (and, indeed, fundamentally misstating a Court order to obfuscate his failure to comply with that deadline).

In support of his timeliness argument, Relator relies on this Court's order permitting an amended pleading in U.S. ex rel Randy Jacobs v. Pacific Dermatology Inst., Inc., 5:20-cv-01906-JGB-SHK (Dkt. No. 54).  (Opp. to DD Motion at 2 n.2.)  That decision is easily distinguishable.  There, the relevant defendants were not dismissed in their entirety; the Court dismissed only some claims against the defendants, who remained parties to the litigation and later agreed to extend the deadline to amend the pleadings.  U.S. ex rel Randy Jacobs v. Pacific Dermatology Inst., Inc., 5:20-cv-01906-JGB-SHK, Dkt. Nos. 54, 64, 88, 102.  That decision thus applies to Defendants AD, Dr. Mitchell, and Clem, all of whom remained in the action, were subject to the Scheduling Order (and agreed to extend those dates) and did not oppose the filing of the SAC.  It does not, however, apply to DD, which did not consent to any extension of the October 11, 2022 deadline imposed by this Court's September 28, 2022 order.

### A.  Rule 41(b)

Federal Rule of Civil Procedure 41(b) provides that an action may be dismissed if the plaintiff fails to "prosecute or to comply with . . . a court order," and courts have repeatedly held that such dismissal is appropriate when a plaintiff fails to file a timely amended pleading.  See,

e.g., Ferdik v. Bonzelet, 963 F.2d 1258, 1260 (9th Cir. 1992). Courts analyze five factors to determine whether dismissal under Rule 41(b) is appropriate: (1) expeditious resolution of litigation; (2) the Court's need to manage its docket; (3) the risk of prejudice; (4) disposition of cases on their merits; and (5) the availability of less drastic alternatives. See Yourish v. Cal. Amplifier, 191 F.3d 983, 990 (9th Cir. 1999). Dismissal is appropriate "where at least four factors support dismissal, . . . or where at least three factors strongly support dismissal." Id. (internal citations and quotations omitted); see also Pagtalunan v. Galaza, 291 F.3d 639, 643 (9th Cir. 2002) (dismissing where only three factors support dismissal).

### 1. Expeditious Resolution

"[T]he public's interest in expeditious resolution of litigation always favors dismissal." Yourish, 191 F.3d at 990. Relator waited a year after the Court dismissed the FAC before attempting to reassert claims against DD. This matter has been pending since July 9, 2020, yet the Court is still deciding pleadings-related disputes well over three years later. This factor weighs heavily in favor of dismissal.

### 2. Docket Management

The Court ordered Relator to file any amended complaint against DD by October 11, 2022. Relator ignored this deadline and attempted to obfuscate his failure to comply. Relator's conduct is dilatory and evasive. Had Relator complied with the Court's deadline, DD's motion could have been resolved a year ago. Where a plaintiff fails to amend by a court-ordered deadline, this factor strongly favors dismissal. See Yourish, 191 F.3d at 990–991. Concluding otherwise would permit "[p]laintiffs to control the pace of the docket rather than the Court." Id.

### 3. Risk of Prejudice

A defendant's risk of prejudice is related to the plaintiff's reason for failing to timely amend; where a plaintiff does not have a reasonable justification for his failure, this factor favors dismissal. See Yourish, 191 F.3d at 991. Relator has not provided any explanation as to why he did not comply with the October 11, 2022 deadline. Although he points to the Court's issuance of the Scheduling Order in February, Relator offers no insight into why he decided he was not bound by the October deadline during the four months which preceded the issuance of the Scheduling Order. This factor favors dismissal.

### 4. Disposition of Cases on Their Merits

This factor generally weighs against dismissal. However, DD argues that this factor is neutral here because the Court does not have jurisdiction over DD. (DD Motion at 8.) Because other factors weigh heavily in favor of dismissal, the Court does not analyze DD's jurisdictional arguments. The Court thus concludes that "public policy strongly favors disposition of actions on the merits." Yourish, 191 F.3d at 992.

### 5. Less Drastic Alternatives

The Court cannot conclude that there is an appropriate but less drastic alternative to dismissal. Relator ignored its obligation to file an amended complaint by October 11, 2022, then sought jurisdictional discovery from DD despite this Court's rejection of his request for such discovery (and his assertion that he had already facts in his possession to support his jurisdictional arguments). Relator later filed a motion for leave to file his SAC which omitted any reference to the deadline he ignored. The Court will not permit Relator to proceed on his own timeline and play by his own rules. There is no less drastic alternative. This factor strongly supports dismissal.

In sum, the Court finds that four of the five factors weigh in favor of dismissal. The SAC is therefore **DISMISSED WITHOUT LEAVE TO AMEND** as to DD pursuant to Rule 41(b).

### V.     FALSE CLAIMS ACT

The False Claims Act ("FCA") makes liable any "person" who "knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval" or "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim." 31 U.S.C. § 3729(a)(1)(A)-(B). A similar provision prohibits the use of material records or statements (or concealment thereof) that "avoids or decreases an obligation to pay or transmit money . . . to the Government." 31 U.S.C. § 3729(a)(1)(G). "In an archetypical qui tam False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent." United States v. United Healthcare Ins. Co., 848 F.3d 1161, 1172-73 (9th Cir. 2016) (internal quotations omitted). "As [is also] relevant here . . . a claim under the [FCA] can be false where a party merely falsely certifies compliance with a statute or regulation as a condition to government payment." Id. at 1173 (internal quotations omitted). "Under a false certification theory, it is the false certification of compliance which creates liability when certification is a prerequisite to obtaining a government benefit." Id. (internal quotations omitted) (emphasis in original). False certification may be express or implied, depending on the sefendant's alleged conduct. See United States ex rel. Rose v. Stephens Inst., 909 F.3d 1012, 1017 (9th Cir. 2018).

Three of the FCA claims at issue here impose liability where one person or entity commits a violation through its control of the actions of another person or entity. For instance, subsection (a)(1)(A) of section 3729 imposes liability on "any person who . . . knowingly presents, or **causes to be presented**, a false or fraudulent claim for payment or approval." 31 U.S.C. § 3729(a)(1)(A) (emphasis added). Subsections (a)(1)(B) and (a)(1)(G) repeat the emphasized language. 31 U.S.C. § 3729(a)(1)(B), (G); see also United States v. Mackby, 261 F.3d 821, 827-28 (9th Cir. 2001) ("[A] person need not be the one who actually submitted the claim forms in order to be liable"); 31 U.S.C. § 3729(b)(2)(A) (broadly defining "claim" as including "any request or demand, whether under a contract or otherwise, for money or property and whether or not the United States has title to the money or property that . . . is presented to an officer, employee, or agent of the United States"). To state a claim under the FCA, a relator

must allege: "(1) a false statement or fraudulent course of conduct; (2) made with scienter; (3) that was material, causing (4) the government to pay out money or forfeit moneys due." United States ex rel. Campie v. Gilead Sciences, Inc., 862 F.3d 890, 902 (9th Cir. 2017).

The SAC adds a fourth FCA claim for conspiracy. (SAC ¶¶ 291–96.) "To state a claim under the FCA for conspiracy, a plaintiff must show that (1) the defendant agreed with one or more persons to get a false or fraudulent claim allowed or paid by the United States; (2) one or more conspirators performed any act to effect the object of the conspiracy; and (3) the United States suffered damages as a result." United States v. B & H Educ. Inc., 2015 WL 13919323, at *4 (C.D. Cal. Aug. 24, 2015).

A. Scienter

The Court previously found that Relator's FAC adequately alleged scienter. (Order on MTD FAC at 15.) AD, Dr. Mitchell, Clem, and SoCal Health ask the Court to reconsider its previous conclusions in light of the Supreme Court's decision in United States ex rel. Schutte v. SuperValu Inc., 598 U.S. 739 (2023) ("Supervalu").

To plead the element of knowledge under the False Claims Act, a relator must allege that a defendant knew a claim for payment was false, or that it acted with reckless disregard or deliberate indifference as to the truth or falsity of the claim." United States ex rel. Silingo v. WellPoint, Inc., 904 F.3d 667, 679 (9th Cir. 2018). "Although the circumstances of a fraud must be pleaded with particularity, knowledge may be pleaded generally." Id. Even so, "conclusory allegations" of knowledge are insufficient. United States ex rel. Modglin v. DJO Global Inc., 114 F. Supp. 3d 993, 1024 (C.D. Cal. 2015).

Applying that standard with respect to the allegations set forth in the FAC, the Court reasoned as follows:

> The allegations raise an inference that AD, Dr. Mitchell, and Mr. Clem knowingly, or with reckless disregard or deliberate indifference, submitted false claims. In Winter, the Ninth Circuit reasoned that "[b]ecause medical necessity is a condition of payment, every Medicare claim includes an express or implied certification that treatment was medically necessary." Winter ex rel. United States v. Gardens Reg'l Hosp. & Med. Ctr., Inc., 953 F.3d 1108, 1114 (9th Cir. 2020), cert. denied sub nom, RollinsNelson LTC Corp. v. United States ex rel. Winters, 141 S. Ct. 1380 (2021). The FAC alleges that Dr. Mitchell intentionally undermeasures the first excision so that he can perform subsequent excisions for additional reimbursement. (FAC ¶ 136.) Relator also alleges that Dr. Mitchell performs excisions where a less invasive or simpler (but less lucrative) procedure could have removed the cancerous lesion. (Id. ¶ 137.) Mr. Clem also pushed for the more costly Mohs procedure: when order forms listed less invasive and costly procedures to remove cancerous lesions, he crossed out the procedure and replaced it with Mohs. (Id. ¶ 150.) Relator alleges facts that plausibly support an

inference that AD, Dr. Mitchell, and Mr. Clem either presented, or caused to be presented, claims for Mohs surgeries where it was not medically necessary to do so. Thus, Relator pleads facts sufficient to support an inference of scienter. See Winter, 953 F.3d at 1114 ("Claims for unnecessary treatment are false claims.")

(Order on MTD FAC at 15.) Defendants now contend that the Supreme Court's decision in SuperValu requires a different outcome. The Court disagrees.

In SuperValu, the Supreme Court held that to impose liability on an FCA defendant for "knowingly" submitting a false claim to the government, a plaintiff may prove that a defendant knew or suspected the submission was false, even if an objectively reasonable person may not have known or believed otherwise. 598 U.S. at 748. In so holding, the Supreme Court rejected the Seventh Circuit's construction of "knowingly," under which an FCA defendant could not knowingly violate a regulation if the defendant's interpretation of the regulation is objectively reasonable, regardless of the defendant's subjective belief (and even if the defendant knew or believed the claims it was submitting were false). Id. at 757. SuperValu otherwise reaffirmed that there are three methods to show scienter under the FCA:

> [T]he FCA defines the term "knowingly" as encompassing three mental states: First, that the person "has actual knowledge of the information," § 3729(b)(1)(A)(i). Second, that the person "acts in deliberate ignorance of the truth or falsity of the information," § 3729(b)(1)(A)(ii). And, third, that the person "acts in reckless disregard of the truth or falsity of the information," § 3729(b)(1)(A)(iii). In short, either actual knowledge, deliberate ignorance, or recklessness will suffice.

Id. at 749–50. SuperValu only altered the FCA landscape with respect to cases where a defendant knowingly submits a false claim, but an objectively reasonable person could believe the claim was proper. Post-SuperValu, defendants with such knowledge may be held liable despite there existing an objectively reasonable basis to believe the claim was proper. But this decision is not applicable here.

Having considered the import of SuperValu, the Court reaffirms its earlier ruling on the FAC and finds that the SAC likewise alleges scienter under the FCA for the same reasons set forth above. To survive a motion to dismiss, a complaint need only "set out sufficient factual matter from which a defendant's knowledge of a fraud might reasonably be inferred." U.S. ex rel. Silingo v. Wellpoint, Inc., 904 F.3d 667, 679-81 (9th Cir. 2018). The scienter standard is met where certain facts "should have tipped off the defendant[s]" and should have "suggest[ed] that something was amiss." Id.

The allegations in the SAC raise an inference that AD, Dr. Mitchell, and Clem knowingly, or with reckless disregard or deliberate indifference, submitted false claims. The SAC alleges that Dr. Mitchell intentionally undermeasures the first excision so that he can perform subsequent excisions for additional reimbursement and performs excisions where a less

invasive or simpler (but less lucrative) procedure could have removed the cancerous lesion. (SAC ¶ 158.) Clem pushed for the more costly Mohs procedure. (Id.) Clem also changed doctors' procedure recommendations based on a patient's insurance, and had administrative staff and others change (or falsify) medical records. (Id. ¶ 199.) Relator therefore alleges facts that plausibly support an inference that AD, Dr. Mitchell, and Mr. Clem either presented, or caused to be presented, claims for Mohs surgeries where it was not medically necessary to do so. Thus, Relator pleads facts sufficient to support an inference of scienter. See Winter, 953 F.3d at 1114 ("Claims for unnecessary treatment are false claims.")

Relator also alleges Defendants expressly certified that they would comply with Medicare rules and regulations and submit accurate, truthful claims when enrolling in Medicare and Medicaid. (SAC ¶¶ 16, 17, 21–26, 73, 77.) The SAC further alleges that Defendants expressly certify that, with each claim submitted, the information included in the claim is complete, accurate, and that the services provided comply with the billed CPT code. (Id. ¶¶ 32, 71, 79.) Moreover, Defendants had an inherent incentive to bill for Mohs procedures rather than using the correct code because Mohs surgeries pay more, and AD is able to submit a high number of claims due to their use of an outside pathologist. (See SAC ¶ 90 ("[T]he codes [Defendants] selected and used to claim federal funds reimbursed at a much higher rate than the codes representing the procedures they performed. Additionally, the volume of…procedures was much greater than would be…possible if Defendants had performed the services for which they billed federal payors.").) Finally, the SAC alleges that the notion that the surgeon must do both parts of a Mohs surgery "is common knowledge in the industry[.]" (Id. at ¶ 72.)

All of these allegations, taken together, demonstrate that AD, Dr. Mitchell, and Clem knowingly, or with reckless disregard or deliberate indifference, submitted false claims. The AD Motion is therefore **DENIED** as to this issue.

### B. FCA Conspiracy Claim

AD contends that Relator has failed to adequately plead his new FCA conspiracy claim because (1) he does not allege a meeting of the minds, and (2) the claim does not satisfy Federal Rule of Civil Procedure 9(b). (AD Motion at 8–11.)

#### 1. Meeting of the Minds

"To state a claim under the FCA for conspiracy, a plaintiff must show," among other elements, that "the defendant agreed with one or more persons to get a false or fraudulent claim allowed or paid by the United States." United States v. B & H Educ., Inc., 2015 WL 13919323, at *4 (C.D. Cal. Aug. 24, 2015). AD contends that FCA conspiracy claims require a heightened mens rea requirement—"an intentional agreement to submit false claims"—which differs from the scienter requirement for other FCA claims, which encompasses reckless disregard or deliberate indifference. (AD Motion at 9–10.) According to AD's construction, then, the Court having found an inference of scienter under a deliberate indifference or reckless disregard standard (as is the case here) does not bear on Relator's FCA conspiracy claim, because those

standards are legally inadequate for FCA conspiracy claims. Relator responds that Congress's revisions to the FCA in response to the Supreme Court's decision in Allison Engine Co. v. United States ex rel. Sanders, 553 U.S. 662 (2008) ("Allison Engine") render incorrect the cases on which AD relies. Relator does not cite a single case in support of this argument. (See Opp. to AD Motion.) The Court agrees with AD that FCA conspiracy claims require Relator to show (and at this stage, to plead) something more than deliberate indifference or reckless disregard.

Integra is instructive. United States ex rel. Integra Med Analytics LLC v. Providence Health & Servs., 2019 WL 3282619, at *22 (C.D. Cal. July 16, 2019) ("Integra"), overruled on other grounds by Integra Med Analytics LLC v. Provident Health & Services, 854 F. App'x 840 (9th Cir. 2021). In Integra, the court began by noting that "the FCA's reference to *conspiracy* claims does *not* have this 'knowingly' requirement." Id. (citing 31 U.S.C. § 3729(a)(1)(C)) (emphasis in original). Because the FCA conspiracy provision does not include the "knowingly" requirement which appears elsewhere in the FCA, "most courts have concluded that general civil conspiracy principles apply to the conspiracy provision of the FCA." Id. (collecting cases). General civil conspiracy principles require relators to "show that the conspiring parties reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful agreement." Id. (quoting Gilbrook v. City of Westminster, 177 F.3d 839, 856 (9th Cir. 1999); accord United States ex rel. Osinek v. Kaiser Permanente, 2023 WL 4054279, at *8 (N.D. Cal. June 15, 2023). The Integra court went on to dismiss the FCA conspiracy claims, finding that "nothing in the SAC—beyond a conclusory allegation of conspiracy—alleges that the [defendants] set out with a joint purpose to submit false claims." Id. The court continued: "While Relator has plausibly alleged Defendants' plan was executed in a manner that predictably led to false claims, such that it was reckless for Defendants to disregard the fact that false claims were submitted, this does not necessarily mean that submitting false claims was Defendants' goal at the outset." Id.

The Court finds Relator's argument against the application of Integra and similar case law unpersuasive. In Allison Engine, the Supreme Court interpreted the FCA's statutory language for both FCA conspiracy claims and standard FCA false statement claims as requiring a specific intent to defraud the Government instead of just an "agree[ment] upon a fraud scheme that had the effect of causing a private entity to make payments using money obtained from the Government." Allison Engine, 553 U.S. 665, 672 (2008). Congress chose to override that decision in its 2009 amendments to the FCA, which were designed to impose FCA liability on subcontractors for "knowing[ly] submit[ting] a false claim to [a] general contractor and get[ting] paid with Government funds" when the subcontractor "intended to defraud . . . their general contractor." See S. Rept. No. 111-10 at 10 (2009). The 2009 amendments extended FCA liability to subcontractors who submitted false payment claims to government contractors; they did not involve the mens rea question at issue here, and Relator does not cite any case law indicating otherwise.

Having clarified the relevant standard, the Court now turns to the question of whether the SAC alleges "a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful agreement." Integra, 2019 WL 3282619, at *22. AD argues that the

allegations in the SAC are similar to those found insufficient in Integra, where the court dismissed the conspiracy claim, and that other cases which conclude that the mens rea requirement for conspiracy claims was adequately pleaded involve specific allegations of awareness of wrongdoing not included in the SAC here.  (Reply at 8.)  The Court agrees with AD.

First, Relator is correct that "a conspiracy can be based on an express agreement or an implied one."  Osinek, 2023 WL 4054279, at *8 (N.D. Cal. June 15, 2023).  But Relator fails to allege the existence of either an express or implied agreement, and instead offers only the following conclusory allegation (and reincorporation of the facts he previously alleged):

> As set forth above, Defendants, by and through their agents, officers, and employees, in violation of the FCA, 31 U.S.C. § 3729(a)(1)(C) and/or the California False Claims Act, Cal. Govt. Code § 12651 et seq., conspired to commit violations of 31 U.S.C. § 3729(a)(1) subparagraphs (A), (B), and (G), and/or Cal. Govt. Code § 12651 et seq.  Through communications and coordinated actions, as well as the individual actions noted above that promoted the false claims scheme, Defendants conspired to violate these laws.

(SAC ¶ 292.)  While the SAC presents sufficient allegations to demonstrate reckless disregard or deliberate inference for the reasons set out above, Relator has not alleged any meeting of the minds or other agreement to intentionally use Mohs CPT codes illegally.  As in Integra, "nothing in the SAC—beyond a conclusory allegation of conspiracy—allege[d] that the [defendants] set out with a joint purpose to submit false claims," and although Relator "plausibly alleged . . . that it was reckless for Defendants to disregard the fact that false claims were submitted, this does not necessarily mean that submitting false claims was Defendants' goal at the outset."  See Integra, 2019 WL 3282619, at *22.  Although Relator need not allege an explicit agreement between Defendants, he must do more than provide facts sufficient to allege reckless disregard or deliberate indifference and ask the Court to assume the existence of a conspiracy.  See Osinek, 2023 WL 4054279, at *8 ("For conspiracy, reckless disregard is not enough.").

For example, the Osinek court found a complaint sufficient where it alleged that a defendant became aware of issues with its diagnosing process via audits but nonetheless continued to pressure doctors to use that inaccurate process.  Id. at *9.  Given those facts, it was "plausible that [Defendant] entities implicitly agreed to submit factually false claims for payment to the United States."  Id.  Even so, the Osinek court described the issue as "arguably a close call."  Id.  And in United States ex rel. Switzer v. Wood, the relator's allegations were found sufficient to support a conspiracy claim where relator alleged that physicians entered into compensation agreements that they knew were illegal (and against hospital policy), and the business arrangement "inherently involved submitting false claims to the government."  2023 WL 6370877, at *3 (C.D. Cal. Aug. 10, 2023).  Both Osinek and Wood involved specific allegations of awareness of wrongdoing sufficient to give rise to an inference that the parties struck some sort of agreement to defraud the government, whether express or implied.  Relator's SAC provides sufficient facts demonstrating that Defendants acted with reckless disregard or

deliberate indifference but does not provide facts which permit the Court to infer conspiracy. The Court therefore **GRANTS** the AD Motion to dismiss Relator's conspiracy claim, **WITH LEAVE TO AMEND**.  See Lopez, 203 F.3d at 1127.

### 2. Rule 9(b) Particularity

Because the Court concludes that Relator's conspiracy claim must be dismissed for failure to state a claim under Rule 12(b)(6), it does not decide whether the claim also fails under Rule 9(b).

### C. Renewed Rule 12(b)(6) and 9(b) Arguments

Finally, Defendants ask the Court to reconsider many of its prior rulings on the sufficiency of the FAC with respect to the SAC.  (See AD Motion at 12–13.)  Specifically, Defendants suggest the Court should revisit its conclusions as to the following arguments: "(1) Relator's Mohs billing allegations do not state a claim for factual or legal falsity; (2) Relator does not plead materiality with the particularity demanded by Rule 9(b) for his main Mohs billing theory; (3) Relator does not plead a violation of the Anti-Kickback Statute ('AKS'); (4) Relator's 'medically unnecessary Mohs procedures' and 'false records' theories do not satisfy Rule 9(b) because he does not plead either falsity or the submission of claims to government payors with particularity; (5) Relator does not plead scienter or materiality for his CLIA and 'physician assistant supervision' claims; and (6) Relator's 'reverse false claim' count is redundant to his other FCA claims."  (Id. at 12; see generally Order on MTD.)

The Court will not revisit its prior rulings.  The SAC is virtually the same as the FAC with respect to these arguments.  Under the law of the case doctrine, "a court is generally precluded from reconsidering an issue previously decided by the same court, or a higher court in the identical case."  United States v. Lummi Indian Tribe, 235 F.3d 443, 452 (9th Cir. 2000). Defendants do not raise any proper grounds for reconsideration of the Court's prior rulings concerning the sufficiency of Relator's complaint.  See United States v. Cuddy, 147 F.3d 1111, 1114 (9th Cir. 1998) ("[A] court may have discretion to depart from the law of the case if: 1) the first decision was clearly erroneous; 2) an intervening change in the law has occurred; 3) the evidence on remand is substantially different; 4) other changed circumstances exist; or 5) a manifest injustice would otherwise result.").  The Court will not reconsider its conclusions.

## VI.  CONCLUSION

For the reasons above, the Court **GRANTS** the DD Motion and **DISMISSES** the FAC as to DD **WITHOUT LEAVE TO AMEND**, **GRANTS IN PART AND DENIES IN PART** the AD Motion and **DISMISSES** the conspiracy claim **WITH LEAVE TO AMEND**, and **VACATES** the February 26, 2024 hearing.  An amended complaint, if any, must be filed by **March 4, 2024**.

**IT IS SO ORDERED.**